UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                            )
TAKAISHA HENDERSON,  *et al*.,              )
                                            )
            Plaintiffs,                     )
                                            )
      v.                                    )  Civil Action No. 06-00947 (HHK)
                                            )
DISTRICT OF COLUMBIA,  *et al*.,            )
                                            )
            Defendants.                     )
_____ )

**DEFENDANT DISTRICT OF COLUMBIA'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendant District of Columbia, by and through counsel, respectfully moves this Court,

pursuant to Fed. R. Civ. Pro. 56 (c), to enter judgment in its favor.  In support of this motion the

Defendant states as follows:

1.  Defendant Off-duty Police Officer Edward Ford was not acting within the scope of his

employment when he shot and killed Ignatius Brown and, therefore, the District of Columbia

cannot be held liable under the theory of vicarious liability.  As such, the District of

Columbia moves for summary judgment on Counts I, II, and V.


A memorandum of points and authorities in support of this motion is attached.

Respectfully submitted,

PETER J. NICKLES
Acting Attorney General

GEORGE VALENTINE
Deputy Attorney General
Civil Litigation Division

NICOLE L. LYNCH [471953]
Assistant Attorney General
Civ. Lit. Div., Chief Section II

/s/David A. Jackson/s/
DAVID A. JACKSON [471535]
Assistant Attorney General
Office of the Attorney General
441 Fourth Street, NW, 6 South
Washington, D.C.  20001
Direct Line: (202) 724-6618
Facsimile: (202) 727-3625
E-mail:  davida.jackson@dc.gov

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____ )
                                          )
TAKAISHA HENDERSON,  *et al*.,            )
                                          )
            Plaintiffs,                   )
                                          )
        v.                                )  Civil Action No. 06-00947 (HHK)
                                          )
DISTRICT OF COLUMBIA, *et al*.,           )
                                          )
            Defendants.                   )
_____ )


**DEFENDANT DISTRICT OF COLUMBIA'S MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY
JUDGMENT**

**PRELIMINARY STATEMENT**

This case arises out of the February 22, 2006 shooting death of Ignatius Brown

(hereinafter "Mr. Brown") by Defendant off-duty Metropolitan Police Department Officer

Edward Ford (hereinafter "Officer Ford").   on May 19, 2006, Mr. Brown's children, Plaintiffs

Takaisha Henderson, Shakia Brown and Terrell Brown,  filed suit against the District of

Columbia (hereinafter "the District") and Officer Ford.  Ms. Henderson is the named personal

representative of the estate of Mr. Brown.  (Complaint ¶ 6).  Plaintiffs' brought suit for

negligence-survival (Count I), wrongful death (Count II), violation of the Fifth Amendment

pursuant to 42 U.S.C. § 1983 (Count III), deliberate indifference to police  training, supervision

and discipline pursuant to § 1983 (Count IV), excessive force (Count V), negligent hiring (Count

VI), and, negligent retention (Count VII).   Counts I through V are brought against both the

District and Officer Ford while Counts VI and VII are only against the District.

On August 8, 2006, this Court stayed this matter pending an investigation of Officer Ford by the United States Attorney's Office for the District of Columbia. The stay was lifted on or about May 5, 2007, after this Court was informed that United States Attorneys Office had issued a letter of declination and would not bring criminal charges against Officer Ford. (See Status Report filed the District at Docket No. 13).

On June 14, 2007, the District filed its answer to the complaint and asserted the defense that Officer Ford acted outside the scope of his employment and, thus, the District could not he held liable for Officer Ford's conduct. (See, District's Answer to the Complaint, Seventh Defense). Officer Ford, who is not represented by the DC Office of the Attorney General filed his answer on July 2, 2007.

On June 8, 2007, this Court granted a joint oral motion by counsel for all parties to allow limited discovery on the District's scope of employment defense and, thereafter, the District would file a dispositive motion on this limited issue. All discovery bearing on the issue of scope of employment has been completed. The District now files this motion for summary judgment on scope of employment, as it can not be vicariously liable for the acts of Officer Ford. The District of Columbia moves for summary judgment on Counts I, II, and V.

### STATEMENT OF FACTS

On February 22, 2006, Defendant off-duty Police Officer Edward Ford shot and killed Ignatius Brown during a confrontation on West Virginia Avenue, NE, Washington. The events leading up to the shooting began several weeks earlier when Officer Ford's girl friend Ms. Jessica Smith-Haynie (hereinafter "Ms. Smith-Haynie"), decided to purchase a house located at

1247 Oates Street, Northeast, from Mr. Brown's mother.  (Ford Depo. at 16).  The Smith-Haynie

and Brown families have known each other for many years.[1]  According to Ms. Smith-Haynie,

she is the mother of five children and was looking for a place to live when she found out that

Mrs. Brown was moving out of the house at 1247 Oates Street.  (Exhibit 3).  According to Ms.

Smith-Haynie, when she went to look at the house she was appalled by its condition.  *Id*.  Ms.

Smith-Haynie stated that H-pack, the finance company, would not finance the purchase of the

house on an "as-is" basis.  *Id.*  According to Ms. Smith-Haynie, she then signed an addendum to

the original purchase agreement to allow her and Officer Ford to complete the repairs to the

house.  *Id*.   At this time, Mrs. Brown was not living in the house but her son  Mr. Brown was.

(Ford Depo. at 17-19).

        In order to get the house in a suitable condition to pass an inspection, with the finance

company, Officer Ford and Ms. Smith-Haynie began to renovate the property.  (Ford Depo. at

90).  Officer Ford testified that during the first walk through of the house, he met Mr. Brown

during the walk through.  (Ford Depo at 15-16).  Officer Ford brought to and left at the house a

number of tools his which included a ladder, table saw, nailing guns, finishing gun, hammers,

nails, compressor, levelers, etc.  (Ford Depo. at 23-24).  Officer Ford estimated that the tools

were valued at three-thousand dollars ($3000.00).   Since Mr. Brown was still occupying the

premises, Officer Ford entered into a contractual relationship with Mr. Brown, wherein Officer

Ford paid Mr. Brown two-hundred dollars ($200) to paint and clean up the house.  (Ford Depo.

at 20-21).   According to Officer Ford, Mr. Brown completed only about twenty percent (20%)

of the work. *Id.*   At one point, Mr. Brown approached Ms. Smith-Haynie and asked for more

---

[1] According to Ms. Smith-Haynie, her mother has known the Brown family since before Ms. Smith Haynie's birth
and her mother, working as a nurse, actually delivered Mr. Brown.  (Exhibit 3).

money.  (Ford Depo. at 23-24).  Officer Ford testified that he told Mr. Brown that he, Mr.

Brown, had to deal with him, Officer Ford, about money.  (Ford Depo. at 21-22).

Officer Ford testified that he had been at the house on twenty to thirty occasions.  Officer

Ford testified that he had observed in the front bedroom drug paraphernalia, including "crack

pipe and other things."  (Ford Depo at 87-89).   Officer Ford also testified that

he found hypodermic needles in the basement.  (Ford Depo at 93-94).  Officer Ford testified that

he never confronted Mr. Brown about the drug paraphernalia because Officer Ford's focus was

on getting the house ready for inspection. (Ford Depo at 87-89).  Officer Ford further testified

that he did not investigatie how the needles ended up in the basement.  (Ford Depo at 94).

Officer Ford testified that "it wasn't my responsibility to probe and see if [Mr. Brown] was on

drugs or if [Mr. Brown] had anything illegal." (Ford Depo at 88).  Officer Ford further testified

that in the District of Columbia possession of drug paraphernalia is illegal.  (Ford Depo at 89).

On February 16, 2006, a week prior to the shooting, Officer Ford went to 1247 Oak

Street to do work and noticed that his tools were missing. (Ford Depo. at 24).   A neighbor told

Officer Ford that Mr. Brown had taken Officer Ford's tools and offered to sell them to him.

(Ford Depo. at 26).    According to Officer Ford, the neighbor recognized the tools as belonging

to Officer Ford because Officer Ford's initials appeared on the tools.  (Ford Depo. at 26-27).

Officer Ford testified that his initials, the last four digits of his social security number and tag

number are engraved on all his tools.  *Id.*

Later that same evening, at approximately 8:30 PM, Mr. Brown appeared at the house

and Officer Ford confronted him about the tools. (Ford Depo. at 27-28).  Officer Ford testified

that Mr. Brown asked Officer Ford to give him a few days to get the tools back.  *Id.*  Officer

Ford testified that he responded by telling Mr. Brown that he, Officer Ford, was going to call the

police and Mr. Brown could tell his story to them. *Id.* Officer Ford testified that Mr. Brown then ran from the house and Officer Ford chased after him. (Ford Depo. at 29). Officer Ford lost sight of Mr. Brown who had ran into an alley. (Ford Depo. at 30)

At the time that Officer Ford chased Mr. Brown, Officer Ford was off-duty and not in uniform. Officer Ford did have his police issued radio, service weapon and police identification on him. (Ford Depo. at 32-35). Officer Ford radioed for assistance and when uniformed officers arrived, Officer Ford spoke with a Detective Tecobaum who told Officer Ford that he would seek a warrant for Mr. Brown due to the value of the tools. (Ford Depo. at 37). Officer Ford also testified that an "official" who had also arrived on the scene told him to "leave it alone." (Ford Depo. at 36). A police report was completed based upon Officer Ford's complaint. Officer Ford testified that once he filed his police report about the missing tools, it would be normal police procedure for the report to be investigated by someone else. (Ford Depo. at 116-117). Officer Ford testified that neither Detective Tecobaun nor the "official" on the scene asked Officer Ford to assist in the arrest of Mr. Brown. (Ford Depo. at 119-120).

Sergeant Colin Hall, of the Fifth District, was one of the officials who arrived on the scene. (Affidavit of Sergeant Hall). Sergeant Hall told Officer Ford to let the investigators handle the investigation into the theft of his tools. *Id.* Sergeant Hall advised Officer Ford that based on the information they had at that time the case needed to be investigated further and the police may not have probable cause to make an arrest. *Id.* Sergeant Hall further told Officer Ford that at "this point Fifth District officers would identify Mr. Brown if he was stopped as part of the investigation." *Id.*

Subsequent to these events but prior to the day of the shooting, Officer Ford spoke to Mr. Brown's brother, Eugene Brown, about the theft of the tools. (Ford Depo. at 104). According to

Officer Ford, Eugene Brown told Officer Ford that he would reimburse Officer Ford for the tools once the house was sold.  (Ford Depo. at 104).  Officer Ford testified that he accepted Eugene Brown's offer.  (Ford Depo. at 105).

The events of the day of the shooting unfolded as follows:  Officer Ford and Ms. Smith-Haynie were driving on  West Virginia Avenue, Northeast towards Neal Street.  When Officer Ford reached the intersection of West Virginia Avenue and Neal Street he saw Mr. Brown walking on West Virginia Avenue.  Officer Ford proceeded through the intersection and parked on West Virginia Avenue.  Officer Ford got out of his car, approached Mr. Brown and said to Mr. Brown "why did you steal from me?"  (Ford Depo. at 141-143).  According to Ms. Smith-Haynie, she heard Officer Ford say something to the effect of "Gary, I want to talk to you about the tools, it's okay, I talked to your brother." (Exhibit 3).   According to Officer Ford, his purpose of approaching Mr. Brown was to have a uniformed police officer on the scene to run a warrant check.  (Ford Depo. at 44-45).

Officer Ford testified that Mr. Brown became agitated, took off his book-bag and began pacing back and forth.  Officer Ford testified that Mr. Brown said "look, I can't go back to jail.  It's not about you, it's about me.  You don't understand, you don't understand."  (Ford Depo. at 47-49).   According to Officer Ford, Mr. Brown then began swinging and making karate moves. (Ford Depo at 49).  Officer Ford testified that he extended his left hand to push Mr. Brown away. *Id*.  Officer Ford further testified that Mr. Brown struck him in the shoulder area but because Officer Ford was wearing padded clothing the blows had no effect.  (Ford Depo at 49-50, 70).

According to Officer Ford, Mr. Brown became more aggressive and continued to approach Officer Ford.  *Id*.  Officer Ford testified that Mr. Brown repeatedly stated "I am not going back to jail.  I am not going back to jail."  *Id*.  Officer Ford stated that he had to push Mr.

Brown away a second time. *Id.* (Ford Depo at 49). Officer Ford testified that while these events are going on he was continuously backing up. (Ford Depo at 50). Officer Ford testified that when he reached the corner of Neal Street and West Virginia Avenue, Mr. Brown jumped at him a third time. *Id.* According to Officer Ford, he then reached into the small of his back and retrieved his service revolver. *Id.* According to Officer Ford, he initially held the gun down towards the ground. (Ford Depo at 51). Officer Ford testified that Mr. Brown then stated "fuck it. I am not going back to jail" and then ran towards and leaped at him. (Ford Depo at 51-53). According to Officer Ford, Mr. Brown was approximately three to four feet away when Officer Ford shot Mr. Brown. (Ford Depo at 53, 78-79). Officer Ford testified that he did not see Mr. Brown with a weapon nor did Mr. Brown state that he had a weapon. (Ford Depo at 51, 56).

District of Columbia Municipal Regulation, Title 6 A, Chapter 2, § 200.5 provides: "Member of the force shall promptly obey any order emanating from a superior officer." Assistant Chief of Police Peter Newsham (hereinafter "Chief Newsham") testified that Officer Ford was not acting within the scope of his employment because Officer Ford was given a direct order by a Sergeant not to participate in the investigation of the case involving Mr. Brown. (Chief Newsham's Depo. at 14-15). Chief Newsham testified that anything that Officer Brown did in violation of an order from Officer Ford's superior would have been outside the scope of his employment. *Id.* Chief Newsham also testified that Officer Ford's actions violated the MPD Code of Ethics as setforth in General Order (GO) RAR-201.36 which provides in pertain part: "I will never act officiously or permit personal feeling, prejudices, political beliefs, aspirations, animosities, or friendships to influence my decisions." Additionally, Chief Newsham testified that Officer Ford's actions also violated GO 201.26 § Part I, B (28) which prohibits a police officer from interfering in the investigation of another police officer.

On these facts the District asserts that Officer Ford was not acting with the scope of his

employment when he shot and killed Mr. Brown and, therefore, the District is entitled to

judgment on this issue.

## STANDARD FOR SUMMARY JUDGMENT

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall

be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on

file, together with the affidavits, if any, show that there is no genuine issue as to any material fact

and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

Summary judgment is not a disfavored procedural shortcut, but rather is an integral part

of the overall design of the rules of civil procedure, which is to secure the just, speedy, and

inexpensive determination of every action. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

The party moving for summary judgment bears the initial responsibility of informing the trial

court of the basis for its motion and identifying those portions of the record which it believes

demonstrate the absence of a genuine issue of material fact. *Alexis v. District of Columbia*, 44 F.

Supp. 331, 337 (D.D.C. 1999); *Celotex*, 477 U.S. at 323. Material facts relate to the substantive

law governing the case and are those facts which would affect the outcome of the case.

*Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986).

When the moving party has carried its burden, the responsibility shifts to the nonmoving

party to show that there is, in fact, a genuine issue of material fact for trial. *Alexis,* 44 F. Supp. at

337. The opposing party must provide "specific facts showing that there is a genuine issue for

trial," and "may not rely on mere allegations or denials to prevail." *Id.* The trial court must enter

summary judgment against a nonmoving party who fails to make a showing sufficient to

establish the existence of an element essential to that party's case, and on which the party will

bear the burden of proof at trial.  *Celotex*, 477 U.S. at 322;  *see also Alexis,* 44 F. Supp. at 337

("Rule 56(c) *mandates* summary judgment" in this circumstance) (emphasis added).

A party may defeat a properly-supported summary judgment motion only by providing a

"response, by affidavits or as otherwise provided in this Rule, [setting] forth specific facts

showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  Rule 56(e) directs that

summary judgment "shall be entered against the adverse party" if that party fails to raise a

genuine issue for trial.  *See Anderson,* 477 U.S. at 249 ("[T]here is no issue for trial unless there

is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party");

*see also Celotex,* 477 U.S. at 324 ("a party who fails to make a showing sufficient to establish

the existence of an element essential to establish that party's case, and on which that party will

bear the burden at trial" cannot withstand a motion for summary judgment).

## ARGUMENT

### I.       The District is entitled to summary judgment because Officer Ford's conduct was outside the scope of his employment and, therefore, the District cannot be held liable.

An employer can be liable under a theory of *respondeat superior* for the tort of one of its

employees when the employee is acting within the scope of his or her employment.  *Weinberg v.

Johnson*, 518 A. 2d 985, 988 (D.C. App. 1986) (*Johnson II*).  Scope of employment questions

are governed by the law of the place where the employment relationship exists. *Williams v.

United States,* 350 U.S. 857, (1955); *Majano v. United States*, 469 F.3d 138, 141 (D.C. Cir.

2006); *Hoston v. Silbert,* 681 F.2d 876 (D.C. Cir. 1982).   Thus, in order to resolve the scope of

employment question presented in this case, this court must look to the law of the District of

Columbia.

The District of Columbia has adopted the definition of scope of employment in § 228 of the Restatement (Second) of Agency (1957). *Moseley v. Second New St. Paul Baptist Church,* 534 A.2d 346, 348 n.4 (D.C. 1987); *accord, District of Columbia v. Coron,* 515 A.2d 435, 437 (D.C. 1986); *Weinberg v. Johnson,* 434 A. 2d 404, 408 (D.C. App. 1981) (*Johnson I*). That section of the Restatement provides:

> (1) Conduct of a servant is within the scope of employment if, but only if:
>
>> (a) it is of the kind he is employed to perform;
>>
>> (b) it occurs substantially within the authorized time and space limits;
>>
>> (c) it is actuated, at least in part, by a purpose to serve the master, and,
>>
>> (d) if force is intentionally used by the servant against another, the use of force is not unexpected by the master.
>
> (2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.

Restatement (Second) of Agency § 228.

Thus, under District of Columbia law, an employer can be held liable under a theory of *respondeat superior* for the intentional torts of its employee. However, an employer will not be held liable for the intentional tort of its employees when the conduct is solely in furtherance of the employee's personal interest and not that of the employer. *Johnson I,* at 408. "An act is not within the scope of employment if done for the employee's purpose only; unless the tort occurred at least in part as a result of a desire to serve the employer, the employer is not liable." *District of Columbia, et al. v. Davis, et al*., 386 A.2d 1195, 1203, (D.C. App. 1978). In addition, the tortuous act "must be of the same general nature as that authorized, or incidental to the conduct authorized." *Id.* In *Johnson I,* the court further explained that the tort must be "the

12

outgrowth of a job-related controversy." *Johnson I, supra* at 408*; Penn Central Transportation Co., v. Reddick*, 398 A.2d 27, 32 (D.C. App. 1979).

When the intentional tort is an assault, the factors to be considered when determining scope of employment are "(1) the nature of the employee's job, (2) whether the assault occurred while the employee was furthering his employer's business, (3) whether the act was personal in nature and wholly unrelated to the employment relationship, and (3) whether the act was unprovoked and unexpected." *Id*. In *Haddon*, the Court held that an intentional assault falls within the scope of employment if it was connected to a "job-related controversy." *Haddon v. United States*, 68 F.3d 1420, 1424 (D.C. Cir. 1995) (applying D.C. Court of Appeals case law). In *Haddon*, the Court of Appeals for the District of Columbia Circuit held that a White House electrician was not acting within the scope of his employment when he threatened the White House chef with physical harm. *Id*. at 1424. The Court noted that the electrician's "alleged tort did not arise directly out of his instructions or job assignment as a White House electrician" because "[u]nlike the … shooting in *Johnson*, the electrician's threat did not stem from a dispute over the performance of his work." *Id*.

In *Penn Central Transportation Co. v. Reddick*, 398 A.2d 27 (D.C. App. 1979), the court held that a railroad employee was not acting within the scope of his employment when he kicked a taxicab driver while traveling between work sites. It concluded that the employee's action "was neither a direct outgrowth of [his] instructions or job assignment, nor an integral part of the employer's business activity," noting that "nothing in the business of running a railroad . . . makes it likely that an assault will occur between a railroad brakeman and a taxicab driver over the celerity with which the latter will provide a taxicab ride to the former." *Id*. at 32; *see also*

*Boykin*, 484 A.2d at 564 (teacher was not acting within scope of employment when he sexually assaulted student because teacher was not then performing teaching responsibilities).

In *Johnson I*, plaintiff brought suit against a laundromat owner after being shot in the face by a laundromat employee. 518 A.2d 985, 986 (D.C. 1986). The employee had been hired to take dry clothes out of the machines, and he and the plaintiff were initially involved in a verbal dispute over the location of the plaintiff's shirts. The plaintiff had given up on the argument and turned to leave. When he turned back, the employee shot him in the face. Despite this unprovoked behavior, the D.C. Court of Appeals held that the employee's intentional shooting of the plaintiff was within the scope of his employment, because his dispute with the plaintiff had arisen out of his job duties, writing:

> As the law has evolved, the intent or purpose criterion has become broad enough to embrace an intentional tort arising out of any dispute that "was originally taken on the employer's behalf." Instead, "the present trend is to extend liability for intentional torts to situations where the employer provides a 'peculiar opportunity and … incentive for such loss of temper, … as where an argument is likely by virtue of the servant's duties, and the conduct is wholly or partially in furtherance of the master's business.

*Id.* at 991.

In *District of Columbia v. Coron*, an off-duty police officer beat plaintiff after plaintiff kicked the wheel of the officer's vehicle. 515 A.2d 435 (D.C. App. 1986) Plaintiff sued the District of Columbia and the police officer for intentional torts. The jury returned a verdict in favor of plaintiff based solely upon the principles of *respondeat superior* liability. On appeal, plaintiff argued that since the Metropolitan Police Regulation required that officers are always on duty the District is liable for the intentional torts committed by one of its employees. The Court rejected this argument and explained:

> We do not, however, interpret such regulation as imposing liability on an employer for the intentional torts of its employee where the employee's conduct was motivated solely by personnel reasons.

> To apply such regulations to a dryly logical extreme, as appellee argues, would impose liability on the District regardless of the nature of an officer's conduct.  This we are unprepared to do.

*Id.* 438.

In *Jordan, et al.  v. Medley, et al*., the Court of Appeals for the District of Columbia Circuit reversed a jury verdict finding that the employee was acting within the scope of his employment when the employee pointed a shot gun at plaintiff during a dispute.  711 F.2d 211, (D.C. Cir. 1983).  In that case, plaintiff was a tenant of defendant.  Defendant's employee went to plaintiff's house to give plaintiff a notice of a rent increase.  A heated argument ensued and plaintiff torn up the notice in front of the employee.  The employee left the premises and returned an hour later.  Plaintiff and the employee again began to argue but this time the employee banished a rifle.  Plaintiff sued the employer, under a theory of vicarious liability, for assault and intentional infliction of emotional distress.  The trial court instructed the jury that "[the employee] was engaged upon the business of the employer … at the time of the incident."   The Court of Appeals held that the instruction was not proper because it amounted to directing a verdict for the plaintiff on whether the employee was acting within the scope of his employment.  The Court stated "an intentional tort, which by it nature is willful and thus more readily suggests personal motivation."  *Id.* at 215-216.  The Court further explained "The outrageous quality of an employee's act may well be persuasive in considering whether his motivation was purely personal. *Id.*

In *Manjano v. United States*, plaintiff sued a fellow employee of the Smithsonian Institute for an alleged assault.  469 F.3d 138 (D.C. Cir. 2006).  The employee pushed plaintiff as the employee entered the office building through an unsecured door.  Plaintiff had been instructed not to allow people to enter the building without identification.  The assault on

plaintiff occurred because plaintiff had asked the employee for identification. The employee

continued to pursue plaintiff, muttering obscenities and calling plaintiff stupid.  The employee

grabbed a strap that was around plaintiff's neck and repeatedly pulled on it.  As a result, plaintiff

alleged that she has suffered a herniated disk in her neck.  The case was originally filed in the

DC Superior Court but removed to federal court when the Attorney General of the United States

certified that the employee had been acting within the scope of her employment.  The United

States then moved for summary judgment which was granted by the trial court.  On appeal, the

Court of Appeals reversed.  In so doing, the Court reasoned that there was evidence from which

a jury could conclude that the employee conduct was not "actuated, at least in part, by a purpose

to serve the [Smithsonian]."   The Court went on to say that "the key inquiry is the employer's

intent at the time moment of the tort."  *Id*. at 141-142.

Applying the principles set forth in Restatement (Second) of Agency, as adopted by the

DC Court of Appeals, and the legal principles developed through case law, no jury could

reasonable find that Officer Ford was acting within the scope of his employment on February 22,

2006 when he shot and killed Mr. Brown.  Officer Ford's confrontation with Mr. Brown was not

the "outgrowth of a job related controversy" but was "personal in nature" and in furtherance  of

the employee's personal interest and not that of the employer.  The controversy between Officer

Ford and Mr. Brown arose from the fact that Officer Ford believed that Mr. Brown had stolen

Officer Ford's tools and Officer Ford's desire to retrieve his tools back from Mr. Brown..

The relationship between Officer Ford and Mr. Brown did not originate as a result of

Officer Ford performing his police duties but rather the relationship originated from the

contractual relationship between Officer Ford and Mr. Brown.  This contractual relationship

arose because of Officer Ford's personal relationship with Ms. Smith-Haynie, whose family

knew Mr. Brown's family for many years. Officer Ford entered into a contractual relationship with Mr. Brown, wherein Officer Ford paid Mr. Brown two-hundred dollars ($200) to paint and clean up. (Ford Depo. at 20-21). Mr. Brown had completed about twenty percent of the work. At one point, Mr. Brown approached Officer Ford's girlfriend, Ms. Smith-Haynie, and asked for more money. (Ford Depo. at 23-24). Officer Ford told Mr. Brown that he, Mr. Brown, had to deal with him, Officer Ford, about money. (Ford Depo. at 21-22). Accordingly, the controversy arose out of the business relationship between Officer Ford and Mr. Brown.

Officer Ford's actions were not actuated by a purpose to serve his employer – the District of Columbia Metropolitan Police Department. On the day of the shooting, when Officer Ford approached Mr. Brown, he did not do so in his capacity as a police officer. Officer Ford states he said to Mr. Brown "why did you steal from me?" (Ford Depo. at 141-143). Ms. Smith-Haynie, heard Officer Ford say something to the effect of "Gary, I want to talk to you about the tools, it's okay, I talked to your brother." (Exhibit 3).

The personal nature of Officer Ford's confrontation with Mr. Brown is also shown by the fact that Officer Ford took no action when he found drug paraphernalia in the bedroom and basement of the house at 1247 West Virginia Avenue. Although Officer Ford knew that in the District of Columbia possession of drug paraphernalia is illegal, he did not confront Mr. Brown who was occupying the premises or investigate how the needles ended up in the basement because as Officer Ford testified his focus was on getting the house ready for inspection. (Ford Depo at 87-89). Moreover, Ford testified that "it wasn't my responsibility to probe and see if [Mr. Brown] was on drugs or if [Mr. Brown] had anything illegal." (Ford Depo at 87-89). Thus, it was only when Mr. Brown's conduct - theft of his tools - affected Officer Ford personally, did Officer Ford confront Mr. Brown.

Additionally, Officer Ford's actions were not actuated by a purpose to serve the District because his actions were in direct violation of the District's Municipal Regulations and MPD General Orders. Officer Ford testified that during the events that transpired a week prior to the shooting an "official" told him to "leave it alone." (Ford Depo. at 36). Sergeant Colin Hall was one of the officials who arrived on the scene. (Affidavit of Sergeant Hall). Sergeant Hall told Officer Ford to let the investigators handle the investigation into the theft of his tools. *Id.* Sergeant Hall advised Officer Ford that based on the information they had at this time, that the case needed to be investigated further and the police may not have probable cause to make an arrest. *Id.* Sergeant Hall further told Officer Ford that at "this point Fifth District officers would identify Mr. Brown if he was stopped as part of the investigation." *Id.*

Officer Ford's actions on February 22, 2006 were contrary to Title 6A, DCMR, Chapter 2, § 200.5 which provides: "Member of the force shall promptly obey any order emanating from a superior officer." Officer Ford testified that once he filed his police report about the missing tools, it would be normal police procedure for the report to be investigated by someone else. (Ford Depo. at 116-117). Officer Ford testified that neither Detective Tecobaun nor the "official" on the scene asked Officer Ford to assist in the arrest of Mr. Brown. (Ford Depo. at 119-120). GO 201.26 § Part I, B (28) prohibited Officer Ford from interfering in the investigation of another police officer. Lastly, Officer Ford's personal pursuit of Mr. Brown also violated the Code of Ethics as set forth in General Order (GO) RAR-201.36 which provides in pertain part: "I will never act officiously or permit personal feeling, prejudices, political beliefs, aspirations, animosities, or friendships to influence my decisions." Thus, Officer Ford's consciously chose to ignore District regulations and MPD GO's, his action were personal in nature and not actuated by a purpose to serve his employer.

18

## CONCLUSION

For the forgoing reasons, the District's motion for summary judgment as to its affirmative defense that Officer Ford was not acting within the scope of employment on February 22, 2006 when he shot and killed Mr. Brown should be granted.  As such, judgment should be entered for the District of Columbia as to Counts I, II, and V as the District can not be held liable under *respondeat superior*.

Respectfully submitted,

PETER J. NICKLES
Acting Attorney General

GEORGE VALENTINE
Deputy Attorney General
Civil Litigation Division

NICOLE L. LYNCH [471953]
Assistant Attorney General
Civ. Lit. Div., Chief Section II

/s/David A. Jackson/s/_____
DAVID A. JACKSON [471535]
Assistant Attorney General
Office of the Attorney General
441 Fourth Street, NW, 6 South
Washington, D.C.  20001
Direct Line: (202) 724-6618
Facsimile: (202) 727-3625
E-mail:  davida.jackson@dc.gov

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                          )
TAKAISHA HENDERSON, *et al.*,              )
                                          )
        Plaintiffs,                        )
                                          )
    v.                                     )   Civil Action No. 06-00947 (HHK)
                                          )
DISTRICT OF COLUMBIA, *et al.*,            )
                                          )
        Defendants.                        )
_____ )

**DEFENDANTS' STATEMENT OF MATERIAL FACTS
AS TO WHICH THERE IS NO GENUINE ISSUE**

Defendant District of Columbia, by and through the Office of the Attorney General,

hereby, submits the following statement of material facts as to which there is no genuine issue.

1.      Exhibit 1 is a true and accurate copy of portions of Officer Edward Ford's
        deposition transcript.

2.      Exhibit 2 is a true and accurate copy of portions of Assistant Chief Peter
        Newsham's deposition transcript.

3.      Exhibit 3 is true and accurate copy of a Report of Investigation concerning the
        interview of Ms. Jessica Smith-Haynie.

4.      Exhibit 4 is a true and accurate copy of relevant sections of Title 6 A DCMR,
        Chapter 2, § 200.5.

5.      Exhibit 5 is a true and accurate copy of relevant sections MPD General Order
        201.26, Part I, B, (28).

6.      Exhibit 6 is a true and accurate copy of relevant sections MPD General Order
        201.36, § III.

7.      Exhibit 7 is a true and accurate copy of an Affidavit of Sergeant Colin Hall.

8.      On February 22, 2006 Defendant off-duty Police Officer Edward Ford shot and
        killed Ignatius Brown during a confrontation on West Virginia Avenue, NE,
        Washington.

9.     The events leading up to the shooting began several weeks earlier when Officer Ford's girl-friend Ms. Jessica Smith-Haynie decided to purchase a house, located at 1247 Oates Street, Northeast, from Mr. Brown's mother.

10.    Mr. Brown's mother was not living in the house but Mr. Brown was.

11.    When Ms. Smith-Haynie, when she went to look at the house she was appalled by its condition and would not be approved by the finance company unless renovations were done.

12.    Ms. Smith-Haynie, she then signed an addendum to the original purchase agreement to allow her and Officer Ford to complete the repairs to the house.

13.    In order to get the house in a suitable condition to pass an inspection Officer Ford and Ms. Smith-Haynie began to renovation the property.  (Ford Depo. at 90).

14.    During the first walk through of the house, Officer Ford met Mr. Brown.  (Ford Depo at 15-16 ).

15.    Officer Ford brought to and left at the house a number of tools which included a ladder, table saw, nailing guns, finishing gun, hammers, nails, compressor, levelers, etc.  (Ford Depo. at 23-24).

16.    Officer Ford entered into a contractual relationship with Mr. Brown, wherein Officer Ford paid Mr. Brown two-hundred dollars ($200) to paint and clean up. (Ford Depo. at 20-21).

17.    According to Officer Ford, Mr. Brown completed only about twenty percent (20%) of the work. *Id.*

18.    At one point, Mr. Brown approached Ms. Smith-Haynie and asked for more money.  (Ford Depo. at 23-24).  Officer Ford told Mr. Brown that he, Mr. Brown, had to deal with him, Officer Ford, about money.  (Ford Depo. at 21-22).

19.    Officer Ford observed in the front bedroom drug paraphernalia, including "crack pipe and other things."  (Ford Depo at 87-89).   Officer Ford found hypodermic needles in the basement.  (Ford Depo at 93-94).

20.    Officer Ford never confronted Mr. Brown about the drug paraphernalia because Officer Ford's focus was on getting the house ready for inspection. (Ford Depo. at 87-89).

21.    Officer Ford believed that "it wasn't [his] responsibility to probe and see if [Mr. Brown] was on drugs or if [Mr. Brown] had anything illegal." (Ford Depo. at 88).

22.    Officer Ford further knew that in the District of Columbia possession of drug
       paraphernalia is illegal.  (Ford Depo at 89).

23.    A week prior to the shooting, Officer Ford went to 1247 Oak Street to do work
       and noticed that his tools were missing. (Ford Depo. at 24).

24.    A neighbor told Officer Ford that Mr. Brown had taken Officer Ford's tools and
       offered to sell them to him.  (Ford Depo. at 26).

25.    The neighbor recognized the tools as belonging to Officer Ford because Officer
       Ford's initials appeared on the tools.  (Ford Depo. at 26-27).   Officer Ford
       testified that his initials, the last four digits of his social security number and tag
       number are engraved on all his tools.  *Id*.

26.    Later that same evening, at approximately 8:30 PM, Mr. Brown appeared at the
       house and Officer Ford confronted him about the tools. (Ford Depo. at 27-28).

27.    Mr. Brown asked Officer Ford to give him a few days to get the tools back.  *Id*.

28.    Officer Ford told Mr. Brown that he, Officer Ford, was going to call the police
       and Mr. Brown could tell his story to them.  *Id*.

29.    Mr. Brown then ran from the house and Officer Ford chased after him.  (Ford
       Depo. at 29).  Officer Ford lost sight of Mr. Brown who had ran into an alley.
       (Ford Depo. at 30).

30.    Officer Ford was off-duty and not in uniform but he did have his police issued
       radio, serve weapon and police identification on him.  (Ford Depo. at 32-35).

31.    When uniformed officers arrived, Officer Ford spoke with a Detective Tecobaum
       who told Officer Ford that he would seek a warrant for Mr. Brown due to the
       value of the tools.  (Ford Depo. at 37).

32.    Officer Ford was told by an "official" who had also arrived on the scene told him
       to "leave it alone."  (Ford Depo. at 36).

33.    Officer Ford knew that once he filed his police report about the missing tools, it
       would be normal police procedure for the report to be investigated by someone
       else.  (Ford Depo. at 116-117).

34.    Neither Detective Tecobaun nor the "official" asked Officer Ford to assist in the
       arrest of Mr. Brown.  (Ford Depo. at 119-120).

35.    Sergeant Colin Hall was one of the official who arrived on the scene.  (Affidavit
       of Sergeant Hall).  Sergeant Hall told Officer Ford to let the investigators handle
       the investigation into the theft of his tools. *Id*.  Sergeant Hall advised Officer Ford

that based on the information they had at this time, that the case needed to be investigated further and the police may not have probable cause to make an arrest at that. *Id.* Sergeant hall further told Officer Ford that at "this point Fifth District officers would identify Mr. Brown if he was stopped as part of the investigation." *Id.*

36.    Mr. Brown's brother, Eugene Brown, about the left of the tools. (Ford Depo. at 104). According to Officer Ford, Eugene Brown told Officer Ford that he would reimburse Officer Ford for the tools once the house was sold. (Ford Depo. at 104).

37.    Officer Ford accepted Eugene Brown's offer. (Ford Depo. at 105).

38.    The events of the day of the shooting Officer Ford was driving on West Virginia Avenue, Neal Street when he saw Mr. Brown walking on West Virginia Avenue.

39.    Officer Ford proceeded through the intersection and parked on West Virginia Avenue. Officer Ford got out of his car, approached Mr. Brown and said to Mr. Brown "why did you steal from me?" (Ford Depo. at 141-143).

40.    Ms. Smith-Haynie, she heard Officer Ford say something to the effect of "Gary, I want to talk to you about the tools, it's okay, I talked to your brother." (Exhibit 3).

41.    A confrontation between Officer Ford and Mr. Brown followed resulting in Officer Ford shooting Mr. Brown.

42.    Officer Ford testified that he did not see Mr. Brown with a weapon nor did Mr. Brown stated that he had a weapon. (Ford Depo at 51, 56).

43.    Officer Ford was off-duty at the time of the shooting.

44.    District of Columbia Municipal Regulation, Title 6 A, Chapter 2, § 200.5 provides: "Member of the force shall promptly obey any order emanating from a superior officer."

45.    MPD Code of Ethics as setforth in General Order (GO) RAR-201.36 which provides in pertain part: "I will never act officiously or permit personal feeling, prejudices, political beliefs, aspirations, animosities, or friendships to influence my decisions."

46.    MPD GO 201.26 § Part I, B (28) prohibits a police officer from interfering in the investigation of another police officer.

47.    Officer Ford was not acting within the scope of his employment when he shot and killed Mr. Brown on February 22, 2006.

Respectfully submitted,

PETER J. NICKLES
Acting Attorney General

GEORGE VALENTINE
Deputy Attorney General
Civil Litigation Division

NICOLE L. LYNCH [471953]
Assistant Attorney General
Civ. Lit. Div., Chief Section II

/s/David A. Jackson/s/
DAVID A. JACKSON [471535]
Assistant Attorney General
Office of the Attorney General
441 Fourth Street, NW, 6 South
Washington, D.C.  20001
Direct Line: (202) 724-6618
Facsimile: (202) 727-3625
E-mail:  davida.jackson@dc.gov

# EXHIBIT 1

COPY

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF VIRGINIA

- - - - - - - - - - - - - - - - X

TAKAISHA HENDERSON, et al.,          :

        Plaintiffs,          :

   vs.                              : 1:06CV00947

DISTRICT OF COLUMBIA, et al.,        :

        Defendants.          :

- - - - - - - - - - - - - - - - X

               Washington, D.C.

               Tuesday, August 7, 2007

Deposition of:

       OFFICER EDWARD MICHAEL FORD,

a witness herein, called for examination by Counsel

for the Plaintiffs in the above-entitled matter,

pursuant to notice, taken at Cohen & Cohen, P.C., 1821

Jefferson Plcae, N.W., 4th Floor, Washington, D.C.,

beginning at 10:00 a.m., before Joan D. Carino, a

court reporter and notary public in and for the

District of Columbia.



Precise Reporting Services
(301) 210-5092
Serving MD, D.C. & VA

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

2

1   APPEARANCES:

2       On behalf of the Plaintiffs:

3           Adam R. Leighton, Esquire

4           Cohen & Cohen, P.C.

5           1821 Jefferson Place, N.W., 4th Floor

6           Washington, D.C.  20036

7           (202) 955-4529

8

9

10      On behalf of the Defendant, The District of

11   Columbia:

12           David A. Jackson, Esquire

13           Office of the Attorney General

14           District of Columbia

15           441 Fourth Street, N.W., 6 South

16           Washington, D.C. 20001

17           (202) 724-6618

18

19

20

21

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

3

1       On behalf of the Defendant, Officer Ford:

2           James W. Pressler, Jr., Esquire

3           Marc L. Wilhite, Esquire

4           Pressler & Senftle, P.C.

5           927 15th Street, N.W., 12th Floor

6           Washington, D.C.  20005

7           (202) 822-8384

8

9

10

11

12

13

14

15

16

17

18

19

20

21

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

5

1          OFFICER EDWARD M. FORD,

2   a witness of lawful age, was duly sworn by the notary

3   public and, being examined by counsel, testified as

4   follows:

5          EXAMINATION BY COUNSEL FOR THE PLAINTIFFS:

6              BY MR. LEIGHTON:

7          Q.   Can you please state your name for the

8   record.

9          A.   My name is Edward Michael Ford.

10         Q.   Mr. Ford, have you ever had your deposition

11   taken before?

12         A.   Yes.

13         Q.   On how many occasions?

14         A.   One.

15         Q.   What was that regarding?

16         A.   The mailbox incident in Georgetown.

17         Q.   That was a few years ago, correct?

18         A.   Yes.

19         Q.   Just to give you a quick  summary of the

20   groundrules -- well, I just actually have one

21   groundrule today and that is if I ask you a question

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

15

1    continuum back in February of 2006?

2        A.   Yes.

3        Q.   Would you agree with me that it's the policy

4    of the Metropolitan Police Department to value and

5    preserve human life?

6        A.   Yes.

7        Q.   Would you agree with me that it's the policy

8    of the Metropolitan Police Department to use the

9    minimum amount of force that is needed to accomplish

10   your mission?

11       A.   Yes.

12       Q.   Prior to February 22nd, 2006 did you know

13   Mr. Ignatius Brown?

14       A.   Could you rephrase?  I am not quite sure by

15   what do you mean by "know".

16       Q.   Prior to February 22nd of 2006 had you ever

17   met Mr. Brown?

18       A.   Yes.

19       Q.   Tell me when the first time is that you

20   remember meeting Mr. Brown?

21       A.   When we went to do a walk-through of a home

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

16

1   that I presently live in.

2        Q.   And when you say you were doing a

3   walk-through of the home you presently live in, that

4   is the 1247 Oates Street, N.E. Address?

5        A.   Yes.

6        Q.   And it's my understanding that you were

7   going to purchase that home, correct?

8        A.   Not I.

9        Q.   Who was going to purchase that home?

10       A.   My girlfriend.

11       Q.   Ms. Smith-Haynie?

12       A.   Yes.

13       Q.   And you accompanied her to do a walk-through

14   of the home?

15       A.   Yes.

16       Q.   Do you remember when that was?

17       A.   It was approximately maybe five to six

18   months prior to the actual purchase of the home.

19       Q.   And tell me the circumstances of how you met

20   Mr. Brown when you were walking through the home?

21       A.   He was present in the home and I didn't know

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

17

1    him.  I didn't know who he was.  He was just there.

2        Q.    Did Ms. Smith-Haynie introduce you at that

3    time?

4        A.    I cannot confirm to say yes or no.

5        Q.    Do you remember having any conversations

6    with Mr. Brown on the day that you went to the

7    walk-through with Ms. Smith-Haynie?

8        A.    No more than probably "Hi, how are you".

9        Q.    Did Mr. Brown to your understanding own that

10   home?

11       A.    No, I wasn't concerned with who the owner

12   was at the time.

13       Q.    After the walk-through that you went on --

14   strike that.

15            What was the purpose of the walk-through?

16       A.    To see whether or not the house was worth

17   purchasing or not.

18       Q.    After the walk-through when, if ever, is the

19   next time that you saw Mr. Brown?

20       A.    Approximately a couple of weeks later,

21   maybe.

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

18

1    Q.   Can you tell me the circumstances of that

2  meeting?

3    A.   It wasn't a meeting.   He was always present.

4    Q.   And when you say he was always present, what

5  do you mean by that?

6    A.   He occupied that house.

7    Q.   To your knowledge after the walk-through did

8  Ms. Smith-Haynie decide to purchase the home at 1247

9  Oates Street?

10    A.   She started the process of purchasing the

11  home.

12    Q.   And to your knowledge when you say she

13  started the process, what did she do to do that?

14    A.   That I can't answer exactly because I am not

15  her.   I didn't do the paperwork.   I didn't do various

16  things.   I was just there to observe and basically to

17  see what repairs had to be done to make it livable.

18    Q.   Was it your intention at that time to help

19  Ms. Smith-Haynie do the repairs to the home?

20    A.   Yes.

21    Q.   My understanding is that while you were

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

19

1    performing repairs on the 147 Oates Street, N.E.

2    property Ms. Smith-Haynie agreed to allow Mr. Brown to

3    continue living at that address, is that correct?

4        A.   I cannot answer for Ms. Smith-Haynie.

5        Q.   When you would go -- strike that.

6             Prior to February 22nd, 2006, how many times

7    would you say that you went to the 147 Oates Street,

8    N.E. home to perform repairs?

9        A.   Approximately in the neighborhood of maybe

10   20 to 30 times.

11       Q.   Of the 20 to 30 times that you went to the

12   147 Oates Street, N.E. property how many times was Mr.

13   Brown present?

14       A.   Almost all the time.

15       Q.   Of the 20 or 30 times that you went to the

16   Oates Street property prior to February 22nd, 2006 was

17   your purpose to perform repairs and renovate the home?

18       A.   Yes.

19       Q.   Of the approximately 20 to 30 times that you

20   went to the 147 Oates Street property prior to

21   February 22nd, 2006 did you have any conversations

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

20

1    that you can remember with Mr. Brown?

2        A.   Yes.

3            MR. LEIGHTON:  Mr. Brown's son, Mr. Terrell

4    Brown, has just entered the room.

5            (Mr. Terrell Brown enters the room.)

6            BY MR. LEIGHTON:

7        Q.   Before we went off the record, Mr. Ford, you

8    were saying that of the 20 or 30 times that you went

9    to the Oates Street address prior to February 22nd,

10   2006 that you had had conversations with Mr. Brown.

11   Can you remember the specifics of any of those

12   conversations?

13       A.   He had actually a conversation with my

14   girlfriend about finding work and we proposed to Mr.

15   Brown that if he didn't find any work he could help

16   out around there with the repairs.

17       Q.   Did there come a time that Mr. Brown helped

18   out with the repairs at the 147 Oates Street address?

19       A.   I wouldn't say he helped out.  I would say

20   that we paid him in advance to do some work and the

21   work wasn't done.

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

21

1    Q.    What did you pay him to do?

2    A.    I paid him myself $200 to help paint and

3    clean up.

4    Q.    Do you know how much Ms. Smith-Haynie paid

5    Mr. Brown?

6    A.    I cannot answer for Ms. Smith-Haynie.

7    Q.    Did Mr. Brown perform the work that you had

8    paid him to do?

9    A.    I would say of the work that I paid him to

10   do there was approximately 20 percent of the work done

11   and then he would disappear.

12   Q.    Besides discussing work that needed to be

13   done and paying Mr. Brown for work that needed to be

14   done at the 147 Oates Street address, are there any

15   other conversations that you remember having with Mr.

16   Brown?

17   A.    Yes, he had asked my girlfriend for some

18   more money and I overheard the conversation and I

19   approached him and told him no longer to ask her for

20   money, that he had to come through me, because of the

21   fact that we paid him once and the work wasn't done.

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

22

1    Q.    And did he respond to you at all?

2    A.    He said something to the nature of "Okay,

3    fine".

4    Q.    Besides that conversation, any other

5    conversations you remember having with Mr. Brown prior

6    to February 22nd, 2006?

7    A.    Yes.  Also he went, he approached Ms.

8    Smith-Haynie again about money and he became upset and

9    he started to, his tone of voice changed and his

10   demeanor changed, and I had to go to him and tell him

11   do not talk to her, if you need anything to talk to

12   me.

13   Q.    Any other conversation you remember having

14   with Mr. Brown prior to February 22nd, 2006?

15   A.    In the house that was about it.  I wasn't

16   very conversational with him.

17   Q.    When you would appear at the Oates Street

18   address and Mr. Brown was present did you ever appear

19   in uniform?

20   A.    Yes.

21   Q.    Did you ever drive your squad car over to

23

1    the property?

2        A.    I do not have a take-home car.

3        Q.    So then you never drove a squad car over to

4    the 147 Oates Street address?

5        A.    No.

6        Q.    Of the probably 20 or 30 times that you went

7    to the Oates Street address prior to February 22nd,

8    2006, do you know how many of those times you were

9    actually in uniform?

10       A.    Approximately 15, 20 times.

11       Q.    My understanding is there came a point in

12   time that you brought some tools over to the house and

13   then realized that those tools were missing, is that

14   correct?

15       A.    Yes.

16       Q.    First of all, what tools did you notice were

17   missing from the home?

18       A.    Well, there was a large variety of tools,

19   table saws, nailing guns, finishing guns, compressors,

20   compressor hoists, levelers, hammers, nails, just

21   basically a workman's variety of tools that a person

24

1    would use to renovate a house.

2        Q.   How soon prior to February 22nd, 2006 did

3    you realize that the tools were missing from the home?

4        A.   Approximately a week before.

5        Q.   When you noticed that the tools were missing

6    what did you do?

7        A.   I went around to my girlfriend's house and

8    called the police.

9        Q.   When you say you went around to your

10   girlfriend's house, where?

11       A.   I believe 1514 Neal Street.

12       Q.   How far away is that address from the Oates

13   Street address?

14       A.   Approximately six blocks.

15       Q.   When you called the police what happened?

16       A.   I waited approximately 45 minutes to an hour

17   for the police to respond.  I explained the situation

18   to the police, that I had entered the home through the

19   back, that normally I would go into the home from the

20   front door, which I had keys to, but the door was

21   barricaded, So I decided to walk around back and gain

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

25

1  entry through the rear of the house.  I did not check

2  the back door upstairs because we did not have keys to

3  the back door upstairs.  The only keys that I had was

4  the keys to the front door and the keys to the

5  basement door.  I entered through the basement door.

6  I walked upstairs and I didn't notice that anything

7  was unusual at that time.  I brought an extension cord

8  around with me, a ladder and a tool box.  I placed

9  that inside the basement in the laundry room.  I went

10 to go run the cord, I walked up through the back door

11 because I was working on the steps.  I had to put a

12 railing up.  And at that time I noticed that the back

13 door was open, it was unlocked, it wasn't quite

14 closed.  I really didn't pay any attention to it

15 because I just figured he went out through the back

16 door and didn't lock it, because there was no key to

17 lock the back door.

18     Q.    When you say he, you mean Mr. Brown?

19     A.    Mr. Brown.  I reentered the house and

20 started looking for certain tools in the dining room,

21 that is where all the tools were, and the first

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

26

1  thought that crossed my mind was that those tools,

2  maybe my girlfriend had come while I was at work for

3  some reason and cleaned up.  I walked through the

4  whole house, the basement, the first floor and the

5  second floor and there was no tools to be found except

6  the tools that I brought with me.  So I went out back

7  because I was really looking for these tools and the

8  guy across the alley, I didn't know him at the time, I

9  didn't know him, he didn't know me, he made a

10  statement that Mr. Brown was out selling tools and he

11  asked me was my name Edward. On all my tools my name

12  is written, plus the last four digits of my Social

13  Security number, plus my tag number which is issued

14  through the Metropolitan Police Department.  He stated

15  that Mr. Brown had offered to sell him the tools for a

16  few dollars.  I reentered the house.  I locked the

17  basement door.  I exited through the basement door, I

18  locked the top door and exited through the basement

19  door and that is when I proceeded to go to 1514 Neal

20  Street to call the police.

21      Q.   Was your whole name on the tool or just

27

1    Edward or Edward Ford?

2       A.   E.M. Ford and my last four digits of my

3    Social Security number and my tag number.

4       Q.   Do you know how that other individual knew

5    your name was Edward?

6       A.   Because he stated that Mr. Brown had showed

7    him the actual tools that he was selling and that is

8    when he spotted my name.  There may have been my first

9    name on some of the tools.

10      Q.   The police that came to take the report at

11   Leo Street, did you know them?

12      A.   No, I did not.

13      Q.   When you made the report what did the police

14   tell you?

15      A.   They just did the report, just like if I was

16   a regular citizen.

17      Q.   After you made the report, when is the next

18   time that you saw Mr. Brown?

19      A.   Later that night.

20      Q.   Where did you see Mr. Brown?

21      A.   We were in the house waiting to confront him

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

28

1    about the tools.

2        Q.    The Neal Street house or the Oates Street

3    house?

4        A.    Oates Street, I'm sorry, and we were in

5    there actually cleaning up, sweeping and everything

6    and he entered the home.

7        Q.    What happened when he entered the home?

8        A.    I confronted him about the tools being

9    missing.

10       Q.    What did you say?

11       A.    I asked him what happened to the tools.

12       Q.    What did he say?

13       A.    He said give him a few days and he will get

14   the tools back, it is not about me, it's about him.

15   Give him some time to get the tools back.

16       Q.    What did you say to that?

17       A.    I told him, well, just stay here while we

18   get the police and you can tell them exactly what you

19   meant by that and the conversation that we had and why

20   the tools are missing.

21       Q.    What did he say to that?

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

29

1    A.   He fled.

2    Q.   Did you follow him?

3    A.   Yes.

4    Q.   And where did he flee?

5    A.   He went eastbound down Oates Street,

6 northbound into the alley between Oates and I believe

7 that is Trinidad and approximately two blocks up.

8    Q.   What time of day was this?

9    A.   It was at night, it was approximately about

10 8:30 at night.

11    Q.   It was February, so I assume it was dark?

12    A.   Yes, I believe so.

13    Q.   Were you in uniform at that time?

14    A.   No, I was not.

15    Q.   When you were chasing Mr. Brown at that time

16 did you say anything to him?

17    A.   No, he had fled.  Let me explain something

18 to you.  I was struck by a car in approximately 1994,

19  '95.  I have an artificial kneecap, I have a rod in

20 my leg and I have pins and screws in my foot, so my

21 sprinting is not as fast as somebody that doesn't have

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

30

1    those injuries.

2        Q.   When you were pursuing Mr. Brown at that

3    time did you at any time draw your gun?

4        A.   As a precaution my weapon did not come out

5    until I entered the alley.

6        Q.   Had you seen Mr. Brown go down the alley?

7        A.   Yes.

8        Q.   When you say as precaution you drew your gun

9    when you were entering the alley, what do you mean by

10   that?

11       A.   That is normal police procedure.  We ready

12   our gun, not in a pointing motion but to hold it to

13   our side as a precaution when we are chasing someone.

14   They turn in the alley, you didn't see exactly where

15   they go, you don't want to be surprised, so it was a

16   precaution.

17       Q.   When you were pursuing Mr. Brown at that

18   time, in your state of mind were you doing so as a

19   member of the Metropolitan Police Department?

20       A.   Yes.  And let me explain something to you.

21   As a member of the Metropolitan Police Department we

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

31

1    work a tour of duty which puts us out on the street as

2    patrol.  Off duty in the District of Columbia we are

3    still police officers within the confines of the

4    District of Columbia.  Our police powers are not

5    revoked nor do we walk away from situations.  It is

6    not like we punch a clock and we say we are not police

7    anymore from the time that we check off in the

8    morning.  When an incident arises we are police

9    officers.

10       Q.   You mentioned something about a tour of

11   duty.  What is a tour of duty?

12       A.   A tour of duty is when I go to roll call

13   from 10:30 at night to 7:30 in the morning, that is my

14   tour of duty.  But my police powers are not revoked,

15   it does not confine me from making arrests or dealing

16   with certain situations.

17       Q.   When you say it doesn't confine you, if you

18   see an incident and you are not in your tour of duty,

19   are you obligated to respond to that incident?

20       A.   I'm responsible to respond to situations.

21       Q.   So if you are not in your tour of duty but

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

32

1    you see a crime being committed, it's still your

2    responsibility to respond to that crime?

3        A.   Yes.  As you well know, I'm quite sure,

4    well, I'm not sure but as you well know if we walk

5    away from a situation, say if we walk away from a bank

6    and they are robbing a bank and we fail to act, then

7    we can also be charged with that crime, plus be given

8    additional time.

9        Q.   When you are not on your tour of duty, does

10   the Metropolitan Police Department still require you

11   to carry your handgun?

12       A.   Yes.

13       Q.   Is that any time you are not in your home

14   you're required to carry your hand gun?

15       A.   Yes, they just passed a general order, I do

16   not have to carry it for certain events, going to

17   church or if I go out to a barber, something like

18   that, but normally in the confines of the District I'm

19   required to carry it off duty, on duty, since

20   President Bush passed this bill from 911 we can carry

21   it anywhere in the country.

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

33

1    Q.    You say they just passed a general order

2  saying you didn't have to carry it to church, was that

3  order passed after February 22nd, 2006?

4    A.    I cannot answer that.  I just know of it.

5    Q.    But on the day that you were chasing Mr.

6  Brown you were not going to church, you did not fall

7  into the any of the categories you just mentioned as

8  far as that general order was concerned, correct?

9    A.    No.

10    Q.    Did you enter the alley?

11    A.    Yes.

12    Q.    And were you able to find Mr. Brown?

13    A.    No.

14    Q.    So what did you do at that point in time?

15    A.    By that time within maybe a minute, a minute

16  and a half the police arrived on the scene, uniformed

17  officers.

18    Q.    Was is it the same officers that had taken

19  your report earlier?

20    A.    I cannot actually say that.

21    Q.    When the officers arrived did you still have

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

34

1   your gun drawn?

2       A.   I had my gun out, not drawn.  Drawn is to

3   point.

4       Q.   And when you say out, you had your gun to

5   your side?

6       A.   Yes.  Long arm, not like this, (indicating),

7   it's long arm to the ground.

8       Q.   What happened when the police arrived?

9       A.   I explained to them what was going on.

10      Q.   Did you identify yourself as a police

11  officer when they arrived on the scene?

12      A.    Once I was confronted by two officers, I

13  verbally told them I was a police officer.  With your

14  weapon out you didn't want to make any sudden moves

15  and I told them I was a police officer and if they

16  gave me a second I would actually show them my

17  identification.

18      Q.   When you say your identification, were you

19  carrying your ID?

20      A.   Yes.

21      Q.   Do you mean a badge?

35

1      A.   A badge and ID card.

2      Q.   Did you show them your badge and ID card at

3   that time?

4      A.   Yes.

5      Q.   Then what happened?

6      A.   We continued to search.

7      Q.   Where else did you search?

8      A.   We searched the last site that I saw him

9   turn into, we searched that area.  We searched a

10  street that comes out on the other side of the alley.

11  Some officers set up a parameter around the block.

12     Q.   At that time did you still have your gun

13  out?

14     A.   Yes.

15     Q.   For how long after the police arrived did

16  you continue to search for Mr. Brown?

17     A.   Approximately five minutes.

18     Q.   Tell me what happened.

19     A.   I was called down by an official to meet him

20  down on the corner.

21     Q.   What is an official?

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

36

1    A.   An official is a sergeant.

2    Q.   Why were you called by the sergeant or the

3    official?

4    A.   To inform of what was going on.

5    Q.   What did he say at that time?

6    A.   He just said that the officers on the scene

7    and myself we could not find Mr. Brown and just leave

8    it alone at that time.

9    Q.   Any other conversations with the police

10   officers at that time?

11   A.   No more than explaining what was going on.

12   Q.   Did you then go back to Oates Street or Leo

13   Street?

14   A.   Went back to Oates Street.

15   Q.   Was the next time that you saw Mr. Brown the

16   date of the shooting?

17   A.   Yes.

18   Q.   Between that day that you chased Mr.

19   Brown -- strike that.

20       Between the day that you just described,

21   where you went after Mr. Brown and were unable to get

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

37

1  him, and the date of the shooting, did you talk to the

2  police at all during that time about Mr. Brown?

3      A.   I stalked to a Detective Tecobaum.

4      Q.   And tell me what your conversations with

5  Detective Tecobaum regarded?

6      A.   He explained that he was applying for a

7  felony warrant due to the value of the tools that were

8  stolen.

9      Q.   If you see someone during your tour of

10  duty -- strike that.

11          If you see someone when you are not on a

12  your tour of duty and you know that they have an

13  arrest warrant out for them, do you have the

14  responsibility to arrest that individual or try to

15  contain them as a metropolitan police officer?

16      A.   Yes.

17      Q.   And was this the case back in February of

18  2006?

19      A.   Yes.

20      Q.   What was your understanding as to when the

21  arrest warrant was going to be issued for Mr. Brown?

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

44

1    some thermals, a T-shirt, a hoodie and a tan colored

2    jacket.

3        Q.    What was the weather like outside?

4        A.    From my best recollection it was cold, it

5    was damp.

6        Q.    Was there snow on the ground?

7        A.    No.

8        Q.    When you pulled over there, pulled your car

9    over, did you say anything to Ms. Smith-Haynie at that

10   time?

11       A.    To my best recollection I believe I answered

12   that question no.  If I said anything it would have

13   been probably, "Hey, there go Gary".

14       Q.    At that time did you get out of your

15   vehicle?

16       A.    Yes.

17       Q.    Then what did you do?

18       A.    I approached Mr. Brown and I asked him about

19   the tools.

20       Q.    What did he say?

21       A.    He said it wasn't about me, it was about

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

45

1    him, but my intention in stopping him was not to let

2    -- I knew that there was a warrant.  My intention was

3    not to let him know that I knew there was a warrant.

4    My intention was to detain him there until a uniform

5    officer showed up on the scene and to have that

6    uniform officer run a 1029.

7        Q.    When you say a 1029, what is that?

8        A.    That is a warrants check, criminal check or

9    however you want to put it.

10       Q.    When you got out of your vehicle to go talk

11   to Mr. Brown it was your understanding that a warrant

12   had been issued for his arrest, correct?

13       A.    Yes.

14       Q.    When you got out of your vehicle to go speak

15   to Mr. Brown, was it your state of mind that you were

16   doing so as a metropolitan police officer?

17       A.    Yes.

18       Q.    What did Mr. Brown say to you?

19       A.    There was a conversation when I was asking

20   him about it, I was trying to let him now that if he

21   didn't do anything and to stand by when the police

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

47

1    me, ma'am, is it possible you can call the police?

2    I'm a police officer".  I reached into my pocket, I

3    pulled out my badge and I visually showed her my badge

4    and my ID.

5        Q.   Did you know that woman?

6        A.   No.

7        Q.   Do you know that woman's name now?

8        A.   All I know is Ms. Jackson.

9        Q.   Did Ms. Jackson respond to you in any way

10   after you told her to call the police?

11       A.   Yes.

12       Q.   What did she say?

13       A.   She said, "Okay".  She was actually on the

14   phone at that time.  That's the reason I asked her to

15   call.  She was on the phone abd once I showed her my

16   badge she said "okay" and seemed like she stopped her

17   conversation and she was trying to call the police.

18       Q.   Do you know if she was on a cell phone or

19   normal phone?

20       A.   From that distance, I couldn't tell.

21       Q.   What happened next?

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

48

1     A.    Mr. Brown became very agitated.  He took off

2  his bookbag and his body language became totally

3  different.  It wasn't like we are talking now, we are

4  having a conversation, it became very agitated, very,

5  very agitated.  And at that time he took his bookbag

6  off and laid it up on the wall, on the grass area and

7  the wall, and started pacing back and forth in a

8  motion like he was very impatient, very impatient.

9     Q.    Were you on the sidewalk or were you on the

10  street?

11     A.    We were on the sidewalk.

12     Q.    Continue.

13     A.    And he started to pace back and forth, pace

14  back and forth, and then all of a sudden he was saying

15  that, "Look, I can't go back to jail.  It's not about

16  you, it's about me.  You don't understand.  You don't

17  understand."  And I'm standing there trying to calm

18  him down saying, "Hey, look, if you didn't do

19  anything, don't worry about it, just wait for the

20  police to get here and we'll both explain to the

21  police what is going on".

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

49

1    Q.   Then what happened?

2    A.   Then he just come out of the bag swinging

3    karate moves, kicking, swinging and punching.

4    Q.   What did you do?

5    A.   I extended my left hand out and he is

6    pushing against me, he is trying to get my hands down

7    and he is pushing and pushing and I'm backing up at

8    this time.  The first time I get him off me and he is

9    standing there and I ask him, "What is your problem?

10   Just stay here".  And he is still saying he can't go

11   back to jail, he doesn't want to stick around and all

12   this.  And he jumps on me again.

13   Q.   Did he ever connect with his karate moves on

14   you?

15   A.   Yes, remember my clothing was pretty well

16   padded so it wasn't like he was giving the full

17   effect, but I was on the offense.

18   Q.   Did he kick you or hit you?

19   A.   He hit me in the body areas, shoulder, but

20   it didn't really do anything.

21   Q.   When you say body area you're pointing to

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

50

1    the left side?

2        A.    Right, my left torso area.

3        Q.    And then you tried to push him back with

4    what hand?

5        A.    My left hand.

6        Q.    Your left hand.  Did he retreat?

7        A.    No, he became more aggressive.

8        Q.    Then what did you do?

9        A.    At that time I'm backing up, backing up,

10   this is the second time I'm backing up.  I get him off

11   me again.  I'm standing there talking to him telling

12   him, "Look, what is your problem?  Why are you doing

13   this?"  His comment again is "I am not going back to

14   jail, I am not going back to jail".  The third time he

15   jumps on me I'm just about on the corner and I'm

16   backing the whole time.

17       Q.    The corner of?

18       A.    West Virginia and Neal.  At that time I'm

19   fumbling trying to get my service weapon out.

20       Q.    Where was your service weapon?

21       A.    In the small of my back to the right side.

51

1    Q.    You were carrying it in a clip?

2    A.    A clip-on holster, yes.

3    Q.    And then what happened?

4    A.    I pulled the weapon out and he held it down

5  long arm to the ground.  When he realized I had my gun

6  out his comment to me was, "Fuck It", it was like,

7  "Fuck it, I am not going back to jail.  Whatever you

8  have got to do, fine, I'm going to meet my maker,

9  whatever you have got to do because I'm not going back

10  to jail".  And I'm telling him, "We are not going to

11  go through this.  Do not do this, do not do this".

12  And at that moment I really felt that if he had got

13  the upper hand I wouldn't be here talking to you right

14  now.

15    Q.    At any time did you see Mr. Brown with a

16  weapon?

17    A.    No.

18    Q.    At all times did you see Mr. Brown's hands?

19    A.    Of course I seen his hands.  His hands were

20  striking and making moves.

21    Q.    Once you took out your gun and he said those

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

52

1    things, what happened next?

2         A.    I really felt that his intentions were to

3    make good of his escape by removing my weapon from me,

4    to possibly use it on me and to make good of his

5    escape, and at that time I really felt that my life

6    would have been taken if he had got ahold of that

7    weapon.  The weapon was not pulled out to

8    intentionally put Mr. Brown down.  It was pulled out

9    as a deterrant, not to put him down.  Most people,

10   when an officer pulls their weapon out and they have

11   it in a long arm position, they usually comply.  He

12   did not comply.  He did not care.  His intentions were

13   to get me and if he had to go through me, that is what

14   he was going to do.

15        Q.    When you pulled out your weapon did you do

16   so in your mind as a member of the Metropolitan Police

17   Department?

18        A.    Yes, from the moment I stopped him and I

19   showed him my badge and requested an officer to the

20   scene, I was acting in the capacity of a police

21   officer.

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

53

1    Q.   Then what happened?

2    A.   I'm in the street at this moment and he is

3  on the curb and he gets a slight running start like he

4  is charging me and at that moment he goes to leap and,

5  normal reaction, the weapon came up and it was

6  discharged, I fired a shot.

7    Q.   When you fired the shot was he, was Mr.

8  Brown also in the street?

9    A.   Yes.

10   Q.   What happened after you fired the shot?

11   A.   By that time approximately I'd say in under

12  a minute the first officer showed up on the scene.

13   Q.   When you fired the shot what was your

14  intent?

15   A.   I'm sorry, could you rephrase that?

16   Q.   What was your intent when you fired the

17  shot?

18   A.   My intent was self-preservation, to save

19  myself and other people that were around. That weapon,

20  he was not going to get that weapon.

21   Q.   In your mind did you fear for your life when

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

70

1    drawn to be discharged except at the last extreme, no

2    other results, no other way that this thing was going

3    to come to a stop.

4         Q.    But when you actually discharged your

5    service weapon, did you intend to discharge it?

6         A.    At the very last moment when there was no

7    other way to exercise getting this thing under

8    control.

9         Q.    So is that a yes?

10        A.    Yes.

11        Q.    How many times did Mr. Brown strike you

12   before you discharged your service weapon?

13        A.    Approximately four or five times.

14        Q.    Where did he strike you?

15        A.    In the upper torso area, arms.

16        Q.    Did he injure you at all?

17        A.    Not with the padding of clothing.

18                    (Ford Exhibit No. 2A, B & C,

19                    marked for identification.)

20             BY MR. LEIGHTON:

21        Q.    Mr. Ford, did you fill out any incident

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

87

1    was really no conversation, no type of buddy type

2    conversation or anything that we, you know, like some

3    kind of comradery or anything.  My whole purpose there

4    was to get this house fixed up because we were forced

5    with a deadline and my whole purpose there was not to

6    joy talk but to work on the house.

7         Q.   So the conversation you were just telling us

8    about was between Mr. Brown and your girlfriend?

9         A.   Yes.

10        Q.   And you overheard that conversation?

11        A.   Yes, I'm standing right next to her.

12        Q.   And when you heard Mr. Brown say that he was

13   fighting five police officers, did you say anything to

14   Mr. Brown?

15        A.   No, I just pretty much just walked off and

16   continued to work.

17        Q.   Did you ever come to find out whether or not

18   that was true?

19        A.   No, it just crossed my mind if he was

20   fighting five police officers why was he back at home.

21        Q.   And prior to the date of the shooting did

1    you ever hear that Mr. Brown had a drug problem or

2    substance abuse problem?

3        A.    Actually, after some time had passed and we

4    were in the house working and we went to the front

5    bedroom, the larger of the two front bedrooms, there

6    was some drug paraphenalia in the bedroom.

7        Q.    And at what point was this prior to the

8    shooting?

9        A.    Approximately maybe a month before,

10   something like that.

11       Q.    Did you confront Mr. Brown about that?

12       A.    No.

13       Q.    What if anything did you do when you saw the

14   drug paraphenalia in the bedroom?

15       A.    It was brought to my attention.  I didn't

16   actually go up.  I wasn't probing.  It wasn't my

17   responsibility to probe and see if he was on drugs or

18   if he had anything illegal.  My whole purpose there

19   was to put this house in shape so it would pass an

20   inspection.  It was brought to my attention by my

21   girlfriend and it's just drug paraphenalia, it was not

1    like, it was basically a crack pipe and other things

2    that drew you to say wait a minute, this is using

3    person or he may have somebody in the house with him

4    that may be using drugs, but that is as far as it

5    went.

6        Q.    Do you know if anyone other than Mr. Brown

7    at the time you were doing these renovations was

8    living in that house?

9        A.    He had a cousin or a nephew by the name of

10   Michael that was there, but he left shortly after we

11   started the renovations.

12       Q.    Is the possession of drug paraphenalia in

13   the District of Columbia a crime?

14       A.    Yes, it is.

15       Q.    And if you're off duty and you see drug

16   paraphenalia in a home, are you required to take any

17   kind of legal action?

18       A.    Well, first I have to attach it to a

19   person.  If he has it on his person or he has it in

20   his possession, then yes, I would, but it was in a

21   bedroom and I could not solely put that on one person.

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

90

1    Q.    Did you make any attempts to determine who

2    might have been the owner of that drug paraphenalia?

3    A.    No.

4    Q.    And is there a reason why not?

5    A.    Because that wasn't my purpose in being

6    there, to see if this was a drug house or if this

7    person was on drugs.

8    Q.    And was your purpose for being there solely

9    to renovate the house that was being bought?

10    A.    Yes.

11    Q.    Now, at some point you indicated that you

12    came to learn that some tools that you had left in the

13    home were missing, is that correct?

14    A.    Yes.

15    Q.    And when did you -- how soon prior to the

16    shooting or prior to the shooting when did you first

17    learn that your tools had been missing?

18    A.    I would say in the timespan of maybe a week,

19    a week before the shooting.

20    Q.    Around a week?  And I believe that you said

21    that later that evening Mr. Brown came to the house,

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

91

1   is that correct?

2       A.   Yes, while we were still in there.  We were

3   working.  We were cleaning out because we had prior,

4   the work that we had paid him to do was never done, so

5   we had a lot of trash and scrap materials because we

6   were preparing to do the floors and we were in there

7   cleaning up.  But we were also waiting for Mr. Brown

8   to show up.

9       Q.   And I believe you indicated that you asked

10  Mr. Brown about the tools?

11      Q.   Yes, I did.

12      Q.   And what did he tell you?

13      A.   He said it wasn't about me, it was about

14  him.  I didn't understand.  He would see what he could

15  do about getting the tools back.  He admitted the

16  tools were gone.

17      Q.   Did Mr. Brown tell you he took the tools?

18      A.   No, he just admitted he knew the tools were

19  gone.

20      Q.   Did you ask Mr. Brown if he actually took

21  the tools himself?

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

92

1    A.    I can't recall if that particular question

2 was asked.

3    Q.    Who was present when Mr. Brown admitted to

4 knowing that the tools were gone?

5    A.    Mr. Brown, myself and my girlfriend.

6    Q.    Were the three of you in the same room?

7    A.    We were standing very close, within maybe 2

8 feet, 3 feet of each other.

9    Q.    Did you ask Mr. Brown where the tools went?

10    A.    He just said give him time to get them back

11 and I made the statement that okay, let me call the

12 police and when I said that he just took off.  He just

13 rushed right past the us and out the door.

14    Q.    Did Mr. Brown indicate how much time he

15 needed to get the tools back?

16    A.    No.

17    Q.    Did you indicate to Mr. Brown that you could

18 give him a certain period of time in which the tools

19 should be returned?

20    A.    No, he never gave me the opportunity to

21 continue the conversation.

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

93

1    Q.   Just let me go back to the drug

2  paraphenalia, as you were cleaning up the house did

3  you find any other items that are used for drug use?

4    A.   Yes.

5    Q.   What else did you find?

6    A.   Yes, actually after we did the walk-through

7  we began the work, the basement was a dump.

8    Q.   It was a what?

9    A.   A dump.  And there was clothes, they had a

10  bar in the back next to the laundry room and there was

11  clothes and they were damp, musty, and apparently

12  there had been a water problem, which had been

13  resolved.  There was a water problem and the stench of

14  musk was in the house.  There was a bed and there were

15  several items around there and when you walked through

16  there there were pipes that were broken in the

17  basement.

18    Q.   What kind of pipes?

19    A.   Hyps, hypothermic needles.  There were hyps

20  and we did not clean up anything.  What it was, when

21  we talked to Eugene Brown we informed him that the

1    items in the basement needed to be removed, so they

2    went down and they removed all those items and that

3    type of stuff went out.

4         Q.   And Eugene Brown is who?

5         A.   Mr. Brown's brother.

6         Q.   Did you do anything to investigate how those

7    hypothermic needles ended up in the basement?

8         A.   No.  You have to understand something and I

9    will try to clear this up to the best of my ability.

10   I don't know if someone there may have been diabetic.

11   I don't know if they were drug hyps.  That is not

12   something that I would -- now, say like if I walked in

13   and this person was using drugs, then I would take

14   police action, but you are talking about something

15   that is not attached to a person and I cannot prove it

16   and you are talking about drug paraphenalia in the

17   bedroom and in the basement, which two people occupy,

18   and I have no way of knowing which one was using it.

19   The best that I could do is to clean it up and hope

20   that it doesn't reappear again.  It wasn't my

21   property, I wasn't probing it as personal space.  I

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

103

1   would handle the situation?

2       A.   Actually, what he said verbatim was that we

3   cannot find the suspect and I don't have the manpower

4   to be going through here looking for somebody we can't

5   find and just leave it alone at this time.  And I said

6   okay, fine, and he asked me what district I was from

7   and that was about it and I left and went back to the

8   house.

9       Q.   And was that Sergeant Parsons?

10      A.   I believe so.

11      Q.   And when Sergeant Parsons said to you,

12  "Leave it alone at this time", what was your

13  understanding of what he was asking you to do?

14      A.   Don't pursue the search.

15      Q.   In terms of the ranking within the police

16  department, is a detective of a higher grade than an

17  officer?

18      A.   No.  I'll explain to you what the difference

19  is.  A detective is an officer that investigates

20  crimes.  He is no more than and no less than a

21  patrolman, except he specializes in investigations

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

104

1    is.  If you ask him to put on his Class A uniform, he

2    would look just like me.  The only difference is his

3    badge says "detective" and mine states "Metropolitan

4    Police Department".  That is the only difference.  He

5    specializes in investigations.

6         Q.   Can a detective give an officer an order?

7         A.   No, he is not an official.  It takes a

8    sergeant, a lieutenant, a captain or above to give an

9    officer a direct order, and they have to state it just

10   like the military, this is an order.

11        Q.   Now, at some point prior to the shooting did

12   you have a conversation with Mr. Eugene Brown about

13   the tools that Mr. Brown had allegedly taken from you?

14        A.   Yes.

15        Q.   Did Mr. Eugene Brown indicate to you that he

16   would repay you for the tools once the house was sold?

17        A.   He would reimburse me for the value of the

18   tools once the house was sold, yes.

19        Q.   And in your opinion what was the value of

20   those tools?

21        A.   Approximately $3,000.

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

105

1    Q.   Did you accept Mr. Eugene Brown's offer to

2    reimburse you for the value of those tools?

3    A.   Yes.

4    Q.   Have you as of today been reimbursed for the

5    value of those tools by Mr. Eugene Brown or anybody

6    from the Brown family?

7    A.   Not a penny from anyone.

8    Q.   In terms of access to the house located on

9    Oates Street, at any time prior to the shooting have

10   the locks ever been changed?

11   A.   Prior?  No.  Actually, we gain access

12   through the front door.  We have keys to the front

13   door and the basement in the back.  That particular

14   day when I discovered that the tools were taken the

15   front door had been barricaded because once I entered

16   the basement door and went up to see why I could not

17   get into the house from the front, he had the door

18   barricaded.

19   Q.   He being who?

20   A.   Gary Brown.

21   Q.   Gary Brown?

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

106

1    A.   Yes.

2    Q.   Who is Gary Brown?

3    A.   The decedent.

4    Q.   And how do you know that he had the door

5   barricaded?

6    A.   He was the sole occupant of the house at

7   that time.

8    Q.   So Michael had moved out?

9    A.   Yes, he had moved out.

10    Q.   When did Michael move out?

11    A.   Approximately maybe a month before,

12   something like that.

13    Q.   After Michael moved out -- was it after

14   Michael moved out that you saw the drug paraphenalia

15   in the bedroom and the basement?

16    A.   No, this was prior.

17    Q.   Did Mr. Brown indicate to you or did you

18   have any conversation with Mr. Brown, and I'm talking

19   about Gary Brown now, as to why the door, the front

20   door had been barricaded?

21    A.   No, he wasn't present at the time that I

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

116

1    Q.  Did you tell Sergeant Wax that Mr. Brown had

2    not hit you at all?

3    A.  I can't really recall the total

4    conversation.

5    Q.  Do you recall whether or not you told

6    Sergeant Wax that although Mr. Brown had not struck

7    you, Mr. Brown had become angry and physically

8    threatening?

9    A.  That is the same question.

10    Q.  Well, it is a different question.  You asked

11    me earlier did I tell Sergeant Wax had I been struck

12    by Mr. Brown and you asked me the same question but

13    you're adding on a little bit more.

14    Q.  Yes, or no, did you tell Sergeant Wax?

15    A.  I can't recall the exact conversation at

16    that time.

17    Q.  Was it your understanding that after you

18    filed your police report that the alleged theft of

19    your tools was being investigated by another District

20    station or somebody else within the Metropolitan

21    Police Department?

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

117

1    A.    That is a normal procedure, yes.

2    Q.    And what did you understand the course of

3 that investigation was prior to the shooting of Mr.

4 Brown?

5    A.    I'm sorry, I didn't quite understand that

6 question.

7    Q.    What did you understand that occurred during

8 the investigation or the processing of your complaint

9 regarding your tools?

10    A.    For a fact I knew there was a felony warrant

11 and my powers as a police officer, I can stop and have

12 that warrant executed and that was the reason to have

13 the additional police come on the scene and run a

14 1029, to execute the warrant, felony warrant.

15         MR. JACKSON:  Could I have the record read

16 back, please.

17         (Record read.)

18         BY MR. JACKSON:

19    Q.    What did you understand was going on with

20 the investigation of your missing tools?

21    A.    That the detective was applying for a

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

118

1  warrant and once the warrant was issued it could be

2  executed.

3      Q.  Was it your understanding that that

4  detective -- do you know who the detective was, by the

5  way?

6      A.  I believe it was the Detective Tecobaum.

7      Q.  Was it your understanding that the

8  investigation of your complaint, the case, was

9  assigned to Detective Tecobaum?

10     A.  Yes.

11                    (Ford Exhibit No. 4 marked

12                     for identification.)

13         BY MR. JACKSON:

14     Q.  Officer Ford, I'm showing you what has been

15  marked as Exhibit No. 4, and just for the record it's

16  the General Order 201, No. 26, effective date November

17  10th, 1976, and the subject is "Duties,

18  Responsibilities and Conduct of Members of the

19  Department".  Did I read that correctly?

20     A.  Where are you reading it from?

21     Q.  The top.

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

119

1    A.   Oh, the very top.

2    Q.   Yes.

3    A.   Yes.

4    Q.   And if you would turn to the page numbers at

5    the bottom, page 571, do you see that?

6    A.   Yes.

7    Q.   And particularly I'm going to direct your

8    attention to No. 28, do you see that?

9    A.   Yes.

10   Q.   "Members shall not interfere with the cases

11   of other members, except by consent of such other

12   members, or their commanding officers".  Did I read

13   that correctly?

14   A.   Yes.

15   Q.   Did Detective Tecobaum ask you to assist you

16   with the arrest of Mr. Brown?

17   A.   I can answer that with an explanation, if

18   you will permit me.

19   Q.   First of all you can answer it yes or no,

20   did he ask you, that was my question?

21   A.   No.

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

120

1    Q.   Did any of his commanding officers or any

2   commanding officer ask you to assist with the arrest

3   of Mr. Brown?

4    A.   No.

5                        (Ford Exhibit No. 5 marked

6                         for identification.)

7    BY MR. JACKSON:

8    Q.   Officer Ford, I'm handing you a document

9   that has been marked as Exhibit No. 5.  Just for the

10   record at the very top it says "Title 6A".  In the

11   right corner it says "District of Columbia Municipal

12   Regulations".  Under that it says "Chapter 2, General

13   Rules".  Did I read that correctly?

14    A.   Yes.

15    Q.   And directing your attention to Section

16   200.5, do you see that?

17    A.   Yes.

18    Q.   And the first sentence reads, "Members of

19   the force shall promptly obey any order emanating from

20   any superior officer", did I read that correctly?

21    A.   Yes.

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

121

1     Q.   And you were told, were you not, by the

2   sergeant to let the detective handle your

3   investigation?

4     A.   I was not ordered.  What you're reading is a

5   specific order and that specific order pretty much

6   goes in the direction if you were to tell me to do

7   something and like I stated before, we are a

8   paramilitary organization and those particular words

9   have to come out to say "I'm ordering you to do this",

10  "I'm ordering you not to do this", This is an order.

11  Those words were never spoken as far as interfering

12  with an investigation case.  If I was anyplace else in

13  this city and I stopped and the person had a warrant,

14  I would not be interfering, I would be executing that

15  warrant, I would be bringing that person in for a

16  warrant that was issued for their arrest.  There was

17  no order given.

18    Q.   So do I understand your testimony that if a

19  superior officer gives you some directive to do

20  something, if that superior officer does not use the

21  word "order" then that is not an order according to

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

122

1    you?

2         A.    It can be suggested but it is not an order.

3         Q.    So is it your testimony that although the

4    sergeant told you to let his detective handle the

5    investigation into the alleged theft of your tools, as

6    far as you're concerned that was not an order?

7         A.    We have to be kind of careful with alleged

8    and directly telling me to do something.  His words

9    were "We cannot find this person.  We'll just leave it

10   alone and let the detectives do what they have to

11   do".  There was never spoken words saying that, "Hey,

12   leave this alone, I'm ordering you to leave this

13   alone.  Do not pursue it".  There were never, ever,

14   ever those words spoken.  So what you're reading is

15   kind of throwing me into saying that I was told to do

16   something when I clearly cannot say that I was told to

17   do that.

18        Q.    Is there a procedure that an off duty police

19   officer should follow, -- well, strike the word

20   should.

21             Is there a procedure that an off duty police

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

123

1    officer must follow when they decide that they are

2    going to take some police action?

3        A.   Say that again.

4        Q.   Is there a procedure that an off duty police

5    officer has to follow when that off duty police

6    officer decides they are going to take police action?

7        A.   We take police actions accordingly and

8    according to as if we were on duty.  Once you're in a

9    situation, you, through the District of Columbia, are

10   on duty at that moment.

11       Q.   So is there a process that has to be

12   followed?

13       A.   Make an arrest, take it to the closest

14   station and process that person.  If those officers

15   had showed up in a timely manner and he was arrested,

16   then his paperwork would have been clearly, he would

17   have had two charges, a PO and the first charge would

18   have been felony bench warrant.

19       Q.   Are you aware of any general orders that

20   requires a police officer who is off duty before

21   taking a police action to contact the communication?

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

124

1    A.    No, only after you made an arrest, if you

2    need a transport or if -- and if I had my radio with

3    me that day I could have clearly went over the air and

4    had the police get there a little more speedily than

5    they actually were instead of going through a wireless

6    system.  There is no procedure.  Once I identify

7    myself as a police officer or once he encounters

8    myself as a police officer I'm in the same situation

9    as someone on patrol.  I'm on duty at that time.

10    Q.    You had indicated earlier that even when a

11   police officer is off duty they are still on duty, is

12   that correct?

13    A.    Yes, within the confines of the District of

14   Columbia, yes.  I believe this order right here is out

15   of date, this 201.36.  I believe there is a revised

16   order to that, there is a revival to that and there is

17   an extension that goes with that order.

18                    (Ford Exhibit No. 6 marked

19                     for identification.)

20         BY MR. JACKSON:

21    Q.    Officer Ford, I'm showing you what has been

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

125

1   marked as Exhibit 6 and for the record it's General

2   Order Metropolitan Police Department.  The title is

3   Outside Employment and it's order No. 201.17,

4   effective date of April 16, 2004.  Did I read that

5   correctly?

6        A.   It is a General Order 201.17.

7        Q.   I want to direct your attention to page

8   471.  Do you have that in front of you?

9        A.   Yes, I do.

10       Q.   At the bottom there is a Section K, do you

11  see that?

12       A.   Yes.

13       Q.   And it says, "Reporting and Arrest

14  Procedures", do you see that?

15       A.   Yes.

16       Q.   No. 1 says, All members, including those

17  engaged in police-related outside employment, shall

18  first notify the Public Safety Communications Center

19  by telephone or police radio, when available and where

20  practicable to do so without jeopardizing the safety

21  of a threatened individual, prior to responding to or

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

126

1    initiating any direct police action, when alerted to a

2    felony in progress or a crime against a person".   Do

3    you see that?

4         A.    Yes, I see that.

5         Q.    Prior to engaging Mr. Brown did you

6    communicate with the Public Safety Communications

7    Center?

8         A.    This order pertains if a sworn member is

9    involved in outside employment and say like if I went

10   to get a part-time job at McDonalds or Lowes or

11   whatever, then I have to notify the department and do

12   the paperwork to ask permission or to notify that I'm

13   engaged in outside employment.  It's no more than if I

14   ask the 16-year old down the street to come and cut my

15   grass.  That doesn't make me his employer nor does it

16   make me run a business.  What it does is say if I'm

17   engaged in outside employment then I must notify the

18   department that I'm in outside employment.  It does

19   not say, "Hey, can you cut my grass for you?  I will

20   pay you".  It's no more than if I was out here working

21   and I didn't notify the department, then this order

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

127

1    would apply.  If I was applying for a job outside of

2    my police duties, this order would apply.  For me to

3    have someone do something for me and compensate them

4    for it does not apply.  This order does not apply to

5    me.

6        Q.  So it is your testimony that although the

7    very first part of that order says "all members", that

8    does not include you?

9        A.  It says, "engaged in police related outside

10   employment".  It does not say all members including

11   those that hire somebody to cut their grass or paint

12   the front of their house.

13       Q.  Let me just read the first part again.  It

14   says, "All members, including those engaged in police

15   related outside employment", doesn't it?

16       A.  Police related outside employment, key word.

17       Q.  Did I read that correctly?

18       MR. PRESSLER:  It is an outside employment

19   general order.  It relates to persons engaged in

20   outside employment.  When it says all members, it

21   means including those whose outside employment is in a

128

1    police-related outside employment.

2            MR. JACKSON:  Do you have an objection?

3            MR. PRESSLER:  Yes, I have an objection.  It

4    is not relevant.

5            MR. JACKSON:  Just state the objection.

6            MR. PRESSLER:  You're testifying for the

7    record what you think this means.

8            MR. JACKSON:  I'm asking him questions.

9            MR. PRESSLER:  It's very clear from the face

10   of this document that this is the outside employment

11   order.  It addresses those members engaged in outside

12   employment, whether non-police related or police

13   related.  It has no relevancy to this case

14   whatsoever.  He was not in outside employment.

15           MR. JACKSON:  Is that your objection?

16           MR. PRESSLER:  That is my objection.

17           BY MR. JACKSON:

18       Q.   So when you're off duty and you decide to

19   take police action, are you required to contact

20   anybody?

21       A.   If the means are available.

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

129

1    Q.    On the day of the shooting when you first

2  spotted Mr. Brown, -- do you have Exhibit 2A in front

3  of you?

4          Now, in Exhibit 2A your vehicle, looking at

5  it from the picture, is the last or the first car from

6  the corner on the right, correct?

7    A.    Correct.

8    Q.    And when you first spotted Mr. Brown were

9  you driving in the direction that your car was headed

10 in this picture?

11   A.    Yes.

12   Q.    Do you know whether or not your girlfriend

13 has a cell phone?

14   A.    No, she didn't, neither one of us had a cell

15 phone at the time.

16   Q.    And I believe you testified that when you

17 first saw him he was near that light pole that is in

18 front of the car that is in front of your car on the

19 right side?

20   A.    Yes.

21   Q.    Did you make any attempt to go inside of the

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

130

1   house that you were renovating to call the detective

2   or the sergeant to let them know Mr. Brown was in the

3   area?

4        A.   There was no phone in the residence.

5        Q.   Then I'm confused because I thought earlier

6   in your testimony you were saying that there was a

7   phone inside the house and that when he ran that you

8   used the phone to call the police?

9        A.   No, sir, I had a police radio at the time.

10       Q.   I'm sorry, you're right, that was my

11  mistake.  So inside of the house there wasn't a

12  working phone?

13       A.   No, sir, there wasn't.  That was the reason

14  I left and went to 1514 Neal Street to make the phone

15  call.

16       Q.   Did you have your police radio on you on the

17  day of the shooting?

18       A.   No, I did not.

19       Q.   And the woman that you saw on the porch with

20  the phone, was she in front of you or to the right of

21  you?

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

131

1      A.    She was to my front right.

2      Q.    To your front right?  Do you know when you

3   saw Mr. Brown where he was coming from?

4      A.    No, I do not.

5      Q.    Do you know where he was going to?

6      A.    No, I do not.

7      Q.    Do you know if he had been into the house

8   that you were renovating just prior to you arriving?

9      A.    No, I do not.

10     Q.    Did you ever tell anybody that when you

11  first spotted Mr. Brown you turned around in your car?

12     A.    I may have told the FITS team investigator

13  during the taping, I may have mentioned it when I was

14  giving a statement to the FITS team investigators.

15     Q.    So was it true that when you first saw Mr.

16  Brown you had to turn around in your car?

17     A.    No, I never made a turn around in my car.

18     Q.    What did you do?

19     A.    Actually, I was started into a turn and that

20  is when I could view him from my left so what I did

21  was backed up a couple of feet and brought the car to

132

1  the left and pulled up at the curb.  I hadn't

2  completed the turn nor had I actually crossed the

3  crosswalk.

4      Q.  So when you first spotted Mr. Brown you were

5  in the process of turning around?

6      A.  Not turning around, I was in the process of

7  making a right-hand turn, which going northbound on

8  West Virginia Avenue.  I was making a right-hand turn

9  that would put Mr. Brown to my left, which gives me a

10  clear view of Mr. Brown coming down the sidewalk.  I

11  never completed the turn.

12      Q.  So in Exhibit No. 2A, do you see where the

13  police car is?

14      A.  Yes.

15      Q.  Were you in that area when you first spotted

16  Mr. Brown?

17      A.  I was in the approximate area but half of

18  the car was on Neal Street and half was on West

19  Virginia.  I was in the process of making a right

20  turn.

21      Q.  You were in the process of turning right

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

133

1    onto Neal Street when you spotted Mr. Brown?

2         A.   Yes.

3         Q.   Is there a reason why you did not proceed to

4    find a telephone to call the detective or Sergeant to

5    let them know that Mr. Brown was in the area?

6         A.   I'm sorry, say that again.

7         Q.   Is there a reason why you did not attempt to

8    find a telephone to call the detective or the sergeant

9    to let them know that Mr. Brown was in the area?

10        A.   Once he was stopped someone was requested

11   and asked for the phone call to be made.

12        Q.   My question is prior to you stopping Mr.

13   Brown, is there a reason why you did not try to find a

14   telephone to call the detective or the sergeant to let

15   them know that Mr. Brown was in the area?

16        A.   I don't really get the question because --

17   you are saying that prior to me exiting my car?

18        Q.   Prior to you exiting your car.

19        A.   It never came to mind.

20        Q.   Never came to mind.

21                         (Ford Exhibit No. 7 marked

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

134

1              for identification.)

2        BY MR. JACKSON:

3        Q.    Officer Ford, I have handed you a document

4   that is marked as Exhibit No. 7.  It is a General

5   Order of the Metropolitan Police Department.  The

6   title is Metropolitan Police Department Sworn Law

7   Enforcement Officer Code of Ethics and it is a General

8   Order 201.36.

9        A.    Go ahead, I'm listening.

10       Q.    Could I ask you, Officer Brown, unless

11  you're writing something that your attorney has

12  instructed you, could you tell me what you're

13  writing?

14            MR. PRESSLER:  He is consulting with me.

15            MR. JACKSON:  Not during the questioning you

16  can't do that.  If you want to take a break and talk

17  to your lawyer, go ahead.

18            MR. PRESSLER:  Do you need to take a break?

19            THE WITNESS:  Yes, real quick.  I need to

20  ask him a question.

21            (Witness confers with Mr. Pressler outside

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

135

1    the room.)

2              BY MR. JACKSON:

3         Q.   Officer Ford, what if anything did you do

4    today to prepare for today's deposition?

5         A.   Nothing, my usual routine.  I just got up

6    this morning, watched the news, made a couple of cups

7    of coffee, took a shower, got dressed and proceeded on

8    down here.

9         Q.   Other than any conversations you may or may

10   not have had with your counsel or anybody from

11   counsel's office did you talk to anybody about what

12   you were going to testify to?

13        A.   No, I don't talk to anybody.  I usually stay

14   to myself.

15        Q.   Did you review any documents?

16        A.   I looked at the documents briefly in my

17   attorney's office but that's it.

18        Q.   Which documents did you look at?

19        A.   I cannot remember, there are so many.

20        Q.   Do you know what a Force Investigation

21   Report is?

136

1      A.    Yes, that is one of the documents you showed

2   me earlier.

3      Q.    Did you look at the Force Investigation

4   Report?

5      A.    The UFA?

6      Q.    No, the Force Investigation Report.

7      A.    May I see one?

8      Q.    The one that was done by the FIT team?

9      A.    That is a UFA.

10      Q.    Did you review that report?

11      A.    No, I just briefly glanced at it.  I didn't

12   study it or anything.

13      Q.    Did you review the report or the sections of

14   the report as it relates to Sergeant Wax' report

15   regarding his interview with you?

16      A.    No.  Actually the only documents that I have

17   really sat down and studied was the lawsuit that was

18   given to me by the person that came to my home and

19   served it, and that is about it.  Really that was the

20   only thing, with Ms. Henderson's name attached to it

21   and the young gentleman at the end of the table and

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

137

1    there is one more person that is attached to it.  And

2    the package that I actually received from the 2nd

3    District which I took a memo with that to General

4    Counsel.

5        Q.   I believe you have in front of you Exhibit

6    7, is that correct?

7        A.   Yes.

8        Q.   And I identified it for the record.  If you

9    look at the second page, page 658, do you see that?

10       A.   Yes.

11       Q.   And the third paragraph from the top, "I'll

12   never", do you see that?

13       A.   Yes.

14       Q.   I'll never act officially or permit personal

15   feelings, prejudices, political beliefs, aspirations,

16   animosities or friendships to influence my

17   decisions".  Did I read that correctly?

18       A.   Yes, I read that.

19       Q.   Would you agree that the situation as it

20   involved you and Mr. Brown was a personal matter?

21       A.   Would I what?

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

138

1      Q.   Would you agree that the situation that

2  involved you and Mr. Brown was a personal matter?

3            MR. PRESSLER:  What do you mean by personal

4  matter?

5            BY MR. JACKSON:

6      Q.   Do you understand the question?

7            MR. PRESSLER:  I don't understand the

8  question.  I'm his lawyer.

9            BY MR. JACKSON:

10     Q.   What is important is the witness understands

11  the question.  Officer Ford, do you understand the

12  question?

13     A.   Yes.

14     Q.   Okay.  And your answer is?

15     A.   You are asking me if I had any personal

16  feelings, prejudice?

17            MR. PRESSLER:  That is not what he asked

18  you.

19            THE WITNESS:  What are you asking me,

20  exactly?

21            BY MR. JACKSON:

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

139

1       Q.    Would you agree that the situation between

2   you and Mr. Brown was a personal matter?

3       A.    No, I was acting in the capacity as a

4   Metropolitan police officer, stopping a person and

5   phoning in.

6       Q.    Would you agree that the theft of your tools

7   was a personal matter?

8       A.    That had been resolved with me being told

9   that I was going to be compensated for that theft, so

10  that was thrown out the window.

11      Q.    That wasn't my question, my question was

12  would you agree that the theft of your tools was a

13  personal matter?

14      A.    No, because that matter had been resolved

15  with the agreement that I would be compensated, so

16  that statement that you are asking me was thrown out

17  the window because it has nothing to do with the fact

18  that I stopped Mr. Brown on a felony warrant.

19      Q.    When you stopped Mr. Brown on the day of the

20  shooting, did you ask him about your tools?

21      A.    Yes, I did.

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

140

1    Q.   So can you explain to me if the matter had

2    been resolved because Mr. Eugene Brown had promised to

3    repay you for the tools, so then why were you asking

4    Mr. Brown on the day of shooting about the tools?

5    A.   Why would I tell him that he had a felony

6    warrant and I was waiting for the police to get there

7    to make an arrest.

8    Q.   My question was -- you said you asked him

9    about the tools on the day of the shooting.  My

10   question was if in your mind it had been resolved why

11   are you now questioning him about that?

12        MR. PRESSLER:  He has already answered

13   that.  He has answered that about two times.  He

14   explained why he confronted Mr. Brown.

15        MR. JACKSON:  He told me about the warrant.

16   I didn't ask him about the warrant.  I wanted to know

17   about the tools.

18        MR. PRESSLER:  What date are you talking

19   about?

20        BY MR. JACKSON:

21   Q.   Do you understand my question?

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

141

1      A.   Not totally, no.

2      Q.   The day of the shooting when you confronted

3  Mr. Brown you indicated to me that you asked him about

4  the tools, correct?

5      A.   Yes, I asked him, I didn't ask him

6  specifically about the tools, I asked him why did he

7  steal from me.  I didn't ask him about returning them,

8  I didn't ask him when I was going to get them back.  I

9  asked him why did he steal from me.

10     Q.   And my question is if in your mind based on

11  what Mr. Eugene Brown told you about reimbursing you

12  for the tools, if that had been resolved, then why are

13  you asking Mr. Brown about the tools?

14     A.   Because I didn't ask him per se about the

15  tools, I asked him a specific question, why did you

16  steal from me.

17     Q.   Did you have any animosity toward Mr. Brown

18  for stealing your tools?

19     A.   No, if I'm going to be reimbursed and I went

20  out and spent my entire paycheck to go back and rebuy

21  tools, no, I don't think so, especially if I knew I

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

142

1    was going to be reimbursed, I mean, that is a big

2    deal.

3        Q.   You have indicated earlier -- when you

4    stopped Mr. Brown right before the shooting, did you

5    have your handcuffs on you?

6        A.   No, I stated earlier when that question was

7    asked what equipment I had on me, I stated that I had

8    my service weapon, my ID and my badge.

9        Q.   I believe you testified that the reason why

10   you drew your weapon was to detain Mr. Brown, is that

11   correct?

12       A.   The reason I drew my service weapon was to

13   stop an attack that Mr. Brown was engaged in on

14   myself.  It was a deterrent to stop the attack.

15       Q.   So if Mr. Brown had just turned around and

16   walked away from you, what would you have done to

17   detain him?

18       A.   Nothing.  We are not trained to shoot

19   anybody that is moving away from you, only if you're

20   attacked and you feel that that fight is going to be

21   lost and you feel that your life is in great danger

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

143

1    and the lives of others are in great danger.  Mr.

2    Brown had every opportunity, from the time that I got

3    out of that car, to turn arround and make a 180 and

4    disappear.  Mr. Brown also had an opportunity when

5    that service weapon came out to comply to my orders as

6    a Metropolitan police officer, which most people do.

7    Mr. Brown made that choice.

8         Q.   At what point did you ask the woman on the

9    porch to call the police?

10        A.   Once I exited the car and I asked him why

11   did he steal from me and he became agitated, and that

12   is when I identified myself to her, that I was a

13   Metropolitan police officer and would you please call

14   the police.

15        Q.   Now, you indicated earlier that within

16   seconds of the shooting the police, a police vehicle

17   pulled up?

18        A.   Yes.

19             MR. PRESSLER:  That is not what he said.  If

20   you want to know what he said maybe she can read it

21   back.

# EXHIBIT 2

# CHIEF PETER NEWSHAM – FEBRUARY 5, 2008

TAKAISHA HENDERSON, et al.
vs.
DISTRICT OF COLUMBIA, et al.

Page 1 to Page 45

Condensed Transcript and Concordance
Prepared By

*PRECISE REPORTING SERVICES*
8804 Sumner Grove Drive
Laurel, Maryland 20708
Phone (301) 210-5092
Toll Free (866) 847-3351
Fax (301) 210-5094
www.precisereportingservices.com



*Precise Reporting Services*
(301) 210-5092
*Serving MD, D.C. & VA*

DEPOSITION OF CHIEF PETER NEWSHAM
Conducted on February 5, 2008

**1**

1  UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

2             CIVIL DIVISION

3  --------------------------x

4  TAKAISHA HENDERSON, et al.,   x

5       Plaintiffs,   x 1:06CV00947

6       v.    x Judge Kennedy

7  DISTRICT OF COLUMBIA, et al.,   x

8       Defendants.   x

9  --------------------------x

10         Tuesday, February 5, 2008

11         Washington, D.C.

12  The deposition of CHIEF PETER NEWSHAM called for

13  examination by counsel for Plaintiffs in the

14  above-titled matter, pursuant to notice, in the

15  Offices of Cohen & Cohen, 1821 Jefferson Place,

16  Northwest, Washington, D.C., before Jonell Easton,

17  notary public in and for the District of Columbia,

18  at 12:40 a.m., when were present on behalf of

19  respective parties:

20

21

**2**

1     On behalf of the Plaintiffs:

2       ADAM R. LEIGHTON, ESQUIRE

3       Cohen & Cohen, P.C.

4       1875 Jefferson Place, Northwest

5       Washington, D.C.  20036

6       202.955.4529

7

8     On behalf of the Defendant

9      District of Columbia:

10

11       DAVID A. JACKSON, ESQUIRE

12       Assistant Attorney General

13       Jaquira Joiner, Intern

14       Office of the Attorney General

15       441 Fourth Street, Northwest

16       6 Floor South

17       Washington, D.C.  20001

18       202.724.6618

19

20

21

**3**

1     On behalf of Defendant

2     Officer Edward Ford:

3

4       MARC WILHITE, ESQUIRE

5       Pressler & Senftle, P.C.

6       927 15th Street, Northwest

7       12th Floor

8       Washington, D.C.  20005

9       202.822.8384

10       - - -

11

12

13

14

15

16

17

18

19

20

21

**4**

1         C O N T E N T S

2  EXAMINATION BY COUNSEL      PAGE

3  MR. LEIGHTON     5, 41

4  MR. WILHITE     38

5  MR. JACKSON     43

6

7

8       NEWSHAM EXHIBITS

9  DEPOSITION EXHIBITS     MARKED

10  No. 1 Review Board report   36

11     (Exhibits attached.)

12       - - -

13

14

15

16

17

18

19

20

21

1 (Pages 1 to 4)

DEPOSITION OF CHIEF PETER NEWSHAM
Conducted on February 5, 2008

Page 5

1    PROCEEDINGS
2    Whereupon,
3        CHIEF PETER NEWSHAM
4    was called for examination by counsel for
5    Plaintiffs and, after having been first duly sworn
6    by the notary public was examined and testified as
7    follows:
8        EXAMINATION BY COUNSEL FOR PLAINTIFFS
9        BY MR. LEIGHTON:
10    Q.  Please state your name for the record.
11    A.  Peter Newsham.
12    Q.  Chief Newsham, have you had your
13    deposition taken before?
14    A.  Yes.
15    Q.  Approximately how many occasions?
16    A.  Probably at least seven or eight.
17    Q.  I only have one ground rule.  If I ask you
18    a question and you answer the question, I will
19    assume you understood the question.  Fair?
20    A.  Fair.
21    Q.  Is it your understanding you are here

Page 6

1    today as a representative of the District of
2    Columbia?
3    A.  Yes.
4    Q.  Is it your understanding that what you say
5    will be binding on the District of Columbia?
6    A.  Yes.
7    Q.  It is my understanding you have been
8    designated in the area --- to talk about scope of
9    employment issues.  Is that your understanding?
10    A.  Yes.
11    Q.  By whom are you employed?
12    A.  Metropolitan Police Department.
13    Q.  For how long have you been so employed?
14    A.  Eighteen years.
15    Q.  What makes you qualified to talk about
16    scope of employment issues?
17    A.  I have had experience with Metropolitan
18    Police Department as a manager, I have been a
19    manager over a number of years and we had to
20    familiarize ourselves when our officers are acting
21    within scope of employment and when not and

Page 7

1    specifically within my experience in Internal
2    Affairs Bureau.
3    Q.  Tell me about your experience in Internal
4    Affairs.
5    A.  We look at an officer's misconduct,
6    officer's use of force, we have a lot of
7    interaction with the U.S. Attorney's office or the
8    Attorney General's office, those types of things.
9    Q.  You said you have had to familiarize
10    yourself with scope of employment issues.
11        What did you do to familiarize yourself
12    with scope of employment issues?
13    A.  Everything I have learned --- reading on
14    the police department, interacting with the
15    attorneys, staying up to date with the current
16    regulations, being familiar with my General Orders.
17    Q.  In today's deposition, when we talk about
18    orders and regulations and any other kind --- and
19    codes we reference, I ask that we talk about those
20    items that were in place at the time of the
21    shooting on February 22, 2006.  Is that okay?

Page 8

1    A.  I will do that to the best I can.
2    Q.  To the extent that something would not
3    apply at the time of the shooting, let me know and
4    we will know that for purposes of the deposition.
5        What have you reviewed for today's
6    deposition?
7    A.  A couple of excerpts from the police
8    manual and the investigation involving Officer
9    Ford's use of force.
10    Q.  Was that the FIT investigation?
11    A.  Yes.
12    Q.  My understanding --- we have been provided
13    a copy of the final investigative report done by
14    Sergeant Wax.
15        My understanding is there have been
16    subsequent additions to the report, which we don't
17    have, but which Mr. Jackson will provide.
18        Did you review Sergeant Wax's report and
19    these items, additional documents?
20    A.  I was a member of the Use of Force Review
21    Board when the case came before it.

2 (Pages 5 to 8)

DEPOSITION OF CHIEF PETER NEWSHAM
Conducted on February 5, 2008

9

1    Q.   For how long were you a member of the Use
2    of Force Review Board?
3    A.   Good question, for a while, at least a
4    year, maybe longer, probably longer, I think maybe
5    it may have been closer to two years.
6    Q.   Are you no longer a member?
7    A.   Because I am in charge of Internal
8    Affairs.
9    Q.   I know you briefly told me about some of
10   the positions you have held while a member of the
11   police department.
12       Can you take me back through your 18 years
13   and go over your history of employment?
14   A.   I was an officer in 6D, became vice
15   investigator in 6D.
16       Promoted to sergeant, went to 7D patrol
17   sergeant.
18       And then I was promoted to lieutenant and
19   went to 5D, I became a lieutenant detective at 5D.
20       Promoted to captain, went back to 6D, I
21   was in patrol.

10

1        I was promoted, became command over Second
2    District.
3        I was promoted to Internal Affairs where I
4    served for about two years.
5        Then I was transferred to Regional
6    Operations Command North.
7        And, most recently, under Chief Lanier, I
8    was brought back to Internal Affairs.
9    Q.   You said you read from, excerpts from the
10   police manual.  Can you be more specific and tell
11   me what you read.
12   A.   Ones relevant, pertinent to this case, for
13   example, requirement for officers must obey orders
14   from superior officers and officers are not
15   supposed to interfere with other officers'
16   investigations, and a couple of others.
17   Q.   Did you ever know, prior to this
18   investigation or this case, Officer Ford?
19   A.   I didn't know him personally, no.
20       Let me correct that, I didn't know him
21   personally that I knew of.  I may have seen him in

11

1    passing.  I didn't know him.
2    Q.   Had you heard of him?
3    A.   I had heard of him, yes.
4    Q.   Related to the mailbox incident?
5    A.   Yes.
6    Q.   As part of the review board, strike.
7        How many members are there of the review
8    board?
9    A.   Six.
10   Q.   Tell me the purpose of the review board.
11   A.   It is to review serious use of force cases
12   by command officials, to make final determination
13   by the police department whether the use of force
14   was justified and, more generally, if there are any
15   trends developing with use of force in the police
16   department and to recommend training, if necessary.
17   Q.   What determination did the board make with
18   regard to Officer Ford's use of force?
19   A.   If I remember, it was unjustified.
20   Q.   Sergeant Wax found it to unjustified, not
21   within departmental policy, would that be the same

12

1    finding?
2    A.   Yes.
3    Q.   Do you know the basis of why the board
4    found this to be an unjustified shooting not within
5    policy?
6    A.   I would have to review board notes.  I can
7    tell you my personal evaluation.
8    Q.   I don't want your personal evaluation,
9    more so because I am looking at the District's
10   position.
11   A.   Okay, if I wait until we get those
12   documents, they should lay it out pretty clearly.
13   Q.   Did the board make a determination as far
14   as whether Officer Ford was within the scope of the
15   employment when the shooting took place?
16   A.   No.
17   Q.   Is that something that the board would or
18   would not normally do in looking at a police
19   shooting?
20   A.   They wouldn't normally do that, it is not
21   a determination they make.

3 (Pages 9 to 12)

DEPOSITION OF CHIEF PETER NEWSHAM
Conducted on February 5, 2008

13

1    Q.   When were you first asked to look at the
2  scope of employment issue with regard to Officer
3  Ford's shooting?
4    A.   When I was asked to testify in this case.
5    Q.   When that was?
6    A.   I don't know exactly, maybe six, eight
7  weeks ago.
8    Q.   When you were asked to, strike.
9        Besides — I don't want to know any
10  conversation with Mr. Jackson, besides Mr. Jackson,
11  have you spoken to anybody about this case and this
12  shooting, strike.
13        With regard to the scope of employment
14  issue, in the last six or eight weeks, besides Mr.
15  Jackson have you spoken to anybody about Officer
16  Ford and the scope of employment?
17    A.   When I spoke to Mr. Jackson, I think there
18  was one other attorney present, other than that,
19  no.
20    Q.   How much time did you spend on review of
21  the FIT report and police manual to make your

14

1  determination?
2    A.   I probably met with Mr. Jackson, spoke to
3  him on the phone a couple of times about once, one
4  maybe two times, I had to review the record, so a
5  couple of hours.
6    Q.   What is the District's position with
7  regard to whether Officer Ford was within scope of
8  employment at the time of shooting February 22,
9  2006?
10    A.   We said he was not in the scope of
11  employment.
12    Q.   Can you tell me the basis of the
13  District's opinion that Officer Ford was not within
14  the scope of his employment?
15    A.   He was given a directive specifically not
16  to participate in that case involving that person,
17  he did disobey that directive.
18    Q.   Do you know who gave him that directive?
19    A.   One of his supervisors or one of the
20  sergeants who interacted with him prior to that
21  event had given him that directive.

15

1    Q.   Is it the District's position because he
2  received an order, anything he would have done in
3  violation of the order would put him outside the
4  scope of employment?
5    A.   Anything he would have done in violation
6  of this order, I would say yes would be outside the
7  scope of his employment.
8    Q.   Assume for purposes of my question that
9  the order was never given, that Officer Ford was
10  never told not to be involved in the investigation.
11        If that order was never given, is there
12  anything else that would place Officer Ford outside
13  the scope of his employment when he approached and
14  subsequently shot Mr. Brown?
15    A.   I think that is getting a little bit more
16  complicated if you get into very specific actions
17  that were taken and I think you evaluate all
18  witnesses that were involved.
19        I would say to accidentally shoot someone
20  would not be within the scope of one's employment.
21        I would say that to intentionally shoot

16

1  someone who was not posing an immediate threat to
2  you would be outside the scope of employment.
3        That is not what we train our police
4  officers to do — to intentionally shoot someone
5  under the circumstances which he shot someone.
6    Q.   Is there anything else that Officer Ford
7  did that would put him outside the scope of
8  employment?
9        I understand you said he violated a direct
10  order.
11        And you talked about the action, shooting,
12  when someone is unintentionally shooting someone,
13  that would be outside the scope.
14        Is there anything else he did that placed
15  him outside the scope?
16    A.   Than those three — I can't think of any
17  other right now.
18        When — do you want me to clarify?
19    Q.   Please.
20    A.   When talking about disobeying an order
21  that, I guess, there are some things that would

4 (Pages 13 to 16)

DEPOSITION OF CHIEF PETER NEWSHAM
Conducted on February 5, 2008

17

1 fall into that — we talked about other
2 regulations, interference with someone else's case
3 I guess could potentially, that would still fall
4 under disobeying an order. That is the main,
5 general violation.
6   Q.  Chief, how about the fact Officer Ford —
7 forget about the order, you told me that was a
8 violation under normal circumstances, that order
9 had not been given.
10     If the officer had seen Mr. Brown, stopped
11 his car, got out, approached him, identified
12 himself to the lady on the porch, said call 911,
13 identified himself as an officer, would any of that
14 put him outside the scope of employment?
15   A.  I think the personal involvement he had
16 with decedent I think would bring him outside the
17 scope of his employment, too.
18     One of the things we try to teach our
19 people is we are supposed to do our job without
20 personal involvement.
21     To the extent someone would get involved

18

1 in the investigation of a crime that is related to
2 them personally, I think that would be outside the
3 scope of what we teach them to do.
4   Q.  Understanding you teach your people not to
5 do that, are there any codes, General Orders or
6 regulations that were in place that officers were
7 not to be involved in a personal issue?
8   A.  I think if you go into the General Orders,
9 I think you could find something we are not
10 supposed to get involved in things that are
11 personal in nature.
12   Q.  Would you be able, upon leaving here, to
13 look for that and provide it to Mr. Jackson and
14 have Mr. Jackson provide to me?
15   A.  Sure.
16   Q.  I would ask, then, for any order you based
17 those opinions on.
18   A.  Right, outside of the scope of written
19 orders, it's something we generally train our
20 people on in daily interaction and when you go to
21 the training division, that is one of the things

19

1 they speak about, not supposed to get involved —
2 in personal relationships, you shouldn't be
3 involved in crimes that are personal to your
4 investigation of those things.
5     Intuitively it doesn't make sense, it is
6 common sense, it gives the appearance of
7 impropriety.
8   Q.  When it goes into training, what — the
9 training academy?
10   A.  Yes, and potentially, we have 40-hour
11 trainings given to officers on a yearly basis. It
12 is potentially mentioned during that. I am sure I
13 discussed when I was at roll call for people in
14 similar incidents and in daily mentoring with our
15 officers.
16     MR. JACKSON:  For the record, the General
17 Orders I believe the chief is referring are the
18 same ones I questioned Officer Ford about at his
19 deposition.
20     THE WITNESS:  2101.24, 201.35, DCMRA
21 Chapter 6 A Section 200.1 and DCMRA Six A Section

20

1 200.5.
2     MR. LEIGHTON:  Were those the ones you
3 provided me already?
4     MR. JACKSON:  Yes.
5   BY MR. LEIGHTON:
6   Q.  Chief, if I showed you these that were
7 provided to me by Mr. Jackson, can you take a look
8 and let me know if you are familiar and if they
9 would be something you would be relying on in your
10 opinions in the case?
11   A.  Sure.
12     MR. LEIGHTON:  Take your time.
13     (Pause in the proceedings.)
14     THE WITNESS:  You want me to point to a
15 specific one I think encompasses what I was talking
16 about?
17   BY MR. LEIGHTON:
18   Q.  I want to know if you are familiar with,
19 if you are familiar them and they are applicable in
20 this case.
21     I need for you to let me know the major

5 (Pages 17 to 20)

DEPOSITION OF CHIEF PETER NEWSHAM
Conducted on February 5, 2008

21

1  ones?
2      A.  201.1, it shall be the duty of each member
3  of the force to be thoroughly familiar with
4  Metropolitan Police Department manual by the time
5  he or she completes the review training school.
6      Carries the function of the department,
7  namely preservation of peace, protection of life
8  and property — all members of the force and
9  employees of the department and all branches of the
10  districts and bureaus thereof shall direct or
11  coordinate their efforts as managers that tends to
12  establish and maintain the highest standard for
13  efficiency.
14      Do you want the next one — 1200.5.
15      Q.  Whatever.
16      A.  Member of the force should promptly obey
17  any order emanating from a superior officer, an
18  order that conflicts with a previous order from any
19  other superior with any general or specific memo or
20  orders provision of the manual, the member of the
21  force to whom such order is given shall call

22

1  attention to the conflict to the officer giving the
2  order so to obviate that conflict, if his or her
3  order shall stand the person obeying order should
4  not be held any way responsible for disobeying any
5  order theretofore issued.
6      201 point 26, may take a while.
7      Under one, it is the duty and
8  responsibility of each member of the police force
9  to preserve, protect life and property, prevent
10  crime, apprehend criminals, recover lost and stolen
11  property, enforce all laws ordinances of the
12  District of Columbia in adequate, fair and
13  impartial manner.
14      I don't think if you are investigating a
15  crime associated with yourself that you can be fair
16  and impartial, that is Part A 1 Number 1 D and R, I
17  would call one of the ones we thought was very
18  important.
19      Q.  What that order in place at the time of
20  the shooting?
21      A.  November 10, 1976 is the date of this

23

1  order.
2      Part one A three — members shall
3  recognize power of police to fulfill function and
4  duty as dependent on public approval of existence
5  — and ability to cure and maintain public aren't.
6      I indicated earlier I think that would be
7  showing the appearance of impropriety if we do
8  personal investigates of minor crime that is
9  occurred to us individually members of the police
10  department.
11      Q.  Let me stop you, you said minor crimes.
12      Was the crime Mr. Brown was wanted for,
13  was it a felony or misdemeanor?
14      A.  Sounded like it was a felony.
15      Q.  How do you categorize minor crime?
16      A.  Unfortunately in the District of Columbia,
17  theft would be considered minor, but as part of the
18  Police Department — we have a lot of theft in the
19  District of Columbia and I don't remember it being
20  a strong arm theft or anything, there wasn't any
21  physical violence.

24

1      Q.  Even classified as a felony, it was minor?
2      A.  I think if you look at the District of
3  Columbia, the distinction between misdemeanor and
4  felony is about $250 because the laws were written
5  so long ago.
6      If they had updated the law, I don't think
7  the threshold would be so low.
8      It would be interesting to see what kind
9  of warrant they got in that case — felony or
10  misdemeanor, I don't know if they got warrants, the
11  U.S. Attorney's office may have decided to charge
12  felony, I think when they indicated it, put it down
13  on the papers, they made it a misdemeanor.
14      Q.  Chief, would your opinion be different
15  Mr. Brown had murdered Mr. Ford's brother, Ford saw
16  him, approached him — everything that happened
17  had happened, would it be different then because it
18  was a major crime?
19      A.  What?
20      MR. JACKSON:  Objection.
21      You can answer.

6 (Pages 21 to 24)

**25**

1       BY MR. LEIGHTON:
2       Q.  Would the scope of issue of employment
3   issue be different?
4       **A.  If all other factors were the same?**
5       Q.  Same.
6       **A.  Different crime?**
7       Q.  Different crime.
8       **A.  I think the scope of employment would be**
9   **the same.  He would be acting outside the scope of**
10  **employment, disobeying an order, he shot an unarmed**
11  **person in an accidental discharge.**
12      **The fact he was investigating a crime, but**
13  **it was personal, I think he violated pretty much**
14  **the substance of this order.**
15      Q.  What, if anything, could Officer Ford have
16  done when he saw Mr. Brown that day?
17      **A.  Called the police from a safe distance and**
18  **have uniform police respond and handle the**
19  **situation.**
20      Q.  Does the fact Officer Ford was not in
21  uniform when he approached Mr. Brown have any

**26**

1   bearing on your opinions in this case?
2       **A.  I can tell you that is not a good idea in**
3   **a theft case, particularly it is not a good idea**
4   **— talking about scope of employment, that would**
5   **be, provided he wasn't given an order — we are**
6   **not talking abuse of force?**
7       Q.  Right, lack of uniform.
8       **A.  Pursuing a criminal in a theft case, we**
9   **are really — your hypothetical is far away from**
10  **this.**
11      Q.  I understand.  I am not trying to muddy
12  the water.  I am trying to look at each thing and
13  see how that effects your opinion.  I know you
14  looked at totality.  I need to know just that.
15      **A.  I think I understand.**
16      **I would say the fact he was in plain**
17  **clothes would that have impact, that alone, I don't**
18  **think so, no.**
19      Q.  These officers, if they see a crime being
20  committed, even if not on their tour of duty, if
21  they are in plain clothes, they can still respond

**27**

1   and be considered on duty.  Correct?
2       **A.  Yeah, yeah, it is not a good idea,**
3   **especially a minor crime.**
4       **The best course of action would be to call**
5   **for a uniformed officer.  That would be something**
6   **in our on-going coaching of our officers, I am sure**
7   **they cover it in the academy, and that is something**
8   **we would discuss.**
9       Q.  Not a good idea because of danger of what
10  could happen?
11      **A.  For a whole number of reasons, danger been**
12  **probably the most important, you don't want to**
13  **approach anybody by yourself.**
14      **Secondly, you don't want to approach**
15  **someone when they don't know you are a police**
16  **officer and they will more likely know that if you**
17  **are driving a marked vehicle and wearing a uniform.**
18      Q.  It would be considered within the scope if
19  you were in uniform and you were in a marked
20  vehicle?
21      **A.  Probably could.**

**28**

1       Q.  You were still going through there.
2       **A.  It will take a while, it is a long order.**
3       Q.  You don't have to read every part.
4       **A.  I would have to read the whole Order.**
5       Q.  Do you feel the whole Order is applicable?
6       **A.  I think a number of parts of the Order,**
7   **which would go back to the main theme, which says**
8   **we are supposed to enforce the law in a fair and**
9   **impartial manner.**
10      **For us to get personally involved in the**
11  **case where we are victims of a crime, the essence**
12  **of the Order is violated.  I really think you are**
13  **acting outside the scope of your employment in that**
14  **case.**
15      Q.  I will not make you read whole General
16  Order.
17      What other General Order would you rely on
18  for your opinion?
19      **A.  What?**
20      Q.  Which other General Order — you have two
21  in front of you, are they —

7 (Pages 25 to 28)

DEPOSITION OF CHIEF PETER NEWSHAM
Conducted on February 5, 2008

---

**29**

1    A. Yes, our ethics order, when you are
2 trying, being ethical, there is an appearance of
3 impropriety when you become involved in a matter
4 that is personal in nature, it gives the public the
5 opinion we are acting personally as opposed to on
6 behalf of the government.
7    I think ethical orders would probably
8 apply, I am not sure the outside employment order
9 would apply because an outside employment order is
10 orders that covers work for private establishments.
11 I didn't think that applied.
12    Q. Besides the order we just discussed, are
13 there any other orders you can think that would be
14 applicable here?
15    A. I don't think I could say that, whether
16 there are or aren't.
17    Q. If you find another that would be
18 applicable, would you supply that to Mr. Jackson so
19 he could give it to me?
20    A. Right.
21    Q. Understanding it may not be a good idea,

---

**30**

1 does a Metropolitan Police Department officer who
2 is not within a tour of duty, but who sees someone
3 who they know there is an arrest warrant out for
4 them, do they have an obligation to try to arrest
5 that person and/or contain them?
6    A. No, definitely, I would say there was an
7 obligation to take police action and police action
8 could be anything as small as making a phone call
9 to the police.
10    I didn't think there is a requirement from
11 someone off duty to intercede in an arrest.
12    By law they would be required in D.C. to
13 take some form of police action.
14    Q. General Order 200.4, you referred to that
15 term off duty, that Orders state members of the
16 force are always considered to be on duty.
17    Can you tell me what is meant by that?
18    MR. JACKSON: For the record, Municipal
19 Regulations and General Orders.
20    BY MR. LEIGHTON:
21    Q. Thank you, I appreciate that.

---

**31**

1    A. I think pretty similar to what we just
2 discussed, if you see a crime occurring, a citizen
3 comes up to you, when you are off duty, I think you
4 are required to take some kind of action.
5    Q. Back in February of 2006, was there a
6 requirement in the District of Columbia that
7 officers carry a service weapon at all times?
8    A. I don't know when we changed the Order.
9 Show me the new Order.
10    Q. I know it has been changed. I didn't know
11 if that was in place. I just got that from
12 Sergeant Wax.
13    A. It has been a while, I believe under Chief
14 Ramsey, that gets you back at least a year.
15    Q. Do you know why it was changed?
16    A. I think specifically to try and allow
17 officers to, for example, go out and eat in D.C.
18 and have a glass of wine and beer with dinner and
19 not be required to carry a service weapon, under
20 those circumstances, I think that had a lot to do
21 with it.

---

**32**

1    MR. JACKSON: Before we go on, I found the
2 Use of Force Review Board report. I didn't really
3 think I had it. I will give it to you and let you
4 make copies.
5    MR. LEIGHTON: I will have someone make
6 copies.
7    MR. JACKSON: Signed by Chief Newsham.
8    (Discussion off the record.)
9    BY MR. LEIGHTON:
10    Q. Even though it may not be a good idea,
11 would you agree police officers who are not on
12 their tour of duty may still arrest and/or contain
13 an individual for a crime?
14    A. Not on their tour of duty?
15    Q. Not.
16    A. Not working?
17    Q. Correct.
18    A. Would it be okay, I can tell you every
19 time that officer would get involved in something
20 like that, I would think that a supervisor would
21 counsel about that being inappropriate, an

---

8 (Pages 29 to 32)

DEPOSITION OF CHIEF PETER NEWSHAM
Conducted on February 5, 2008

---

33

1  inappropriate tactical maneuver.
2      Q.   Would it put that outside the scope of
3  employment?
4      A.   I'd say it's a fine line, no, probably
5  not.
6      Q.   Did you read Officer Ford's deposition?
7      A.   No.
8      Q.   Chief, on page --- I took Officer Ford's
9  deposition, on page 52, I will read you a question
10  I asked him and the answer he gave.
11      Question, when you pulled out your weapon,
12  did you do so in your mind as a member of
13  Metropolitan Police Department.
14      Answer, yes, the moment I stopped him and
15  showed him my badge, arrived on the scene, I was
16  acting in the capacity of a police officer.
17      My question would be would Officer Ford's
18  state of mind at the time he was approaching and
19  subsequently shot Mr. Brown, would his state of
20  mind go into your determination, at all, with
21  regard to his scope of employment?

---

34

1      A.   No.
2      Q.   Why not?
3      A.   Because he was directed not to get
4  involved in the first place.
5      His state of mind, I think it would be,
6  come into play that you could get a determination
7  what his motives were, you know what I mean, at the
8  time, you know, so let me --- it will take
9  clarification.
10      If his motives were getting this guy who
11  stole his tools, we are more outside, we are even
12  more outside the scope of employment.
13      If his motives were to arrest this guy
14  wanted on this warrant, I think which is highly
15  questionable for that to be a motive considering
16  all of the circumstances, the fact he was still
17  given an order not to participate, that still
18  places him outside the scope.
19      I don't know if that helps you.
20      You are saying his state of mind, you
21  would get him further out of the scope of

---

35

1  employment if he said I will go over there and get
2  revenge against this person who stole my tools.  I
3  think that puts him, to that extent, that could
4  impact he is outside the scope of employment.  I
5  think that puts him more outside the scope of
6  employment.
7      On the other hand, if he was to say I was
8  acting as Metropolitan Police Department, that's
9  pretty self-serving, to say the least.
10      I don't think that would impact the scope
11  of employment because he was all ready outside
12  scope of employment.
13      Q.   Did the Attorney General's, the District's
14  attorney recommendation that charges not be filed
15  against Officer Ford come down before or after you
16  final report?
17      A.   Before.
18      Q.   Did you speak to the District's attorney,
19  at all, regarding that decision?
20      A.   No.
21      MR. LEIGHTON:  Mark this please.

---

36

1      (Newsham Deposition Exhibit No. 1 was
2  marked for identification.)
3      BY MR. LEIGHTON:
4      Q.   Chief, we have marked as Exhibit 1 the
5  Metropolitan Police Department Use of, Review Board
6  final FIT report?
7      A.   It is Use of Force Review Board Report.
8      Q.   You authored this report?
9      A.   I have an administrator who writes the
10  report.  I reviewed and signed.
11      Q.   Upon signing it, you agreed with the
12  contents of it?
13      A.   Yes.
14      Q.   Under General Order 201.26, there is a
15  section dealing with conduct in arrests,
16  processing, well, I will read it --- member shall
17  make diligent efforts ---
18      A.   May I see a copy?
19      Q.   Of course, just read it and I can ask you
20  questions.
21      A.   Okay.

---

9 (Pages 33 to 36)

DEPOSITION OF CHIEF PETER NEWSHAM
Conducted on February 5, 2008

Page 37

1    (Witness complies.)
2    THE WITNESS:  D two or three?
3    MR. LEIGHTON:  Two.
4    THE WITNESS:  Okay.
5    BY MR. LEIGHTON:
6    Q.   Member shall make diligent effort to
7    arrest or locate the wanted person and recover
8    stolen and lost property --- was this order in
9    place at the time of the shooting?
10   A.  This order, yes.
11   Q.   Could it be said that Officer Ford was, in
12   fact, locating a wanted person for stolen or lost
13   property and investigating at the time of the
14   shooting?
15   A.  Repeat the question.
16   Q.   Could this order be.applicable to Officer
17   Ford if he was attempting to arrest or locate the
18   person who was wanted for stolen and lost property?
19   A.  I don't think it would apply to Officer
20   Ford in his circumstance because he was given an
21   order not to do it.  That would not be an illegal

Page 38

1    order, that would be a legal order.
2    Q.   If it was an illegal order, he could have?
3    A.  That is the only order you can disobey.
4    MR. LEIGHTON:  I don't think I have any
5    further questions.
6    MR. WILHITE:  Let me take a moment to
7    check my notes.
8    (Discussion off the record.)
9    EXAMINATION BY COUNSEL FOR DEFENDANT
10       OFFICER EDWARD FORD
11   BY MR. WILHITE:
12   Q.   Chief, I am Marc Wilhite, counsel for
13   Officer Ford.
14   I have a couple of questions to follow up
15   on what has been covered, specifically concerning
16   the plain clothes issue.
17   The testimony you gave, it is my
18   understanding that in response to that line of
19   questions concerning approaching a suspect while in
20   plain clothes and when a crime is being committed
21   was your response while saying that could be in the

Page 39

1    scope, it is your impression that wouldn't be a
2    good idea?
3    A.  Right.
4    Q.   My question is are you aware, is it your
5    understanding that for an officer in the District
6    of Columbia who observed a crime being committed
7    that could be subject to, in an administrative
8    context, some sort of discipline for failing to act
9    if they chose not to do anything?
10   A.  It would be a big difference between not
11   doing anything and taking some kind of action.
12   Police action could be as small as making
13   a phone call.
14   To be in plain clothes and to not make an
15   arrest because you determined it was a bad tactical
16   decision would not be something we could discipline
17   someone for.
18   Q.   Specifically in this situation if, for
19   instance, the situation is you have someone in
20   plain clothes and they do observe something they
21   know to be a violation of the law in D.C. and they

Page 40

1    didn't do anything, kept walking, is that your
2    understanding?
3    A.  Potentially could be discipline.
4    Q.   The only other subject other I wanted to
5    touch on was your discussion briefly on the matter
6    being personal in nature.
7    I guess really from what you testified to,
8    you obviously indicated, I believe, is it true
9    things are that, where an officer is considered
10   specifically to have been given an order not to be
11   involved, they should cease, not take action or to
12   investigate?
13   A.  If you were directed to stay out of the
14   investigation, that would be a lawful order.
15   Q.   Are there any situations, based on your
16   experience and your understanding of the rules and
17   regulations where, strike.
18   If there is any personal involvement that
19   officer has, does that in and of itself not permit
20   that officer to be involved in the investigation?
21   A.  I think they would, according to this

10 (Pages 37 to 40)

DEPOSITION OF CHIEF PETER NEWSHAM
Conducted on February 5, 2008

41

1  Order, be required to withdraw themselves from that
2  to police in a fair and impartial way.
3      MR. WILHITE:  Thank you.
4      MR. LEIGHTON:  Two minutes.
5      (Discussion off the record.)
6      EXAMINATION BY COUNSEL FOR PLAINTIFFS
7      BY MR. LEIGHTON:
8   Q.  Chief, in looking at Officer Ford's
9  deposition, he states he was not ordered to not
10  interfere in this investigation, that being said,
11  if he was never ordered, I know there is testimony
12  from people saying he was given an order.
13      If he wasn't given an order, he still
14  would have, wasn't within the scope because he
15  discharged his weapon when it wasn't appropriate.
16  Correct?
17   A.  That is one of the reasons I would say,
18  yes.
19   Q.  There is the personal involvement which we
20  talked about?
21   A.  Right, I mean you don't want me to comment

43

1         EXAMINATION BY COUNSEL FOR
2         DEFENDANT DISTRICT OF COLUMBIA
3         BY MR. JACKSON:
4   Q.  Chief, when there is an order from a
5  superior officer to a subordinate, does the order
6  have to be in writing or can it be verbal?
7   A.  Could be verbal.
8      MR. JACKSON:  That is all I have.
9      (Signing having not been waived, the
10  deposition was concluded at 1:42 p.m.)

42

1  or personal involvement.
2   Q.  Go ahead.
3   A.  I guess one of the things that is kind of
4  telling with regard to his motivation in this
5  particular case is that in particular area of the
6  city there is a lot of wanted people.
7      And I guess we would have to review the
8  officer's history to see how frequently he became
9  involved in an arrest of other wanted people in
10  that particular neighborhood and see if that is
11  something he did on a frequent basis.
12   Q.  He would have to know they were wanted?
13   A.  Right.
14   Q.  Here it was known he was wanted?
15   A.  Right, officers that live in their
16  neighborhoods in our city became very much familiar
17  with the people who are wanted.
18      In that neighborhood, there are a lot of
19  wanted people.
20      MR. LEIGHTON:  That is all I have.
21      MR. JACKSON:  Two questions.

44

1         CERTIFICATE OF NOTARY PUBLIC
2   I, JONELL EASTON, the officer before whom the
3  foregoing deposition was taken, do hereby testify
4  that the witness whose testimony appears in the
5  foregoing deposition was duly sworn by me; that the
6  testimony of said witness was taken by me
7  stenographically and thereafter reduced to
8  typewriting under my direction; that said
9  deposition is a true and accurate record of the
10  testimony given by said witness; that I am neither
11  counsel for, related to, nor employed by any of the
12  parties to the action in which this deposition was
13  taken; and further, that I am not a relative or
14  employee of any attorney or counsel employed by the
15  parties hereto nor financially or otherwise
16  interested in the outcome of the action.
17         JONELL EASTON
18
19         Notary Public in and for the
20         District of Columbia
21  My Commission Expires:  March 31, 2009

11 (Pages 41 to 44)

DEPOSITION OF CHIEF PETER NEWSHAM
Conducted on February 5, 2008

45

1       CERTIFICATE FOR READING AND SIGNING

2

3       I hereby certify that I have read and examined

4    the within transcript and the same is a true and

5    accurate record of the testimony given by me.

6       Any corrections that I feel are necessary, I

7    have listed on the separate ERRATA SHEET enclosed,

8    indicating the page and line number of each

9    correction.

10

11

12

13    _____

14    Signature of Witness,    Date

15

16

17

18

19

20

12 (Page 45)

**EXHIBIT 3**

GOVERNMENT OF THE DISTRICT OF COLUMBIA
METROPOLITAN POLICE DEPARTMENT
INVESTIGATIVE FILE REPORT

P.D. 854 rev 7/76

## REPORT OF INVESTIGATION

| FILE TITLE | DIVISION | BRANCH |
|---|---|---|
| Use of Service Pistol Investigation | OPR | FIT |
| | I.D. NO. | ARREST NO. |
| | COMPLAINT NO. 06-023-994 | CASE NO. FIT #S-F-05-075 |

| | OTHER OFFICERS. Sgt. Brian Corrigan | CROSS FILE | RELATED FILES |
|---|---|---|---|
| ☐ ACTIVE ☐ CLOSED ☐ REQUESTED ACTION OTHER | | ☐ | |
| ☐ REQUESTED ACTION FROM ☐ OTHER | | ☐ | |
| BY | | ☐ | |
| UNIT Sgt. Ralph Wax | | ☐ | |
| DATE OPR/FIT | | ☐ | |
| February 22, 2006 | | | |

REPORT RE:

### Interview of Officer Edward Ford

On Wednesday, February 22, 2006, Second District Officer Edward Ford was interviewed by Force Investigation Team Sergeants Ralph Wax and Brian Corrigan regarding his use of service pistol incident that occurred at the intersection of West Virginia Avenue and Neal Street, Northeast. Present during the interview was Officer Ford's legal counsel Mr. Harold Martin. Prior to the interview Officer Ford was given Garrity warnings and volunteered to provide a statement. The following is a summary of Officer Ford's audio taped statement:

Officer Ford stated that he and his girlfriend, Ms. Jessica Smith-Haynie were in the process of renovating a house located at 1247 Oates Street, Northeast, preparing it for a home inspection. Officer Ford and Ms. Smith-Haynie were in the process of purchasing the house from the Brown family. As part of the purchase arrangement, Mr. Ignatius Brown, who had recently gotten out of prison, was allowed to reside in the premises while the repairs were being conducted and until the closing date. At some time about 12:00 PM, Thursday, February 16, 2006, Officer Ford arrived at the house and unloaded a ladder and some tools. It was then that he noted that his air compressor, several pneumatic nail guns, a table saw, and other process of carpentry tools were missing from with the house. Officer Ford checked the premises for evidence for a forced entry or break-in and found nothing. Officer Ford indicated that the only other person with keys to enter the house was Mr. Brown. Officer Ford stated that he spoke to an unidentified male in the alley who told him that he had seen Mr. Brown remove a saw from the premises and noted that it had the name "*Edward*" on it and that Mr. Brown was selling it. Also, a neighbor provided Officer Ford with a computer disk with digital photographs of Mr. Brown taking the property. Officer Ford then went to Ms. Smith Haynie's house on Neal Street, Northeast and called the police, who responded and took a report fro Theft-1. The officers then he a code-one radio assignment and left the scene. The reporting officer returned a short time later and provided Officer Ford with the report numbers. Officer Ford returned to work on the house with his remaining tools and noticed that the tools and ladder that he had just brought to the house were gone and Officer Ford prepared to report it to the officers.

Later that night, Officer Ford and Ms. Smith Haynie waited inside of 1247 Oates Street, Northeast, until Mr. Brown returned. At that time, the two confronted Mr. Brown, who admitted taking the property and said to give him time to get the tool back because he was not going back to jail. Officer Ford told Mr. Brown that he was going to get the police, to which Mr. Brown ran from the premises. Officer Ford pursued Mr. Brown for about two blocks towards Trinidad Street, Northeast. Several officers arrived on the scene and Mr. Brown got away and was not seen again. A Fifth District detective called Officer Ford the next day and told him that he was preparing an arrest warrant for Mr. Brown, but indicated that he would not be able to get it until the following Tuesday.

DISTRIBUTION:

SIGNATURE (Officer)

APPROVED (Name and title)

**OFFICIAL USE ONLY**

This report is the property of the Metropolitan Police Department
Neither it nor its contents may be disseminated outside the agency to which loaned

DATE 2/7/07

# GOVERNMENT OF THE DISTRICT OF COLUMBIA
## METROPOLITAN POLICE DEPARTMENT
### INVESTIGATIVE FILE REPORT

P.D. 854A Rev. 4/74

**REPORT OF INVESTIGATION**
(Continuation)

| FILE TITLE | DATE | BRANCH |
|---|---|---|
| | February 22, 2006 | |
| Interview of Officer Edward Ford | | I.D. NUMBER |

On Tuesday, February 22, 2006, Officer Ford and Ms. Smith-Haynie had an appointment with a representative of *Geico Insurance* at 1:00 PM, to do a pre-inspection of the house for homeowner's insurance. Ms. Smith Haynie then had to go to *Urban Legal System* at 220 I Street, Northwest. After approximately thirty minutes, the two left and then stopped at the store on the corner of Florida and West Virginia Avenues, Northeast. There the two purchased some bread a six pack of beer, chip and snack cakes. As Officer Ford and Ms. Smith-Haynie were traveling northbound on West Virginia Avenue, Northeast, in Officer Ford's vehicle and were turning eastbound on Neal Street, Northeast. It was there that Officer Ford observed Mr. Brown walking southbound on the east sidewalk of West Virginia Avenue, Northeast. Officer Ford stopped his vehicle, backed it up and then parked it at the east curb of Virginia Avenue, Northeast.

Officer Ford and Ms. Smith-Haynie then confronted Mr. Brown about the stolen tools. Mr. Brown said that Officer Ford did not understand that it was not about him, it was about Mr. Brown. The two argued about the stolen property. Officer Ford told Mr. Brown to stay there until the police came and then he asked a woman on the porch in front 1309 West Virginia Avenue, Northeast, talking on a cellular telephone, to call the police. Officer Ford identified himself as a police officer, pulled out his badge and asked the woman to call the police and tell that that he was holing someone there. The woman said okay and then began dialing her telephone. At that time Mr. Brown began walking towards Officer Ford and then took off his black backpack and placed it on the lawn of an adjacent house and stated that he was not going back to jail. At the point when Mr. Brown apparently realized that the police were responding he started swinging at Officer Ford. Officer Ford related that he knew that when Mr. Brown removed his book bag, he was not going to be cooperative and was prepared to fight. According to Officer Ford, Mr. Brown began making karate type moves and was swinging his fists at him. Officer Ford attempted to calm Mr. Brown and told him to stay there until the police came. As Mr. Brown moved forward Officer Ford extended his arm in an attempt to keep him back. Officer Ford told Mr. Brown that he was getting to close to him and asked him to "*Go back!*" Mr. Brown was backing Officer Ford southbound down the sidewalk towards Neal Street, Northeast. Officer Ford described how he placed his right hand on his holstered service pistol and use his left hand to extend forward towards Mr. Brown's chest.

At the point immediately before Officer Ford stepped off of the sidewalk onto Neal Street, Northeast, Officer Ford drew his service pistol in response to Mr. Brown stating, "*Well you know what? Fuck it, if I've got to meet my maker, just fuck it!*" Officer Ford was asked what threatening behavior on the part of Mr. Brown warranted a display of deadly force. Officer Ford indicated that seated in a vehicle he could not show Mr. Brown's actions, but he explained that although he had not been struck, Mr. Brown was angry and physically threatening.

According to Officer Ford after he drew his service pistol Mr. Brown charged at him. Officer Ford called out to Mr. Brown, "*Just hold up! Just stop!*" while still extending his hand forward Mr. Brown had backed Officer Ford into the street where he held his service pistol against his chest with both hands. Mr. Brown then lunged towards the officer. It was then that was when the weapon discharged. Officer Ford why he had discharged his service pistol and he responded, "*It wasn't intentional. It really was not. It was just to detain him there. It really was not.*" Mr. Brown after being shot groaned and fell to the ground. Officer Ford stated that Mr. Brown never presented a weapon.

Officer Ford stated that Mr. Brown knew that he was a police officer. He related that for the past four months, after leaving work he would come over to 1247 Oates Street, Northeast, often in uniform, and work on the premises. ﹍ording to Officer Ford, Mr. Brown was often there when he was in uniform and added that he had paid Mr. ﹍wn to help him. Mr. Brown was employed to help with odd jobs, painting and cleaning etc. Officer Ford stated

**OFFICIAL USE ONLY**

This report is the property of the Metropolitan Police Department
Neither it nor its contents may be disseminated outside the agency to which loaned

GOVERNMENT OF THE DISTRICT OF COLUMBIA
**METROPOLITAN POLICE DEPARTMENT**
INVESTIGATIVE FILE REPORT

P.D. 854A Rev. 4/74

**REPORT OF INVESTIGATION**
(Continuation)

| FILE TITLE | DATE | BRANCH |
|---|---|---|
| Interview of Officer Edward Ford | February 22, 2006 | I.D. NUMBER |

that he knew that Mr. Brown had service time in prison and that Ms. Smith-Haynie was a friend of the Brown family. Officer Ford was told by Ms. Smith Haynie that Mr. Brown's mother had been abused by the children.

Officer Ford stated that he did not have his issued ASP, O.C. Spray canister or handcuffs with him and indicated that his Sam Brown belt was inside of Ms. Smith Haynie's residence. Officer Ford showed investigators that he was wearing a clip-on type inside of the pants holster and stated that the holster had been approved by the Metropolitan Police Department range personnel and had been stamped. Officer Ford stated that he did not consume any alcohol and showed investigators that the six pack of beer had not been opened.

Officer Ford stated that he was very upset and indicated that he was sorry that the incident happened. Officer Ford stated that he did everything possible not to let it happen as it did. Officer Ford added that this incident profoundly affected his life.



**OFFICIAL USE ONLY**

This report is the property of the Metropolitan Police Department
Neither it nor its contents may be disseminated outside the agency to which loaned

# EXHIBIT 4

# CHAPTER 2   GENERAL RULES

Secs.

| | |
|---|---|
| 200 | Performance of Duties |
| 201 | [Reserved] |
| 202 | Standards of Conduct |
| 203-205 | [Reserved] |
| 206 | Badges, Cap Plates, Identification Cards, and Revolvers |
| 207 | Use of Firearms and Other Weapons |
| 208 | Service of Process |

**200**      **PERFORMANCE OF DUTIES**

200.1      It shall be the duty of each member of the force to thoroughly familiarize himself or herself with the Metropolitan Police Manual by the time he or she completes recruit training school.

200.2      Notwithstanding the assignment of specific duties and responsibilities to members of the Metropolitan Police Force by the provisions of the Metropolitan Police Manual, all members of the force shall perform all other duties as may be required of them by competent authority. Policewomen shall, according to rank be governed by the rules laid down for the guidance of male members of the department.

200.3      In carrying out the functions of the department, namely, the preservation of peace, the protection of life and property, the prevention of crime, and the arrest of violators of the law, all members of the force and employees of the department and all branches, districts and bureaus thereof shall direct and coordinate their efforts in a manner as will tend to establish and maintain the highest standard of efficiency.

200.4      Members of the force shall be held to be always on duty, although periodically relieved from the routine performance of it; shall always be subject to orders from the proper authorities and to call from citizens; and the fact that they may be technically off duty shall not be held as relieving them from the responsibility of taking proper police action in any matter coming to their attention requiring that action.

200.5      Members of the force shall promptly obey any order emanating from any superior officer. If an order emanating from any superior officer conflicts with a previous order from any other superior officer, or with any general, special or memorandum order, or provisions of the manual, the member of the force to whom such order is given shall respectfully call attention to that conflict of orders, and if the officer giving the order does not change the order so as to obviate that conflict, his or her order shall stand and the responsibility shall be his or hers, and the person obeying the order shall not be held in any way responsible for disobedience of any orders theretofore issued.

# EXHIBIT 5



| GENERAL ORDER | SERIES | NUMBER | EFFECTIVE DATE |
|---|---|---|---|
| | 201 | 26 | November 10, 1976 |

**SUBJECT**

Duties, Responsibilities and Conduct of
Members of the Department

**DISTRIBUTION**
A

**ORIGINATING UNIT**
PDD

The purpose of this order is to establish the policy and procedures for the conduct of all members of the Metropolitan Police Department concerning their performance of duty, the exercise of their police powers, and their relationship with the public. This order consists of the following parts:

    PART I    Responsibilities and Procedures for
                   Members of the Department

           A.    Responsibilities.
           B.    General Duties and Personnel Conduct.
           C.    Conduct Toward the Public.
           D.    Conduct in Arresting and the
                   Processing of Law Violators.
           E.    Citizen - Police Officer Relationships.
           F.    Code of Ethics.

PART I

    A.   **Responsibilities.**

       1.   It is the duty and responsibility of each member of the police force to preserve the peace, protect life and property, prevent crime, apprehend criminals, recover lost and stolen property, and enforce all laws and ordinances of the District of Columbia and the United States in a fair and impartial manner.

       2.   In accordance with the District of Columbia Human Rights Law, members shall not discriminate, either in the enforcement of the law, or in the provision of police service, on the basis of race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, family responsibilities, matriculation, political affiliation, physical handicap, source of income, or place of residence or business, except as required by specific statute.

       3.   In accomplishing their mission, members shall recognize that:

           a.    The power of the police to fulfill their functions and duties
                is dependent on public approval of their existence, actions,
                and behavior and on their ability to secure and maintain pub-
                lic respect.

           b.    To secure and maintain public respect and approval means also
                obtaining public willingness to cooperate in the task of
                securing observance of the law.

-2-

c. The extent to which the cooperation of the public can be secured diminishes proportionately the necessity for the use of physical force in achieving police objectives.

d. The ultimate goal of police operations is the absence of crime and disorder, not the visible evidence of police action in dealing with them.

B. **General Duties and Personal Conduct.**

1. The prevention of crime being the most important factor from a police point of view, members shall familiarize themselves with the laws and regulations they are required to enforce.

2. Members shall provide themselves with memorandum books and shall make note of matters of interest coming to their attention within the scope of their duties. Such memorandum books shall be subject at all times to examination by their supervisors.

3. Members shall continually maintain a valid operator's license issued by the jurisdiction in which the member resides. Any change in the status of the member's license shall be reported to an official of the department prior to the member's next tour of duty.

4. Members shall report for roll call properly uniformed and equipped and shall give attention to dispatches, orders, and instructions read and issued by the official then in command.

5. When directed to take their beats, they shall do so by the most expedient route and method, and if notified that the member whom they are to relieve has information concerning police business, they shall meet such members at a designated location. However, they shall not utilize their privately-owned mode of transportation unless so directed by competent authority.

6. Unless otherwise directed, or authorized by proper authority, or when necessary for emergency purposes, members assigned to foot patrol beats shall not ride, nor be transported in a vehicle while so assigned during a tour of duty.

7. They shall become thoroughly acquainted with every part of their beat and acquire such knowledge of the residents as will enable them to promptly recognize and furnish information regarding them. At night they shall form impressions of persons they encounter on the streets, so as to enable them to recognize them later; and if the circumstances are of a suspicious nature, they shall ascertain the name and addresses of the persons and appropriately report such information.

8. They shall give persons of known bad character such attention as will make it apparent to the persons that they are under observation and that detection will follow the commission of a crime and shall note and appropriately report the presence of such persons on their beats.

General Order No. 201.26
(Revised    6/25/86    )

568



| Publication | Effective Date | Change Number | Page Number |
|---|---|---|---|
| **General Order 201.26** | **June 28, 1994** | **2** | **5 of 11** |

26.    Members shall not suggest, recommend, advise, or otherwise counsel concerning the retention of an attorney, or bondsman to any person coming to their attention as a result of police business. This does not apply when a relative of the member seeks such service.

27.    Unless specifically authorized by the reporting member or by an official department directive, no member, other than the reporting member, shall sign an official report.

28.    Members shall not interfere with the cases of other members, except by consent of such other members, or their commanding officers.

29.    Members shall report to their immediate supervisor any violations of the rules of the Metropolitan Police Department by any other member of the force.

30.    When questioned by superior officers in connection with matters relating to the official business of the police department, subordinate members shall respond truthfully. Additionally, during the course of an investigation, all members shall respond truthfully to questions by any agent or official of the Office of Internal Affairs (OIA), even if the OIA agent is not of superior rank. During the progress of an investigation, every agent is authorized to conduct any and all investigative activities in the furtherance of an investigation.

31.    A member of the force below the grade of lieutenant who desires an interview with the Chief of Police, or a Bureau Head shall, except as otherwise provided by departmental regulations, make request to his/her commanding officer stating briefly the reason for the request and the commanding officer shall transmit the request to the official indicated for his/her approval, or disapproval. This shall not be construed as restricting any member of the force from requesting an interview with any of the officials mentioned.

32.    Members in either uniform, or civilian attire <u>shall always</u> exercise sound judgement and tact when speaking to, or conversing with other members in civilian attire. This is of utmost importance in order to prevent the inadvertent exposure of members working in confidential, or sensitive assignments. Members must realize that even a casual acknowledgement of a member working in a confidential assignment could possibly place the member and his/her assignment in jeopardy. <u>Therefore, it is imperative that all members of the department strictly adhere to this policy.</u>

33.    In referring to, or addressing a superior officer, whether on, or off duty, the appropriate title to the officer addressed, or referred to shall be used, such as "Chief," "Inspector," "Captain," "Lieutenant," or "Sergeant." Superior officers in addressing members of the force below the rank of sergeant on official business shall use the prefix "Officer."

# EXHIBIT 6

# GENERAL ORDER



**DISTRICT OF COLUMBIA**

| | |
|---|---|
| **Title** | |
| **Metropolitan Police Department Sworn Law Enforcement Officer Code of Ethics** | |
| **Series / Number** | |
| **GO–RAR–201.36** | |
| **Effective Date** | **Distribution** |
| **April 11, 2005** | **B** |
| **Rescinds** | |
| Part I Section F of GO-PER-201.26 (Duties, Responsibilities and Conduct of Members of the Department), Special Order 97-31 (Metropolitan Police Department Code of Ethics) dated December 15, 1997, Special Order 97-34 (Ethics, Conduct and Appearance) dated December 23, 1997 | |

I. Background................................. Page 1
II. Policy......................................... Page 1
III. Regulations............................... Page 1
IV. Procedural Guidelines.................... Page 2
V. Cross References........................... Page 3

## I.   BACKGROUND

Ethics is defined as a code, system, or body of moral principles or good conduct, particularly a system for a group of people or a profession, such as law or medicine. Ethics deals primarily with values: what is good, what is bad, what is right and what is wrong. The responsibility to act ethically rests with every sworn law enforcement officer when he/she goes about his/her professional duties and in his/her personal life.

The Metropolitan Police Department (MPD) derives its authority from the D.C. Official Code § 5-127.03 (Police to have powers of constables; authorization to execute certain Superior Court orders). With this authority, sworn law enforcement officers investigate other people, abridge normal liberties, and use force when necessary. Therefore, it is imperative that sworn law enforcement officers of the MPD epitomize the highest degree of ethical behavior when serving the communities and citizens who live, work, and visit Washington, D.C.

## II.   POLICY

The policy of the Metropolitan Police Department is that sworn law enforcement officers shall maintain the highest standard of conduct and perform their duties in a nondiscriminating, efficient, courteous, respectful, and ethical manner at all times. Further, these official powers shall not be used for personal profit or gain, or violate the Constitution or laws in performance of their work. (CALEA 1.1.2)

## III.   REGULATIONS

Sworn law enforcement officers shall abide by the following Metropolitan Police Department Law Enforcement Officer Code of Ethics, adopted from the International Association of Chiefs of Police Law Enforcement Code of Ethics:

"As a law enforcement officer, my fundamental duty is to serve the community, to safeguard lives and property, to protect the innocent against deception, the weak against oppression or intimidation, and the peaceful against violence or disorder, and to respect the Constitutional rights of all to liberty, equality and justice.

I will keep my private life unsullied as an example to all, and will behave in a manner that does not bring discredit to me or to my agency. I will maintain courageous calm in the face of danger, scorn, or ridicule; develop self-restraint; and be constantly mindful of the welfare of others. Honest in thought and deed in both my personal and official life, I will be exemplary in obeying the law and the regulations of my Department. Whatever I see or hear of a confidential nature, or that is confided to me in my official capacity, will be kept ever secret unless revelation is necessary in the performance of my duty.

I will never act officiously or permit personal feelings, prejudices, political beliefs, aspirations, animosities, or friendships to influence my decisions. With no compromise for crime and with relentless prosecution of criminals, I will enforce the law courteously and appropriately without fear or favor, malice or ill will, never employing unnecessary force or violence and never accepting gratuities.

I recognize the badge of my office as a symbol of public faith, and I accept it as a public trust to be held so long as I am true to the ethics of the police service. I will never engage in acts of corruption or bribery, nor will I condone such acts by other police officers. I will cooperate with all legally authorized agencies and their representatives in the pursuit of justice.

I know that I alone am responsible for my own standard of professional performance and will take every reasonable opportunity to enhance and improve my level of knowledge and competence.

I will constantly strive to achieve these objectives and ideals, dedicating myself to my chosen profession ... law enforcement."

IV.     **PROCEDURAL GUIDELINES**

A.     Specific violations of Department policy or procedures shall be handled in accordance with General Order 1202.1 (Disciplinary Procedures and Processes) and other applicable directives.

B.     Commanding Officers/Directors shall ensure that sworn members of their command:

   1.     Familiarize themselves with the contents of this directive through roll call training and Police Service Area team meetings; and

   2.     Subscribe to the contents of this directive.

    C.    The Director, Institute of Police Science shall ensure that:

        1.    Recruits are familiar with the content of this directive prior to graduation from the Institute of Police Science; and

        2.    The annual in-service training program shall include the contents of this order in the core curriculum.

## V.    CROSS REFERENCES

    A.    General Orders

        1.    GO-PER-201.09 (Equal Employment Opportunity)

        2.    General Order 1202.1 (Disciplinary Procedures and Processes)

        3.    General Order 201.26 (Duties, Responsibilities and Conduct of Members of the Department)

        4.    GO-OPS-304.15 (Unbiased Policing)

    B.    Related Materials

        1.    DC Personnel Regulations, Chapter 18, Part 1 (Employee Conduct)

        2.    MPD Handbook (Authorities, Accountabilities and Duties, 2000 edition)

    C.    D.C. Human Rights Act of 1977, as amended, D.C. Official Code § 3-201 et seq.

Charles H. Ramsey
Chief of Police

CHR:SOA:DAH:JAH:mcw:pas

# EXHIBIT 7

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| TAKAISHA HENDERSON, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civil Action No. 06-00947 (HHK) |
| | ) |
| DISTRICT OF COLUMBIA, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## <u>AFFIDAVIT OF COLIN HALL</u>

1.      My name is Colin Hall. I am over the age of 18 years, and I am competent to testify as to the matters contained herein.

2.      I have been employed with the Metropolitan Police Department since 3/18/98, and I have held the rank of Sergeant since 2/1/04.

3.      On Thursday February 16, 2006, I responded to an incident regarding the theft of property from 1247 Oates Street, Northeast, Washington, as reported by the Officer Edward Ford.

4      When I arrived at the scene, I spoke with Officer Ford who told that Mr. Brown had stolen his tools.

5.      I told Officer Ford to let the investigators handle the investigation into the theft of his tools.

6.      I advised Officer Ford that based on the information we had at this time, that the case needed to be investigated further and we may not have probable cause to make an arrest at this time if we do stop Mr. Brown.

7.      I told Officer Ford at this point Fifth District officers would identify Mr. Brown if he was

stopped as part of the investigation.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY.

Dated: _4-2-08_____

_____
Colin Hall

District of Columbia ss:

WITNESS MY HAND AND OFFICIAL SEAL

_____
        Notary Public

My commission expires: _6-14-2008____

_4/2/08_____
Date

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____ )
                                            )
TAKAISHA HENDERSON,  *et al.*,              )
                                            )
           Plaintiffs,                      )
                                            )
     v.                                     )  Civil Action No. 06-00947 (HHK)
                                            )
DISTRICT OF COLUMBIA,  *et al.*,            )
                                            )
           Defendants.                      )
_____ )

**PROPOSED ORDER**

Upon consideration of Defendant District of Columbia's Motion for Partial Summary

Judgment, the Memorandum of Points and Authorities in Support thereof, the Opposition

thereto, the Reply, if any, and the entire record herein, it is this _____ day of _____

2008,

ORDERED that the District's Motion is GRANTED; and further

ORDERED that the Counts I, II, and V of the complaint as to the District of Columbia

are DISMISSED with prejudiced.


                                    _____
                                    Judge Henry H. Kennedy, Jr.
                                    United States District Court
                                    District of Columbia

Copies:
All Counsel by ECF