# EXHIBIT 1

COPY

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF VIRGINIA

- - - - - - - - - - - - - - - X

TAKAISHA HENDERSON, et al.,          :

        Plaintiffs,          :

    vs.                              : 1:06CV00947

DISTRICT OF COLUMBIA, et al.,        :

        Defendants.          :

- - - - - - - - - - - - - - - X

        Washington, D.C.

        Tuesday, August 7, 2007

Deposition of:

        OFFICER EDWARD MICHAEL FORD,

a witness herein, called for examination by Counsel

for the Plaintiffs in the above-entitled matter,

pursuant to notice, taken at Cohen & Cohen, P.C., 1821

Jefferson Plcae, N.W., 4th Floor, Washington, D.C.,

beginning at 10:00 a.m., before Joan D. Carino, a

court reporter and notary public in and for the

District of Columbia.



Precise Reporting Services
(301) 210-5092
Serving MD, D.C. & VA

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

2

1    APPEARANCES:

2        On behalf of the Plaintiffs:

3            Adam R. Leighton, Esquire

4            Cohen & Cohen, P.C.

5            1821 Jefferson Place, N.W., 4th Floor

6            Washington, D.C.  20036

7            (202) 955-4529

8

9

10       On behalf of the Defendant, The District of

11   Columbia:

12           David A. Jackson, Esquire

13           Office of the Attorney General

14           District of Columbia

15           441 Fourth Street, N.W., 6 South

16           Washington, D.C. 20001

17           (202) 724-6618

18

19

20

21

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

3

1       On behalf of the Defendant, Officer Ford:

2           James W. Pressler, Jr., Esquire

3           Marc L. Wilhite, Esquire

4           Pressler & Senftle, P.C.

5           927 15th Street, N.W., 12th Floor

6           Washington, D.C.  20005

7           (202) 822-8384

8

9

10

11

12

13

14

15

16

17

18

19

20

21

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

5

OFFICER EDWARD M. FORD,

1

2  a witness of lawful age, was duly sworn by the notary

3  public and, being examined by counsel, testified as

4  follows:

5      EXAMINATION BY COUNSEL FOR THE PLAINTIFFS:

6          BY MR. LEIGHTON:

7      Q.    Can you please state your name for the

8  record.

9      A.    My name is Edward Michael Ford.

10     Q.    Mr. Ford, have you ever had your deposition

11 taken before?

12     A.    Yes.

13     Q.    On how many occasions?

14     A.    One.

15     Q.    What was that regarding?

16     A.    The mailbox incident in Georgetown.

17     Q.    That was a few years ago, correct?

18     A.    Yes.

19     Q.    Just to give you a quick  summary of the

20 groundrules -- well, I just actually have one

21 groundrule today and that is if I ask you a question

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

15

1    continuum back in February of 2006?

2        A.    Yes.

3        Q.    Would you agree with me that it's the policy

4    of the Metropolitan Police Department to value and

5    preserve human life?

6        A.    Yes.

7        Q.    Would you agree with me that it's the policy

8    of the Metropolitan Police Department to use the

9    minimum amount of force that is needed to accomplish

10   your mission?

11       A.    Yes.

12       Q.    Prior to February 22nd, 2006 did you know

13   Mr. Ignatius Brown?

14       A.    Could you rephrase?  I am not quite sure by

15   what do you mean by "know".

16       Q.    Prior to February 22nd of 2006 had you ever

17   met Mr. Brown?

18       A.    Yes.

19       Q.    Tell me when the first time is that you

20   remember meeting Mr. Brown?

21       A.    When we went to do a walk-through of a home

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

16

1  that I presently live in.

2      Q.    And when you say you were doing a

3  walk-through of the home you presently live in, that

4  is the 1247 Oates Street, N.E. Address?

5      A.    Yes.

6      Q.    And it's my understanding that you were

7  going to purchase that home, correct?

8      A.    Not I.

9      Q.    Who was going to purchase that home?

10      A.    My girlfriend.

11      Q.    Ms. Smith-Haynie?

12      A.    Yes.

13      Q.    And you accompanied her to do a walk-through

14  of the home?

15      A.    Yes.

16      Q.    Do you remember when that was?

17      A.    It was approximately maybe five to six

18  months prior to the actual purchase of the home.

19      Q.    And tell me the circumstances of how you met

20  Mr. Brown when you were walking through the home?

21      A.    He was present in the home and I didn't know

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

17

1    him.  I didn't know who he was.  He was just there.

2        Q.   Did Ms. Smith-Haynie introduce you at that

3    time?

4        A.   I cannot confirm to say yes or no.

5        Q.   Do you remember having any conversations

6    with Mr. Brown on the day that you went to the

7    walk-through with Ms. Smith-Haynie?

8        A.   No more than probably "Hi, how are you".

9        Q.   Did Mr. Brown to your understanding own that

10   home?

11       A.   No, I wasn't concerned with who the owner

12   was at the time.

13       Q.   After the walk-through that you went on --

14   strike that.

15            What was the purpose of the walk-through?

16       A.   To see whether or not the house was worth

17   purchasing or not.

18       Q.   After the walk-through when, if ever, is the

19   next time that you saw Mr. Brown?

20       A.   Approximately a couple of weeks later,

21   maybe.

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

18

1    Q.    Can you tell me the circumstances of that

2  meeting?

3    A.    It wasn't a meeting.  He was always present.

4    Q.    And when you say he was always present, what

5  do you mean by that?

6    A.    He occupied that house.

7    Q.    To your knowledge after the walk-through did

8  Ms. Smith-Haynie decide to purchase the home at 1247

9  Oates Street?

10    A.    She started the process of purchasing the

11  home.

12    Q.    And to your knowledge when you say she

13  started the process, what did she do to do that?

14    A.    That I can't answer exactly because I am not

15  her.  I didn't do the paperwork.  I didn't do various

16  things.  I was just there to observe and basically to

17  see what repairs had to be done to make it livable.

18    Q.    Was it your intention at that time to help

19  Ms. Smith-Haynie do the repairs to the home?

20    A.    Yes.

21    Q.    My understanding is that while you were

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

19

1   performing repairs on the 147 Oates Street, N.E.

2   property Ms. Smith-Haynie agreed to allow Mr. Brown to

3   continue living at that address, is that correct?

4        A.   I cannot answer for Ms. Smith-Haynie.

5        Q.   When you would go -- strike that.

6             Prior to February 22nd, 2006, how many times

7   would you say that you went to the 147 Oates Street,

8   N.E. home to perform repairs?

9        A.   Approximately in the neighborhood of maybe

10  20 to 30 times.

11       Q.   Of the 20 to 30 times that you went to the

12  147 Oates Street, N.E. property how many times was Mr.

13  Brown present?

14       A.   Almost all the time.

15       Q.   Of the 20 or 30 times that you went to the

16  Oates Street property prior to February 22nd, 2006 was

17  your purpose to perform repairs and renovate the home?

18       A.   Yes.

19       Q.   Of the approximately 20 to 30 times that you

20  went to the 147 Oates Street property prior to

21  February 22nd, 2006 did you have any conversations

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

20

1    that you can remember with Mr. Brown?

2        A.    Yes.

3            MR. LEIGHTON:   Mr. Brown's son, Mr. Terrell

4    Brown, has just entered the room.

5            (Mr. Terrell Brown enters the room.)

6            BY MR. LEIGHTON:

7        Q.    Before we went off the record, Mr. Ford, you

8    were saying that of the 20 or 30 times that you went

9    to the Oates Street address prior to February 22nd,

10   2006 that you had had conversations with Mr. Brown.

11   Can you remember the specifics of any of those

12   conversations?

13       A.    He had actually a conversation with my

14   girlfriend about finding work and we proposed to Mr.

15   Brown that if he didn't find any work he could help

16   out around there with the repairs.

17       Q.    Did there come a time that Mr. Brown helped

18   out with the repairs at the 147 Oates Street address?

19       A.    I wouldn't say he helped out.  I would say

20   that we paid him in advance to do some work and the

21   work wasn't done.

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

21

1    Q.   What did you pay him to do?

2    A.   I paid him myself $200 to help paint and

3  clean up.

4    Q.   Do you know how much Ms. Smith-Haynie paid

5  Mr. Brown?

6    A.   I cannot answer for Ms. Smith-Haynie.

7    Q.   Did Mr. Brown perform the work that you had

8  paid him to do?

9    A.   I would say of the work that I paid him to

10  do there was approximately 20 percent of the work done

11  and then he would disappear.

12    Q.   Besides discussing work that needed to be

13  done and paying Mr. Brown for work that needed to be

14  done at the 147 Oates Street address, are there any

15  other conversations that you remember having with Mr.

16  Brown?

17    A.   Yes, he had asked my girlfriend for some

18  more money and I overheard the conversation and I

19  approached him and told him no longer to ask her for

20  money, that he had to come through me, because of the

21  fact that we paid him once and the work wasn't done.

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

22

1     Q.    And did he respond to you at all?

2     A.    He said something to the nature of "Okay,

3  fine".

4     Q.    Besides that conversation, any other

5  conversations you remember having with Mr. Brown prior

6  to February 22nd, 2006?

7     A.    Yes.  Also he went, he approached Ms.

8  Smith-Haynie again about money and he became upset and

9  he started to, his tone of voice changed and his

10  demeanor changed, and I had to go to him and tell him

11  do not talk to her, if you need anything to talk to

12  me.

13     Q.    Any other conversation you remember having

14  with Mr. Brown prior to February 22nd, 2006?

15     A.    In the house that was about it.  I wasn't

16  very conversational with him.

17     Q.    When you would appear at the Oates Street

18  address and Mr. Brown was present did you ever appear

19  in uniform?

20     A.    Yes.

21     Q.    Did you ever drive your squad car over to

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

23

1  the property?

2      A.   I do not have a take-home car.

3      Q.   So then you never drove a squad car over to

4  the 147 Oates Street address?

5      A.   No.

6      Q.   Of the probably 20 or 30 times that you went

7  to the Oates Street address prior to February 22nd,

8  2006, do you know how many of those times you were

9  actually in uniform?

10     A.   Approximately 15, 20 times.

11     Q.   My understanding is there came a point in

12 time that you brought some tools over to the house and

13 then realized that those tools were missing, is that

14 correct?

15     A.   Yes.

16     Q.   First of all, what tools did you notice were

17 missing from the home?

18     A.   Well, there was a large variety of tools,

19 table saws, nailing guns, finishing guns, compressors,

20 compressor hoists, levelers, hammers, nails, just

21 basically a workman's variety of tools that a person

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

24

1    would use to renovate a house.

2        Q.   How soon prior to February 22nd, 2006 did

3    you realize that the tools were missing from the home?

4        A.   Approximately a week before.

5        Q.   When you noticed that the tools were missing

6    what did you do?

7        A.   I went around to my girlfriend's house and

8    called the police.

9        Q.   When you say you went around to your

10   girlfriend's house, where?

11       A.   I believe 1514 Neal Street.

12       Q.   How far away is that address from the Oates

13   Street address?

14       A.   Approximately six blocks.

15       Q.   When you called the police what happened?

16       A.   I waited approximately 45 minutes to an hour

17   for the police to respond.  I explained the situation

18   to the police, that I had entered the home through the

19   back, that normally I would go into the home from the

20   front door, which I had keys to, but the door was

21   barricaded, So I decided to walk around back and gain

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

25

1    entry through the rear of the house.  I did not check

2    the back door upstairs because we did not have keys to

3    the back door upstairs.  The only keys that I had was

4    the keys to the front door and the keys to the

5    basement door.  I entered through the basement door.

6    I walked upstairs and I didn't notice that anything

7    was unusual at that time.  I brought an extension cord

8    around with me, a ladder and a tool box.  I placed

9    that inside the basement in the laundry room.  I went

10   to go run the cord, I walked up through the back door

11   because I was working on the steps.  I had to put a

12   railing up.  And at that time I noticed that the back

13   door was open, it was unlocked, it wasn't quite

14   closed.  I really didn't pay any attention to it

15   because I just figured he went out through the back

16   door and didn't lock it, because there was no key to

17   lock the back door.

18        Q.   When you say he, you mean Mr. Brown?

19        A.   Mr. Brown.  I reentered the house and

20   started looking for certain tools in the dining room,

21   that is where all the tools were, and the first

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

26

1  thought that crossed my mind was that those tools,

2  maybe my girlfriend had come while I was at work for

3  some reason and cleaned up.  I walked through the

4  whole house, the basement, the first floor and the

5  second floor and there was no tools to be found except

6  the tools that I brought with me.  So I went out back

7  because I was really looking for these tools and the

8  guy across the alley, I didn't know him at the time, I

9  didn't know him, he didn't know me, he made a

10  statement that Mr. Brown was out selling tools and he

11  asked me was my name Edward. On all my tools my name

12  is written, plus the last four digits of my Social

13  Security number, plus my tag number which is issued

14  through the Metropolitan Police Department.  He stated

15  that Mr. Brown had offered to sell him the tools for a

16  few dollars.  I reentered the house.  I locked the

17  basement door.  I exited through the basement door, I

18  locked the top door and exited through the basement

19  door and that is when I proceeded to go to 1514 Neal

20  Street to call the police.

21       Q.   Was your whole name on the tool or just

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

27

1    Edward or Edward Ford?

2        A.    E.M. Ford and my last four digits of my

3    Social Security number and my tag number.

4        Q.    Do you know how that other individual knew

5    your name was Edward?

6        A.    Because he stated that Mr. Brown had showed

7    him the actual tools that he was selling and that is

8    when he spotted my name.  There may have been my first

9    name on some of the tools.

10       Q.    The police that came to take the report at

11   Leo Street, did you know them?

12       A.    No, I did not.

13       Q.    When you made the report what did the police

14   tell you?

15       A.    They just did the report, just like if I was

16   a regular citizen.

17       Q.    After you made the report, when is the next

18   time that you saw Mr. Brown?

19       A.    Later that night.

20       Q.    Where did you see Mr. Brown?

21       A.    We were in the house waiting to confront him

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

28

1   about the tools.

2        Q.   The Neal Street house or the Oates Street

3   house?

4        A.   Oates Street, I'm sorry, and we were in

5   there actually cleaning up, sweeping and everything

6   and he entered the home.

7        Q.   What happened when he entered the home?

8        A.   I confronted him about the tools being

9   missing.

10       Q.   What did you say?

11       A.   I asked him what happened to the tools.

12       Q.   What did he say?

13       A.   He said give him a few days and he will get

14  the tools back, it is not about me, it's about him.

15  Give him some time to get the tools back.

16       Q.   What did you say to that?

17       A.   I told him, well, just stay here while we

18  get the police and you can tell them exactly what you

19  meant by that and the conversation that we had and why

20  the tools are missing.

21       Q.   What did he say to that?

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

29

1    A.    He fled.

2    Q.    Did you follow him?

3    A.    Yes.

4    Q.    And where did he flee?

5    A.    He went eastbound down Oates Street,

6    northbound into the alley between Oates and I believe

7    that is Trinidad and approximately two blocks up.

8    Q.    What time of day was this?

9    A.    It was at night, it was approximately about

10   8:30 at night.

11   Q.    It was February, so I assume it was dark?

12   A.    Yes, I believe so.

13   Q.    Were you in uniform at that time?

14   A.    No, I was not.

15   Q.    When you were chasing Mr. Brown at that time

16   did you say anything to him?

17   A.    No, he had fled.  Let me explain something

18   to you.  I was struck by a car in approximately 1994,

19    '95.  I have an artificial kneecap, I have a rod in

20   my leg and I have pins and screws in my foot, so my

21   sprinting is not as fast as somebody that doesn't have

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

30

1    those injuries.

2        Q.    When you were pursuing Mr. Brown at that

3    time did you at any time draw your gun?

4        A.    As a precaution my weapon did not come out

5    until I entered the alley.

6        Q.    Had you seen Mr. Brown go down the alley?

7        A.    Yes.

8        Q.    When you say as precaution you drew your gun

9    when you were entering the alley, what do you mean by

10   that?

11       A.    That is normal police procedure.  We ready

12   our gun, not in a pointing motion but to hold it to

13   our side as a precaution when we are chasing someone.

14   They turn in the alley, you didn't see exactly where

15   they go, you don't want to be surprised, so it was a

16   precaution.

17       Q.    When you were pursuing Mr. Brown at that

18   time, in your state of mind were you doing so as a

19   member of the Metropolitan Police Department?

20       A.    Yes.  And let me explain something to you.

21   As a member of the Metropolitan Police Department we

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

31

1    work a tour of duty which puts us out on the street as

2    patrol.  Off duty in the District of Columbia we are

3    still police officers within the confines of the

4    District of Columbia.  Our police powers are not

5    revoked nor do we walk away from situations.  It is

6    not like we punch a clock and we say we are not police

7    anymore from the time that we check off in the

8    morning.  When an incident arises we are police

9    officers.

10        Q.    You mentioned something about a tour of

11   duty.  What is a tour of duty?

12        A.    A tour of duty is when I go to roll call

13   from 10:30 at night to 7:30 in the morning, that is my

14   tour of duty.  But my police powers are not revoked,

15   it does not confine me from making arrests or dealing

16   with certain situations.

17        Q.    When you say it doesn't confine you, if you

18   see an incident and you are not in your tour of duty,

19   are you obligated to respond to that incident?

20        A.    I'm responsible to respond to situations.

21        Q.    So if you are not in your tour of duty but

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

32

1    you see a crime being committed, it's still your

2    responsibility to respond to that crime?

3        A.    Yes.  As you well know, I'm quite sure,

4    well, I'm not sure but as you well know if we walk

5    away from a situation, say if we walk away from a bank

6    and they are robbing a bank and we fail to act, then

7    we can also be charged with that crime, plus be given

8    additional time.

9        Q.    When you are not on your tour of duty, does

10   the Metropolitan Police Department still require you

11   to carry your handgun?

12       A.    Yes.

13       Q.    Is that any time you are not in your home

14   you're required to carry your hand gun?

15       A.    Yes, they just passed a general order, I do

16   not have to carry it for certain events, going to

17   church or if I go out to a barber, something like

18   that, but normally in the confines of the District I'm

19   required to carry it off duty, on duty, since

20   President Bush passed this bill from 911 we can carry

21   it anywhere in the country.

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

33

1    Q.   You say they just passed a general order

2  saying you didn't have to carry it to church, was that

3  order passed after February 22nd, 2006?

4    A.   I cannot answer that.  I just know of it.

5    Q.   But on the day that you were chasing Mr.

6  Brown you were not going to church, you did not fall

7  into the any of the categories you just mentioned as

8  far as that general order was concerned, correct?

9    A.   No.

10   Q.   Did you enter the alley?

11   A.   Yes.

12   Q.   And were you able to find Mr. Brown?

13   A.   No.

14   Q.   So what did you do at that point in time?

15   A.   By that time within maybe a minute, a minute

16  and a half the police arrived on the scene, uniformed

17  officers.

18   Q.   Was is it the same officers that had taken

19  your report earlier?

20   A.   I cannot actually say that.

21   Q.   When the officers arrived did you still have

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

34

1   your gun drawn?

2       A.   I had my gun out, not drawn.  Drawn is to

3   point.

4       Q.   And when you say out, you had your gun to

5   your side?

6       A.   Yes.  Long arm, not like this, (indicating),

7   it's long arm to the ground.

8       Q.   What happened when the police arrived?

9       A.   I explained to them what was going on.

10      Q.   Did you identify yourself as a police

11  officer when they arrived on the scene?

12      A.   Once I was confronted by two officers, I

13  verbally told them I was a police officer.  With your

14  weapon out you didn't want to make any sudden moves

15  and I told them I was a police officer and if they

16  gave me a second I would actually show them my

17  identification.

18      Q.   When you say your identification, were you

19  carrying your ID?

20      A.   Yes.

21      Q.   Do you mean a badge?

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

35

1    A.    A badge and ID card.

2    Q.    Did you show them your badge and ID card at

3   that time?

4    A.    Yes.

5    Q.    Then what happened?

6    A.    We continued to search.

7    Q.    Where else did you search?

8    A.    We searched the last site that I saw him

9   turn into, we searched that area.  We searched a

10  street that comes out on the other side of the alley.

11  Some officers set up a parameter around the block.

12   Q.    At that time did you still have your gun

13  out?

14   A.    Yes.

15   Q.    For how long after the police arrived did

16  you continue to search for Mr. Brown?

17   A.    Approximately five minutes.

18   Q.    Tell me what happened.

19   A.    I was called down by an official to meet him

20  down on the corner.

21   Q.    What is an official?

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

36

1    A.    An official is a sergeant.

2    Q.    Why were you called by the sergeant or the

3  official?

4    A.    To inform of what was going on.

5    Q.    What did he say at that time?

6    A.    He just said that the officers on the scene

7  and myself we could not find Mr. Brown and just leave

8  it alone at that time.

9    Q.    Any other conversations with the police

10  officers at that time?

11    A.    No more than explaining what was going on.

12    Q.    Did you then go back to Oates Street or Leo

13  Street?

14    A.    Went back to Oates Street.

15    Q.    Was the next time that you saw Mr. Brown the

16  date of the shooting?

17    A.    Yes.

18    Q.    Between that day that you chased Mr.

19  Brown -- strike that.

20        Between the day that you just described,

21  where you went after Mr. Brown and were unable to get

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

37

1    him, and the date of the shooting, did you talk to the

2    police at all during that time about Mr. Brown?

3         A.    I stalked to a Detective Tecobaum.

4         Q.    And tell me what your conversations with

5    Detective Tecobaum regarded?

6         A.    He explained that he was applying for a

7    felony warrant due to the value of the tools that were

8    stolen.

9         Q.    If you see someone during your tour of

10   duty -- strike that.

11             If you see someone when you are not on a

12   your tour of duty and you know that they have an

13   arrest warrant out for them, do you have the

14   responsibility to arrest that individual or try to

15   contain them as a metropolitan police officer?

16        A.    Yes.

17        Q.    And was this the case back in February of

18   2006?

19        A.    Yes.

20        Q.    What was your understanding as to when the

21   arrest warrant was going to be issued for Mr. Brown?

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

44

1    some thermals, a T-shirt, a hoodie and a tan colored

2    jacket.

3        Q.    What was the weather like outside?

4        A.    From my best recollection it was cold, it

5    was damp.

6        Q.    Was there snow on the ground?

7        A.    No.

8        Q.    When you pulled over there, pulled your car

9    over, did you say anything to Ms. Smith-Haynie at that

10   time?

11       A.    To my best recollection I believe I answered

12   that question no.  If I said anything it would have

13   been probably, "Hey, there go Gary".

14       Q.    At that time did you get out of your

15   vehicle?

16       A.    Yes.

17       Q.    Then what did you do?

18       A.    I approached Mr. Brown and I asked him about

19   the tools.

20       Q.    What did he say?

21       A.    He said it wasn't about me, it was about

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

45

1   him, but my intention in stopping him was not to let

2   -- I knew that there was a warrant.  My intention was

3   not to let him know that I knew there was a warrant.

4   My intention was to detain him there until a uniform

5   officer showed up on the scene and to have that

6   uniform officer run a 1029.

7       Q.   When you say a 1029, what is that?

8       A.   That is a warrants check, criminal check or

9   however you want to put it.

10      Q.   When you got out of your vehicle to go talk

11  to Mr. Brown it was your understanding that a warrant

12  had been issued for his arrest, correct?

13      A.   Yes.

14      Q.   When you got out of your vehicle to go speak

15  to Mr. Brown, was it your state of mind that you were

16  doing so as a metropolitan police officer?

17      A.   Yes.

18      Q.   What did Mr. Brown say to you?

19      A.   There was a conversation when I was asking

20  him about it, I was trying to let him now that if he

21  didn't do anything and to stand by when the police

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

47

1    me, ma'am, is it possible you can call the police?

2    I'm a police officer".  I reached into my pocket, I

3    pulled out my badge and I visually showed her my badge

4    and my ID.

5        Q.   Did you know that woman?

6        A.   No.

7        Q.   Do you know that woman's name now?

8        A.   All I know is Ms. Jackson.

9        Q.   Did Ms. Jackson respond to you in any way

10   after you told her to call the police?

11       A.   Yes.

12       Q.   What did she say?

13       A.   She said, "Okay".  She was actually on the

14   phone at that time.  That's the reason I asked her to

15   call.  She was on the phone abd once I showed her my

16   badge she said "okay" and seemed like she stopped her

17   conversation and she was trying to call the police.

18       Q.   Do you know if she was on a cell phone or

19   normal phone?

20       A.   From that distance, I couldn't tell.

21       Q.   What happened next?

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

48

1    A.   Mr. Brown became very agitated.  He took off

2   his bookbag and his body language became totally

3   different.  It wasn't like we are talking now, we are

4   having a conversation, it became very agitated, very,

5   very agitated.  And at that time he took his bookbag

6   off and laid it up on the wall, on the grass area and

7   the wall, and started pacing back and forth in a

8   motion like he was very impatient, very impatient.

9    Q.   Were you on the sidewalk or were you on the

10   street?

11    A.   We were on the sidewalk.

12    Q.   Continue.

13    A.   And he started to pace back and forth, pace

14   back and forth, and then all of a sudden he was saying

15   that, "Look, I can't go back to jail.  It's not about

16   you, it's about me.  You don't understand.  You don't

17   understand."  And I'm standing there trying to calm

18   him down saying, "Hey, look, if you didn't do

19   anything, don't worry about it, just wait for the

20   police to get here and we'll both explain to the

21   police what is going on".

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

49

1    Q.    Then what happened?

2    A.    Then he just come out of the bag swinging

3    karate moves, kicking, swinging and punching.

4    Q.    What did you do?

5    A.    I extended my left hand out and he is

6    pushing against me, he is trying to get my hands down

7    and he is pushing and pushing and I'm backing up at

8    this time.  The first time I get him off me and he is

9    standing there and I ask him, "What is your problem?

10   Just stay here".  And he is still saying he can't go

11   back to jail, he doesn't want to stick around and all

12   this.  And he jumps on me again.

13   Q.    Did he ever connect with his karate moves on

14   you?

15   A.    Yes, remember my clothing was pretty well

16   padded so it wasn't like he was giving the full

17   effect, but I was on the offense.

18   Q.    Did he kick you or hit you?

19   A.    He hit me in the body areas, shoulder, but

20   it didn't really do anything.

21   Q.    When you say body area you're pointing to

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

50

1    the left side?

2        A.    Right, my left torso area.

3        Q.    And then you tried to push him back with

4    what hand?

5        A.    My left hand.

6        Q.    Your left hand.  Did he retreat?

7        A.    No, he became more aggressive.

8        Q.    Then what did you do?

9        A.    At that time I'm backing up, backing up,

10   this is the second time I'm backing up.  I get him off

11   me again.  I'm standing there talking to him telling

12   him, "Look, what is your problem?  Why are you doing

13   this?"  His comment again is "I am not going back to

14   jail, I am not going back to jail".  The third time he

15   jumps on me I'm just about on the corner and I'm

16   backing the whole time.

17       Q.    The corner of?

18       A.    West Virginia and Neal.  At that time I'm

19   fumbling trying to get my service weapon out.

20       Q.    Where was your service weapon?

21       A.    In the small of my back to the right side.

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

51

1        Q.   You were carrying it in a clip?

2        A.   A clip-on holster, yes.

3        Q.   And then what happened?

4        A.   I pulled the weapon out and he held it down

5   long arm to the ground.  When he realized I had my gun

6   out his comment to me was, "Fuck It", it was like,

7   "Fuck it, I am not going back to jail.  Whatever you

8   have got to do, fine, I'm going to meet my maker,

9   whatever you have got to do because I'm not going back

10  to jail".  And I'm telling him, "We are not going to

11  go through this.  Do not do this, do not do this".

12  And at that moment I really felt that if he had got

13  the upper hand I wouldn't be here talking to you right

14  now.

15       Q.   At any time did you see Mr. Brown with a

16  weapon?

17       A.   No.

18       Q.   At all times did you see Mr. Brown's hands?

19       A.   Of course I seen his hands.  His hands were

20  striking and making moves.

21       Q.   Once you took out your gun and he said those

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

52

1    things, what happened next?

2        A.    I really felt that his intentions were to

3    make good of his escape by removing my weapon from me,

4    to possibly use it on me and to make good of his

5    escape, and at that time I really felt that my life

6    would have been taken if he had got ahold of that

7    weapon.  The weapon was not pulled out to

8    intentionally put Mr. Brown down.  It was pulled out

9    as a deterrant, not to put him down.  Most people,

10   when an officer pulls their weapon out and they have

11   it in a long arm position, they usually comply.  He

12   did not comply.  He did not care.  His intentions were

13   to get me and if he had to go through me, that is what

14   he was going to do.

15       Q.    When you pulled out your weapon did you do

16   so in your mind as a member of the Metropolitan Police

17   Department?

18       A.    Yes, from the moment I stopped him and I

19   showed him my badge and requested an officer to the

20   scene, I was acting in the capacity of a police

21   officer.

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

53

1      Q.    Then what happened?

2      A.    I'm in the street at this moment and he is

3  on the curb and he gets a slight running start like he

4  is charging me and at that moment he goes to leap and,

5  normal reaction, the weapon came up and it was

6  discharged, I fired a shot.

7      Q.    When you fired the shot was he, was Mr.

8  Brown also in the street?

9      A.    Yes.

10     Q.    What happened after you fired the shot?

11     A.    By that time approximately I'd say in under

12 a minute the first officer showed up on the scene.

13     Q.    When you fired the shot what was your

14 intent?

15     A.    I'm sorry, could you rephrase that?

16     Q.    What was your intent when you fired the

17 shot?

18     A.    My intent was self-preservation, to save

19 myself and other people that were around. That weapon,

20 he was not going to get that weapon.

21     Q.    In your mind did you fear for your life when

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

70

1    drawn to be discharged except at the last extreme, no

2    other results, no other way that this thing was going

3    to come to a stop.

4        Q.   But when you actually discharged your

5    service weapon, did you intend to discharge it?

6        A.   At the very last moment when there was no

7    other way to exercise getting this thing under

8    control.

9        Q.   So is that a yes?

10       A.   Yes.

11       Q.   How many times did Mr. Brown strike you

12   before you discharged your service weapon?

13       A.   Approximately four or five times.

14       Q.   Where did he strike you?

15       A.   In the upper torso area, arms.

16       Q.   Did he injure you at all?

17       A.   Not with the padding of clothing.

18                  (Ford Exhibit No. 2A, B & C,

19                  marked for identification.)

20              BY MR. LEIGHTON:

21       Q.   Mr. Ford, did you fill out any incident

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

87

1    was really no conversation, no type of buddy type

2    conversation or anything that we, you know, like some

3    kind of comradery or anything.  My whole purpose there

4    was to get this house fixed up because we were forced

5    with a deadline and my whole purpose there was not to

6    joy talk but to work on the house.

7        Q.   So the conversation you were just telling us

8    about was between Mr. Brown and your girlfriend?

9        A.   Yes.

10       Q.   And you overheard that conversation?

11       A.   Yes, I'm standing right next to her.

12       Q.   And when you heard Mr. Brown say that he was

13   fighting five police officers, did you say anything to

14   Mr. Brown?

15       A.   No, I just pretty much just walked off and

16   continued to work.

17       Q.   Did you ever come to find out whether or not

18   that was true?

19       A.   No, it just crossed my mind if he was

20   fighting five police officers why was he back at home.

21       Q.   And prior to the date of the shooting did

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

88

1    you ever hear that Mr. Brown had a drug problem or

2    substance abuse problem?

3        A.    Actually, after some time had passed and we

4    were in the house working and we went to the front

5    bedroom, the larger of the two front bedrooms, there

6    was some drug paraphenalia in the bedroom.

7        Q.    And at what point was this prior to the

8    shooting?

9        A.    Approximately maybe a month before,

10   something like that.

11       Q.    Did you confront Mr. Brown about that?

12       A.    No.

13       Q.    What if anything did you do when you saw the

14   drug paraphenalia in the bedroom?

15       A.    It was brought to my attention.  I didn't

16   actually go up.  I wasn't probing.  It wasn't my

17   responsibility to probe and see if he was on drugs or

18   if he had anything illegal.  My whole purpose there

19   was to put this house in shape so it would pass an

20   inspection.  It was brought to my attention by my

21   girlfriend and it's just drug paraphenalia, it was not

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

89

1   like, it was basically a crack pipe and other things

2   that drew you to say wait a minute, this is using

3   person or he may have somebody in the house with him

4   that may be using drugs, but that is as far as it

5   went.

6       Q.   Do you know if anyone other than Mr. Brown

7   at the time you were doing these renovations was

8   living in that house?

9       A.   He had a cousin or a nephew by the name of

10  Michael that was there, but he left shortly after we

11  started the renovations.

12      Q.   Is the possession of drug paraphenalia in

13  the District of Columbia a crime?

14      A.   Yes, it is.

15      Q.   And if you're off duty and you see drug

16  paraphenalia in a home, are you required to take any

17  kind of legal action?

18      A.   Well, first I have to attach it to a

19  person.  If he has it on his person or he has it in

20  his possession, then yes, I would, but it was in a

21  bedroom and I could not solely put that on one person.

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

90

1    Q.   Did you make any attempts to determine who

2 might have been the owner of that drug paraphenalia?

3    A.   No.

4    Q.   And is there a reason why not?

5    A.   Because that wasn't my purpose in being

6 there, to see if this was a drug house or if this

7 person was on drugs.

8    Q.   And was your purpose for being there solely

9 to renovate the house that was being bought?

10    A.   Yes.

11    Q.   Now, at some point you indicated that you

12 came to learn that some tools that you had left in the

13 home were missing, is that correct?

14    A.   Yes.

15    Q.   And when did you -- how soon prior to the

16 shooting or prior to the shooting when did you first

17 learn that your tools had been missing?

18    A.   I would say in the timespan of maybe a week,

19 a week before the shooting.

20    Q.   Around a week?  And I believe that you said

21 that later that evening Mr. Brown came to the house,

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

91

1    is that correct?

2        A.    Yes, while we were still in there.  We were

3    working.  We were cleaning out because we had prior,

4    the work that we had paid him to do was never done, so

5    we had a lot of trash and scrap materials because we

6    were preparing to do the floors and we were in there

7    cleaning up.  But we were also waiting for Mr. Brown

8    to show up.

9        Q.    And I believe you indicated that you asked

10   Mr. Brown about the tools?

11       Q.    Yes, I did.

12       Q.    And what did he tell you?

13       A.    He said it wasn't about me, it was about

14   him.  I didn't understand.  He would see what he could

15   do about getting the tools back.  He admitted the

16   tools were gone.

17       Q.    Did Mr. Brown tell you he took the tools?

18       A.    No, he just admitted he knew the tools were

19   gone.

20       Q.    Did you ask Mr. Brown if he actually took

21   the tools himself?

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

92

1      A.    I can't recall if that particular question

2   was asked.

3      Q.    Who was present when Mr. Brown admitted to

4   knowing that the tools were gone?

5      A.    Mr. Brown, myself and my girlfriend.

6      Q.    Were the three of you in the same room?

7      A.    We were standing very close, within maybe 2

8   feet, 3 feet of each other.

9      Q.    Did you ask Mr. Brown where the tools went?

10     A.    He just said give him time to get them back

11  and I made the statement that okay, let me call the

12  police and when I said that he just took off.  He just

13  rushed right past the us and out the door.

14     Q.    Did Mr. Brown indicate how much time he

15  needed to get the tools back?

16     A.    No.

17     Q.    Did you indicate to Mr. Brown that you could

18  give him a certain period of time in which the tools

19  should be returned?

20     A.    No, he never gave me the opportunity to

21  continue the conversation.

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

93

1     Q.    Just let me go back to the drug

2   paraphenalia, as you were cleaning up the house did

3   you find any other items that are used for drug use?

4     A.    Yes.

5     Q.    What else did you find?

6     A.    Yes, actually after we did the walk-through

7   we began the work, the basement was a dump.

8     Q.    It was a what?

9     A.    A dump.  And there was clothes, they had a

10  bar in the back next to the laundry room and there was

11  clothes and they were damp, musty, and apparently

12  there had been a water problem, which had been

13  resolved.  There was a water problem and the stench of

14  musk was in the house.  There was a bed and there were

15  several items around there and when you walked through

16  there there were pipes that were broken in the

17  basement.

18    Q.    What kind of pipes?

19    A.    Hyps, hypothermic needles.  There were hyps

20  and we did not clean up anything.  What it was, when

21  we talked to Eugene Brown we informed him that the

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

94

1    items in the basement needed to be removed, so they

2    went down and they removed all those items and that

3    type of stuff went out.

4         Q.    And Eugene Brown is who?

5         A.    Mr. Brown's brother.

6         Q.    Did you do anything to investigate how those

7    hypothermic needles ended up in the basement?

8         A.    No.  You have to understand something and I

9    will try to clear this up to the best of my ability.

10   I don't know if someone there may have been diabetic.

11   I don't know if they were drug hyps.  That is not

12   something that I would -- now, say like if I walked in

13   and this person was using drugs, then I would take

14   police action, but you are talking about something

15   that is not attached to a person and I cannot prove it

16   and you are talking about drug paraphenalia in the

17   bedroom and in the basement, which two people occupy,

18   and I have no way of knowing which one was using it.

19   The best that I could do is to clean it up and hope

20   that it doesn't reappear again.  It wasn't my

21   property, I wasn't probing it as personal space.  I

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

103

1   would handle the situation?

2        A.   Actually, what he said verbatim was that we

3   cannot find the suspect and I don't have the manpower

4   to be going through here looking for somebody we can't

5   find and just leave it alone at this time.  And I said

6   okay, fine, and he asked me what district I was from

7   and that was about it and I left and went back to the

8   house.

9        Q.   And was that Sergeant Parsons?

10       A.   I believe so.

11       Q.   And when Sergeant Parsons said to you,

12  "Leave it alone at this time", what was your

13  understanding of what he was asking you to do?

14       A.   Don't pursue the search.

15       Q.   In terms of the ranking within the police

16  department, is a detective of a higher grade than an

17  officer?

18       A.   No.  I'll explain to you what the difference

19  is.  A detective is an officer that investigates

20  crimes.  He is no more than and no less than a

21  patrolman, except he specializes in investigations

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

104

1    is.  If you ask him to put on his Class A uniform, he

2    would look just like me.  The only difference is his

3    badge says "detective" and mine states "Metropolitan

4    Police Department".  That is the only difference.  He

5    specializes in investigations.

6         Q.   Can a detective give an officer an order?

7         A.   No, he is not an official.  It takes a

8    sergeant, a lieutenant, a captain or above to give an

9    officer a direct order, and they have to state it just

10   like the military, this is an order.

11        Q.   Now, at some point prior to the shooting did

12   you have a conversation with Mr. Eugene Brown about

13   the tools that Mr. Brown had allegedly taken from you?

14        A.   Yes.

15        Q.   Did Mr. Eugene Brown indicate to you that he

16   would repay you for the tools once the house was sold?

17        A.   He would reimburse me for the value of the

18   tools once the house was sold, yes.

19        Q.   And in your opinion what was the value of

20   those tools?

21        A.   Approximately $3,000.

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

105

1      Q.    Did you accept Mr. Eugene Brown's offer to

2  reimburse you for the value of those tools?

3      A.    Yes.

4      Q.    Have you as of today been reimbursed for the

5  value of those tools by Mr. Eugene Brown or anybody

6  from the Brown family?

7      A.    Not a penny from anyone.

8      Q.    In terms of access to the house located on

9  Oates Street, at any time prior to the shooting have

10  the locks ever been changed?

11      A.    Prior?  No.  Actually, we gain access

12  through the front door.  We have keys to the front

13  door and the basement in the back.  That particular

14  day when I discovered that the tools were taken the

15  front door had been barricaded because once I entered

16  the basement door and went up to see why I could not

17  get into the house from the front, he had the door

18  barricaded.

19      Q.    He being who?

20      A.    Gary Brown.

21      Q.    Gary Brown?

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

106

1      A.    Yes.

2      Q.    Who is Gary Brown?

3      A.    The decedent.

4      Q.    And how do you know that he had the door

5  barricaded?

6      A.    He was the sole occupant of the house at

7  that time.

8      Q.    So Michael had moved out?

9      A.    Yes, he had moved out.

10     Q.    When did Michael move out?

11     A.    Approximately maybe a month before,

12  something like that.

13     Q.    After Michael moved out -- was it after

14  Michael moved out that you saw the drug paraphenalia

15  in the bedroom and the basement?

16     A.    No, this was prior.

17     Q.    Did Mr. Brown indicate to you or did you

18  have any conversation with Mr. Brown, and I'm talking

19  about Gary Brown now, as to why the door, the front

20  door had been barricaded?

21     A.    No, he wasn't present at the time that I

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

116

1      Q.   Did you tell Sergeant Wax that Mr. Brown had

2   not hit you at all?

3      A.   I can't really recall the total

4   conversation.

5      Q.   Do you recall whether or not you told

6   Sergeant Wax that although Mr. Brown had not struck

7   you, Mr. Brown had become angry and physically

8   threatening?

9      A.   That is the same question.

10      Q.   Well, it is a different question.  You asked

11   me earlier did I tell Sergeant Wax had I been struck

12   by Mr. Brown and you asked me the same question but

13   you're adding on a little bit more.

14      Q.   Yes, or no, did you tell Sergeant Wax?

15      A.   I can't recall the exact conversation at

16   that time.

17      Q.   Was it your understanding that after you

18   filed your police report that the alleged theft of

19   your tools was being investigated by another District

20   station or somebody else within the Metropolitan

21   Police Department?

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

117

1      A.   That is a normal procedure, yes.

2      Q.   And what did you understand the course of

3  that investigation was prior to the shooting of Mr.

4  Brown?

5      A.   I'm sorry, I didn't quite understand that

6  question.

7      Q.   What did you understand that occurred during

8  the investigation or the processing of your complaint

9  regarding your tools?

10     A.   For a fact I knew there was a felony warrant

11 and my powers as a police officer, I can stop and have

12 that warrant executed and that was the reason to have

13 the additional police come on the scene and run a

14 1029, to execute the warrant, felony warrant.

15          MR. JACKSON:  Could I have the record read

16 back, please.

17          (Record read.)

18          BY MR. JACKSON:

19     Q.   What did you understand was going on with

20 the investigation of your missing tools?

21     A.   That the detective was applying for a

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

118

1   warrant and once the warrant was issued it could be

2   executed.

3        Q.   Was it your understanding that that

4   detective -- do you know who the detective was, by the

5   way?

6        A.   I believe it was the Detective Tecobaum.

7        Q.   Was it your understanding that the

8   investigation of your complaint, the case, was

9   assigned to Detective Tecobaum?

10       A.   Yes.

11                          (Ford Exhibit No. 4 marked

12                           for identification.)

13            BY MR. JACKSON:

14       Q.   Officer Ford, I'm showing you what has been

15   marked as Exhibit No. 4, and just for the record it's

16   the General Order 201, No. 26, effective date November

17   10th, 1976, and the subject is "Duties,

18   Responsibilities and Conduct of Members of the

19   Department".  Did I read that correctly?

20       A.   Where are you reading it from?

21       Q.   The top.

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

119

1      A.    Oh, the very top.

2      Q.    Yes.

3      A.    Yes.

4      Q.    And if you would turn to the page numbers at

5   the bottom, page 571, do you see that?

6      A.    Yes.

7      Q.    And particularly I'm going to direct your

8   attention to No. 28, do you see that?

9      A.    Yes.

10     Q.    "Members shall not interfere with the cases

11  of other members, except by consent of such other

12  members, or their commanding officers".  Did I read

13  that correctly?

14     A.    Yes.

15     Q.    Did Detective Tecobaum ask you to assist you

16  with the arrest of Mr. Brown?

17     A.    I can answer that with an explanation, if

18  you will permit me.

19     Q.    First of all you can answer it yes or no,

20  did he ask you, that was my question?

21     A.    No.

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

120

1    Q.   Did any of his commanding officers or any

2    commanding officer ask you to assist with the arrest

3    of Mr. Brown?

4    A.   No.

5                              (Ford Exhibit No. 5 marked

6                              for identification.)

7    BY MR. JACKSON:

8    Q.   Officer Ford, I'm handing you a document

9    that has been marked as Exhibit No. 5.  Just for the

10   record at the very top it says "Title 6A".  In the

11   right corner it says "District of Columbia Municipal

12   Regulations".  Under that it says "Chapter 2, General

13   Rules".  Did I read that correctly?

14   A.   Yes.

15   Q.   And directing your attention to Section

16   200.5, do you see that?

17   A.   Yes.

18   Q.   And the first sentence reads, "Members of

19   the force shall promptly obey any order emanating from

20   any superior officer", did I read that correctly?

21   A.   Yes.

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

121

1    Q.   And you were told, were you not, by the

2   sergeant to let the detective handle your

3   investigation?

4    A.   I was not ordered.  What you're reading is a

5   specific order and that specific order pretty much

6   goes in the direction if you were to tell me to do

7   something and like I stated before, we are a

8   paramilitary organization and those particular words

9   have to come out to say "I'm ordering you to do this",

10  "I'm ordering you not to do this", This is an order.

11  Those words were never spoken as far as interfering

12  with an investigation case.  If I was anyplace else in

13  this city and I stopped and the person had a warrant,

14  I would not be interfering, I would be executing that

15  warrant, I would be bringing that person in for a

16  warrant that was issued for their arrest.  There was

17  no order given.

18   Q.   So do I understand your testimony that if a

19  superior officer gives you some directive to do

20  something, if that superior officer does not use the

21  word "order" then that is not an order according to

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

122

1    you?

2        A.    It can be suggested but it is not an order.

3        Q.    So is it your testimony that although the

4    sergeant told you to let his detective handle the

5    investigation into the alleged theft of your tools, as

6    far as you're concerned that was not an order?

7        A.    We have to be kind of careful with alleged

8    and directly telling me to do something.  His words

9    were "We cannot find this person.  We'll just leave it

10   alone and let the detectives do what they have to

11   do".  There was never spoken words saying that, "Hey,

12   leave this alone, I'm ordering you to leave this

13   alone.  Do not pursue it".  There were never, ever,

14   ever those words spoken.  So what you're reading is

15   kind of throwing me into saying that I was told to do

16   something when I clearly cannot say that I was told to

17   do that.

18       Q.    Is there a procedure that an off duty police

19   officer should follow, -- well, strike the word

20   should.

21            Is there a procedure that an off duty police

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

123

1    officer must follow when they decide that they are

2    going to take some police action?

3        A.    Say that again.

4        Q.    Is there a procedure that an off duty police

5    officer has to follow when that off duty police

6    officer decides they are going to take police action?

7        A.    We take police actions accordingly and

8    according to as if we were on duty.  Once you're in a

9    situation, you, through the District of Columbia, are

10   on duty at that moment.

11       Q.    So is there a process that has to be

12   followed?

13       A.    Make an arrest, take it to the closest

14   station and process that person.  If those officers

15   had showed up in a timely manner and he was arrested,

16   then his paperwork would have been clearly, he would

17   have had two charges, a PO and the first charge would

18   have been felony bench warrant.

19       Q.    Are you aware of any general orders that

20   requires a police officer who is off duty before

21   taking a police action to contact the communication?

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

124

1    A.    No, only after you made an arrest, if you

2   need a transport or if -- and if I had my radio with

3   me that day I could have clearly went over the air and

4   had the police get there a little more speedily than

5   they actually were instead of going through a wireless

6   system.  There is no procedure.  Once I identify

7   myself as a police officer or once he encounters

8   myself as a police officer I'm in the same situation

9   as someone on patrol.  I'm on duty at that time.

10    Q.    You had indicated earlier that even when a

11   police officer is off duty they are still on duty, is

12   that correct?

13    A.    Yes, within the confines of the District of

14   Columbia, yes.  I believe this order right here is out

15   of date, this 201.36.  I believe there is a revised

16   order to that, there is a revival to that and there is

17   an extension that goes with that order.

18                        (Ford Exhibit No. 6 marked

19                        for identification.)

20        BY MR. JACKSON:

21    Q.    Officer Ford, I'm showing you what has been

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

125

1    marked as Exhibit 6 and for the record it's General

2    Order Metropolitan Police Department.  The title is

3    Outside Employment and it's order No. 201.17,

4    effective date of April 16, 2004.  Did I read that

5    correctly?

6         A.    It is a General Order 201.17.

7         Q.    I want to direct your attention to page

8    471.  Do you have that in front of you?

9         A.    Yes, I do.

10        Q.    At the bottom there is a Section K, do you

11   see that?

12        A.    Yes.

13        Q.    And it says, "Reporting and Arrest

14   Procedures", do you see that?

15        A.    Yes.

16        Q.    No. 1 says, All members, including those

17   engaged in police-related outside employment, shall

18   first notify the Public Safety Communications Center

19   by telephone or police radio, when available and where

20   practicable to do so without jeopardizing the safety

21   of a threatened individual, prior to responding to or

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

126

1    initiating any direct police action, when alerted to a

2    felony in progress or a crime against a person".   Do

3    you see that?

4         A.   Yes, I see that.

5         Q.   Prior to engaging Mr. Brown did you

6    communicate with the Public Safety Communications

7    Center?

8         A.   This order pertains if a sworn member is

9    involved in outside employment and say like if I went

10   to get a part-time job at McDonalds or Lowes or

11   whatever, then I have to notify the department and do

12   the paperwork to ask permission or to notify that I'm

13   engaged in outside employment.  It's no more than if I

14   ask the 16-year old down the street to come and cut my

15   grass.  That doesn't make me his employer nor does it

16   make me run a business.  What it does is say if I'm

17   engaged in outside employment then I must notify the

18   department that I'm in outside employment.  It does

19   not say, "Hey, can you cut my grass for you?  I will

20   pay you".  It's no more than if I was out here working

21   and I didn't notify the department, then this order

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

127

1   would apply.  If I was applying for a job outside of

2   my police duties, this order would apply.  For me to

3   have someone do something for me and compensate them

4   for it does not apply.  This order does not apply to

5   me.

6        Q.   So it is your testimony that although the

7   very first part of that order says "all members", that

8   does not include you?

9        A.   It says, "engaged in police related outside

10  employment".  It does not say all members including

11  those that hire somebody to cut their grass or paint

12  the front of their house.

13       Q.   Let me just read the first part again.  It

14  says, "All members, including those engaged in police

15  related outside employment", doesn't it?

16       A.   Police related outside employment, key word.

17       Q.   Did I read that correctly?

18            MR. PRESSLER:  It is an outside employment

19  general order.  It relates to persons engaged in

20  outside employment.  When it says all members, it

21  means including those whose outside employment is in a

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

128

1    police-related outside employment.

2         MR. JACKSON:  Do you have an objection?

3         MR. PRESSLER:  Yes, I have an objection.  It

4    is not relevant.

5         MR. JACKSON:  Just state the objection.

6         MR. PRESSLER:  You're testifying for the

7    record what you think this means.

8         MR. JACKSON:  I'm asking him questions.

9         MR. PRESSLER:  It's very clear from the face

10   of this document that this is the outside employment

11   order.  It addresses those members engaged in outside

12   employment, whether non-police related or police

13   related.  It has no relevancy to this case

14   whatsoever.  He was not in outside employment.

15        MR. JACKSON:  Is that your objection?

16        MR. PRESSLER:  That is my objection.

17        BY MR. JACKSON:

18   Q.   So when you're off duty and you decide to

19   take police action, are you required to contact

20   anybody?

21   A.   If the means are available.

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

129

1    Q.   On the day of the shooting when you first

2  spotted Mr. Brown, -- do you have Exhibit 2A in front

3  of you?

4          Now, in Exhibit 2A your vehicle, looking at

5  it from the picture, is the last or the first car from

6  the corner on the right, correct?

7    A.   Correct.

8    Q.   And when you first spotted Mr. Brown were

9  you driving in the direction that your car was headed

10 in this picture?

11   A.   Yes.

12   Q.   Do you know whether or not your girlfriend

13 has a cell phone?

14   A.   No, she didn't, neither one of us had a cell

15 phone at the time.

16   Q.   And I believe you testified that when you

17 first saw him he was near that light pole that is in

18 front of the car that is in front of your car on the

19 right side?

20   A.   Yes.

21   Q.   Did you make any attempt to go inside of the

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

130

1   house that you were renovating to call the detective

2   or the sergeant to let them know Mr. Brown was in the

3   area?

4       A.   There was no phone in the residence.

5       Q.   Then I'm confused because I thought earlier

6   in your testimony you were saying that there was a

7   phone inside the house and that when he ran that you

8   used the phone to call the police?

9       A.   No, sir, I had a police radio at the time.

10      Q.   I'm sorry, you're right, that was my

11  mistake.  So inside of the house there wasn't a

12  working phone?

13      A.   No, sir, there wasn't.  That was the reason

14  I left and went to 1514 Neal Street to make the phone

15  call.

16      Q.   Did you have your police radio on you on the

17  day of the shooting?

18      A.   No, I did not.

19      Q.   And the woman that you saw on the porch with

20  the phone, was she in front of you or to the right of

21  you?

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

131

1    A.    She was to my front right.

2    Q.    To your front right?  Do you know when you

3    saw Mr. Brown where he was coming from?

4    A.    No, I do not.

5    Q.    Do you know where he was going to?

6    A.    No, I do not.

7    Q.    Do you know if he had been into the house

8    that you were renovating just prior to you arriving?

9    A.    No, I do not.

10   Q.    Did you ever tell anybody that when you

11   first spotted Mr. Brown you turned around in your car?

12   A.    I may have told the FITS team investigator

13   during the taping, I may have mentioned it when I was

14   giving a statement to the FITS team investigators.

15   Q.    So was it true that when you first saw Mr.

16   Brown you had to turn around in your car?

17   A.    No, I never made a turn around in my car.

18   Q.    What did you do?

19   A.    Actually, I was started into a turn and that

20   is when I could view him from my left so what I did

21   was backed up a couple of feet and brought the car to

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

132

1    the left and pulled up at the curb.  I hadn't

2    completed the turn nor had I actually crossed the

3    crosswalk.

4         Q.   So when you first spotted Mr. Brown you were

5    in the process of turning around?

6         A.   Not turning around, I was in the process of

7    making a right-hand turn, which going northbound on

8    West Virginia Avenue.  I was making a right-hand turn

9    that would put Mr. Brown to my left, which gives me a

10   clear view of Mr. Brown coming down the sidewalk.  I

11   never completed the turn.

12        Q.   So in Exhibit No. 2A, do you see where the

13   police car is?

14        A.   Yes.

15        Q.   Were you in that area when you first spotted

16   Mr. Brown?

17        A.   I was in the approximate area but half of

18   the car was on Neal Street and half was on West

19   Virginia.  I was in the process of making a right

20   turn.

21        Q.   You were in the process of turning right

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

133

1   onto Neal Street when you spotted Mr. Brown?

2       A.   Yes.

3       Q.   Is there a reason why you did not proceed to

4   find a telephone to call the detective or Sergeant to

5   let them know that Mr. Brown was in the area?

6       A.   I'm sorry, say that again.

7       Q.   Is there a reason why you did not attempt to

8   find a telephone to call the detective or the sergeant

9   to let them know that Mr. Brown was in the area?

10      A.   Once he was stopped someone was requested

11  and asked for the phone call to be made.

12      Q.   My question is prior to you stopping Mr.

13  Brown, is there a reason why you did not try to find a

14  telephone to call the detective or the sergeant to let

15  them know that Mr. Brown was in the area?

16      A.   I don't really get the question because --

17  you are saying that prior to me exiting my car?

18      Q.   Prior to you exiting your car.

19      A.   It never came to mind.

20      Q.   Never came to mind.

21                      (Ford Exhibit No. 7 marked

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

134

1                        for identification.)

2            BY MR. JACKSON:

3        Q.   Officer Ford, I have handed you a document

4    that is marked as Exhibit No. 7.  It is a General

5    Order of the Metropolitan Police Department.  The

6    title is Metropolitan Police Department Sworn Law

7    Enforcement Officer Code of Ethics and it is a General

8    Order 201.36.

9        A.   Go ahead, I'm listening.

10       Q.   Could I ask you, Officer Brown, unless

11   you're writing something that your attorney has

12   instructed you, could you tell me what you're

13   writing?

14           MR. PRESSLER:  He is consulting with me.

15           MR. JACKSON:  Not during the questioning you

16   can't do that.  If you want to take a break and talk

17   to your lawyer, go ahead.

18           MR. PRESSLER:  Do you need to take a break?

19           THE WITNESS:  Yes, real quick.  I need to

20   ask him a question.

21           (Witness confers with Mr. Pressler outside

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

135

1    the room.)

2            BY MR. JACKSON:

3        Q.    Officer Ford, what if anything did you do

4    today to prepare for today's deposition?

5        A.    Nothing, my usual routine.  I just got up

6    this morning, watched the news, made a couple of cups

7    of coffee, took a shower, got dressed and proceeded on

8    down here.

9        Q.    Other than any conversations you may or may

10   not have had with your counsel or anybody from

11   counsel's office did you talk to anybody about what

12   you were going to testify to?

13       A.    No, I don't talk to anybody.  I usually stay

14   to myself.

15       Q.    Did you review any documents?

16       A.    I looked at the documents briefly in my

17   attorney's office but that's it.

18       Q.    Which documents did you look at?

19       A.    I cannot remember, there are so many.

20       Q.    Do you know what a Force Investigation

21   Report is?

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

136

1       A.    Yes, that is one of the documents you showed

2   me earlier.

3       Q.    Did you look at the Force Investigation

4   Report?

5       A.    The UFA?

6       Q.    No, the Force Investigation Report.

7       A.    May I see one?

8       Q.    The one that was done by the FIT team?

9       A.    That is a UFA.

10      Q.    Did you review that report?

11      A.    No, I just briefly glanced at it.  I didn't

12  study it or anything.

13      Q.    Did you review the report or the sections of

14  the report as it relates to Sergeant Wax' report

15  regarding his interview with you?

16      A.    No.  Actually the only documents that I have

17  really sat down and studied was the lawsuit that was

18  given to me by the person that came to my home and

19  served it, and that is about it.  Really that was the

20  only thing, with Ms. Henderson's name attached to it

21  and the young gentleman at the end of the table and

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

137

1    there is one more person that is attached to it.  And

2    the package that I actually received from the 2nd

3    District which I took a memo with that to General

4    Counsel.

5        Q.    I believe you have in front of you Exhibit

6    7, is that correct?

7        A.    Yes.

8        Q.    And I identified it for the record.  If you

9    look at the second page, page 658, do you see that?

10       A.    Yes.

11       Q.    And the third paragraph from the top, "I'll

12   never", do you see that?

13       A.    Yes.

14       Q.    I'll never act officially or permit personal

15   feelings, prejudices, political beliefs, aspirations,

16   animosities or friendships to influence my

17   decisions".  Did I read that correctly?

18       A.    Yes, I read that.

19       Q.    Would you agree that the situation as it

20   involved you and Mr. Brown was a personal matter?

21       A.    Would I what?

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

138

1      Q.   Would you agree that the situation that

2    involved you and Mr. Brown was a personal matter?

3           MR. PRESSLER:   What do you mean by personal

4    matter?

5           BY MR. JACKSON:

6      Q.   Do you understand the question?

7           MR. PRESSLER:   I don't understand the

8    question.   I'm his lawyer.

9           BY MR. JACKSON:

10     Q.   What is important is the witness understands

11   the question.   Officer Ford, do you understand the

12   question?

13     A.   Yes.

14     Q.   Okay.   And your answer is?

15     A.   You are asking me if I had any personal

16   feelings, prejudice?

17          MR. PRESSLER:   That is not what he asked

18   you.

19          THE WITNESS:   What are you asking me,

20   exactly?

21          BY MR. JACKSON:

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

139

1    Q.    Would you agree that the situation between

2  you and Mr. Brown was a personal matter?

3    A.    No, I was acting in the capacity as a

4  Metropolitan police officer, stopping a person and

5  phoning in.

6    Q.    Would you agree that the theft of your tools

7  was a personal matter?

8    A.    That had been resolved with me being told

9  that I was going to be compensated for that theft, so

10  that was thrown out the window.

11    Q.    That wasn't my question, my question was

12  would you agree that the theft of your tools was a

13  personal matter?

14    A.    No, because that matter had been resolved

15  with the agreement that I would be compensated, so

16  that statement that you are asking me was thrown out

17  the window because it has nothing to do with the fact

18  that I stopped Mr. Brown on a felony warrant.

19    Q.    When you stopped Mr. Brown on the day of the

20  shooting, did you ask him about your tools?

21    A.    Yes, I did.

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

140

1    Q.    So can you explain to me if the matter had

2    been resolved because Mr. Eugene Brown had promised to

3    repay you for the tools, so then why were you asking

4    Mr. Brown on the day of shooting about the tools?

5    A.    Why would I tell him that he had a felony

6    warrant and I was waiting for the police to get there

7    to make an arrest.

8    Q.    My question was -- you said you asked him

9    about the tools on the day of the shooting.  My

10   question was if in your mind it had been resolved why

11   are you now questioning him about that?

12        MR. PRESSLER:  He has already answered

13   that.  He has answered that about two times.  He

14   explained why he confronted Mr. Brown.

15        MR. JACKSON:  He told me about the warrant.

16   I didn't ask him about the warrant.  I wanted to know

17   about the tools.

18        MR. PRESSLER:  What date are you talking

19   about?

20        BY MR. JACKSON:

21   Q.    Do you understand my question?

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

141

1      A.    Not totally, no.

2      Q.    The day of the shooting when you confronted

3   Mr. Brown you indicated to me that you asked him about

4   the tools, correct?

5      A.    Yes, I asked him, I didn't ask him

6   specifically about the tools, I asked him why did he

7   steal from me.  I didn't ask him about returning them,

8   I didn't ask him when I was going to get them back.  I

9   asked him why did he steal from me.

10     Q.    And my question is if in your mind based on

11  what Mr. Eugene Brown told you about reimbursing you

12  for the tools, if that had been resolved, then why are

13  you asking Mr. Brown about the tools?

14     A.    Because I didn't ask him per se about the

15  tools, I asked him a specific question, why did you

16  steal from me.

17     Q.    Did you have any animosity toward Mr. Brown

18  for stealing your tools?

19     A.    No, if I'm going to be reimbursed and I went

20  out and spent my entire paycheck to go back and rebuy

21  tools, no, I don't think so, especially if I knew I

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

142

1    was going to be reimbursed, I mean, that is a big

2    deal.

3        Q.   You have indicated earlier -- when you

4    stopped Mr. Brown right before the shooting, did you

5    have your handcuffs on you?

6        A.   No, I stated earlier when that question was

7    asked what equipment I had on me, I stated that I had

8    my service weapon, my ID and my badge.

9        Q.   I believe you testified that the reason why

10   you drew your weapon was to detain Mr. Brown, is that

11   correct?

12       A.   The reason I drew my service weapon was to

13   stop an attack that Mr. Brown was engaged in on

14   myself.  It was a deterrent to stop the attack.

15       Q.   So if Mr. Brown had just turned around and

16   walked away from you, what would you have done to

17   detain him?

18       A.   Nothing.  We are not trained to shoot

19   anybody that is moving away from you, only if you're

20   attacked and you feel that that fight is going to be

21   lost and you feel that your life is in great danger

DEPOSITION OF OFFICER EDWARD MICHAEL FORD
Conducted on August 7, 2007

143

1  and the lives of others are in great danger.  Mr.

2  Brown had every opportunity, from the time that I got

3  out of that car, to turn arround and make a 180 and

4  disappear.  Mr. Brown also had an opportunity when

5  that service weapon came out to comply to my orders as

6  a Metropolitan police officer, which most people do.

7  Mr. Brown made that choice.

8       Q.  At what point did you ask the woman on the

9  porch to call the police?

10      A.  Once I exited the car and I asked him why

11  did he steal from me and he became agitated, and that

12  is when I identified myself to her, that I was a

13  Metropolitan police officer and would you please call

14  the police.

15      Q.  Now, you indicated earlier that within

16  seconds of the shooting the police, a police vehicle

17  pulled up?

18      A.  Yes.

19           MR. PRESSLER:  That is not what he said.  If

20  you want to know what he said maybe she can read it

21  back.