**EXHIBIT 2**

**CHIEF PETER NEWSHAM - FEBRUARY 5, 2008**

TAKAISHA HENDERSON, et al.
vs.
DISTRICT OF COLUMBIA, et al.

Page 1 to Page 45

Condensed Transcript and Concordance
Prepared By

*PRECISE REPORTING SERVICES*
8804 Sumner Grove Drive
Laurel, Maryland 20708
Phone (301) 210-5092
Toll Free (866) 847-3351
Fax (301) 210-5094
www.precisereportingservices.com



Precise Reporting Services
(301) 210-5092
Serving MD, D.C. & VA

DEPOSITION OF CHIEF PETER NEWSHAM
Conducted on February 5, 2008

---

**Page 1**

```
 1  UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA
 2                    CIVIL DIVISION
 3  -------------------x
 4  TAKAISHA HENDERSON, et al.,    x
 5       Plaintiffs,      x 1:06CV00947
 6       v.               x Judge Kennedy
 7  DISTRICT OF COLUMBIA, et al.,  x
 8       Defendants.      x
 9  -------------------x
10              Tuesday, February 5, 2008
11              Washington, D.C.
12  The deposition of CHIEF PETER NEWSHAM called for
13  examination by counsel for Plaintiffs in the
14  above-titled matter, pursuant to notice, in the
15  Offices of Cohen & Cohen, 1821 Jefferson Place,
16  Northwest, Washington, D.C., before Jonell Easton,
17  notary public in and for the District of Columbia,
18  at 12:40 a.m., when were present on behalf of
19  respective parties:
20
21
```

**Page 2**

```
 1  On behalf of the Plaintiffs:
 2      ADAM R. LEIGHTON, ESQUIRE
 3      Cohen & Cohen, P.C.
 4      1875 Jefferson Place, Northwest
 5      Washington, D.C.  20036
 6      202.955.4529
 7
 8  On behalf of the Defendant
 9      District of Columbia:
10
11      DAVID A. JACKSON, ESQUIRE
12      Assistant Attorney General
13      Jaquira Joiner, Intern
14      Office of the Attorney General
15      441 Fourth Street, Northwest
16      6 Floor South
17      Washington, D.C.  20001
18      202.724.6618
19
20
21
```

**Page 3**

```
 1  On behalf of Defendant
 2      Officer Edward Ford:
 3
 4      MARC WILHITE, ESQUIRE
 5      Pressler & Senftle, P.C.
 6      927 15th Street, Northwest
 7      12th Floor
 8      Washington, D.C.  20005
 9      202.822.8384
10              - - -
```

**Page 4**

```
 1              C O N T E N T S
 2  EXAMINATION BY COUNSEL            PAGE
 3  MR. LEIGHTON                      5, 41
 4  MR. WILHITE                       38
 5  MR. JACKSON                       43
 6
 7
 8              NEWSHAM EXHIBITS
 9  DEPOSITION EXHIBITS               MARKED
10  No. 1 Review Board report         36
11          (Exhibits attached.)
12              - - -
```

Page 5

```
 1           PROCEEDINGS
 2      Whereupon,
 3           CHIEF PETER NEWSHAM
 4  was called for examination by counsel for
 5  Plaintiffs and, after having been first duly sworn
 6  by the notary public was examined and testified as
 7  follows:
 8      EXAMINATION BY COUNSEL FOR PLAINTIFFS
 9      BY MR. LEIGHTON:
10      Q.  Please state your name for the record.
11      A.  Peter Newsham.
12      Q.  Chief Newsham, have you had your
13  deposition taken before?
14      A.  Yes.
15      Q.  Approximately how many occasions?
16      A.  Probably at least seven or eight.
17      Q.  I only have one ground rule.  If I ask you
18  a question and you answer the question, I will
19  assume you understood the question.  Fair?
20      A.  Fair.
21      Q.  Is it your understanding you are here
```

Page 6

```
 1  today as a representative of the District of
 2  Columbia?
 3      A.  Yes.
 4      Q.  Is it your understanding that what you say
 5  will be binding on the District of Columbia?
 6      A.  Yes.
 7      Q.  It is my understanding you have been
 8  designated in the area --- to talk about scope of
 9  employment issues.  Is that your understanding?
10      A.  Yes.
11      Q.  By whom are you employed?
12      A.  Metropolitan Police Department.
13      Q.  For how long have you been so employed?
14      A.  Eighteen years.
15      Q.  What makes you qualified to talk about
16  scope of employment issues?
17      A.  I have had experience with Metropolitan
18  Police Department as a manager, I have been a
19  manager over a number of years and we had to
20  familiarize ourselves when our officers are acting
21  within scope of employment and when not and
```

Page 7

```
 1  specifically within my experience in Internal
 2  Affairs Bureau.
 3      Q.  Tell me about your experience in Internal
 4  Affairs.
 5      A.  We look at an officer's misconduct,
 6  officer's use of force, we have a lot of
 7  interaction with the U.S. Attorney's office or the
 8  Attorney General's office, those types of things.
 9      Q.  You said you have had to familiarize
10  yourself with scope of employment issues.
11      What did you do to familiarize yourself
12  with scope of employment issues?
13      A.  Everything I have learned --- reading on
14  the police department, interacting with the
15  attorneys, staying up to date with the current
16  regulations, being familiar with my General Orders.
17      Q.  In today's deposition, when we talk about
18  orders and regulations and any other kind --- and
19  codes we reference, I ask that we talk about those
20  items that were in place at the time of the
21  shooting on February 22, 2006.  Is that okay?
```

Page 8

```
 1      A.  I will do that to the best I can.
 2      Q.  To the extent that something would not
 3  apply at the time of the shooting, let me know and
 4  we will know that for purposes of the deposition.
 5      What have you reviewed for today's
 6  deposition?
 7      A.  A couple of excerpts from the police
 8  manual and the investigation involving Officer
 9  Ford's use of force.
10      Q.  Was that the FIT investigation?
11      A.  Yes.
12      Q.  My understanding --- we have been provided
13  a copy of the final investigative report done by
14  Sergeant Wax.
15      My understanding is there have been
16  subsequent additions to the report, which we don't
17  have, but which Mr. Jackson will provide.
18      Did you review Sergeant Wax's report and
19  these items, additional documents?
20      A.  I was a member of the Use of Force Review
21  Board when the case came before it.
```

Page 9

1 Q. For how long were you a member of the Use
2 of Force Review Board?
3 A. Good question, for a while, at least a
4 year, maybe longer, probably longer, I think maybe
5 it may have been closer to two years.
6 Q. Are you no longer a member?
7 A. Because I am in charge of Internal
8 Affairs.
9 Q. I know you briefly told me about some of
10 the positions you have held while a member of the
11 police department.
12     Can you take me back through your 18 years
13 and go over your history of employment?
14 A. I was an officer in 6D, became vice
15 investigator in 6D.
16     Promoted to sergeant, went to 7D patrol
17 sergeant.
18     And then I was promoted to lieutenant and
19 went to 5D, I became a lieutenant detective at 5D.
20     Promoted to captain, went back to 6D, I
21 was in patrol.

Page 10

1     I was promoted, became command over Second
2 District.
3     I was promoted to Internal Affairs where I
4 served for about two years.
5     Then I was transferred to Regional
6 Operations Command North.
7     And, most recently, under Chief Lanier, I
8 was brought back to Internal Affairs.
9 Q. You said you read from, excerpts from the
10 police manual. Can you be more specific and tell
11 me what you read.
12 A. Ones relevant, pertinent to this case, for
13 example, requirement for officers must obey orders
14 from superior officers and officers are not
15 supposed to interfere with other officers'
16 investigations, and a couple of others.
17 Q. Did you ever know, prior to this
18 investigation or this case, Officer Ford?
19 A. I didn't know him personally, no.
20     Let me correct that, I didn't know him
21 personally that I knew of. I may have seen him in

Page 11

1 passing. I didn't know him.
2 Q. Had you heard of him?
3 A. I had heard of him, yes.
4 Q. Related to the mailbox incident?
5 A. Yes.
6 Q. As part of the review board, strike.
7     How many members are there of the review
8 board?
9 A. Six.
10 Q. Tell me the purpose of the review board.
11 A. It is to review serious use of force cases
12 by command officials, to make final determination
13 by the police department whether the use of force
14 was justified and, more generally, if there are any
15 trends developing with use of force in the police
16 department and to recommend training, if necessary.
17 Q. What determination did the board make with
18 regard to Officer Ford's use of force?
19 A. If I remember, it was unjustified.
20 Q. Sergeant Wax found it to unjustified, not
21 within departmental policy, would that be the same

Page 12

1 finding?
2 A. Yes.
3 Q. Do you know the basis of why the board
4 found this to be an unjustified shooting not within
5 policy?
6 A. I would have to review board notes. I can
7 tell you my personal evaluation.
8 Q. I don't want your personal evaluation,
9 more so because I am looking at the District's
10 position.
11 A. Okay, if I wait until we get those
12 documents, they should lay it out pretty clearly.
13 Q. Did the board make a determination as far
14 as whether Officer Ford was within the scope of the
15 employment when the shooting took place?
16 A. No.
17 Q. Is that something that the board would or
18 would not normally do in looking at a police
19 shooting?
20 A. They wouldn't normally do that, it is not
21 a determination they make.

DEPOSITION OF CHIEF PETER NEWSHAM
Conducted on February 5, 2008

13

1  Q. When were you first asked to look at the
2  scope of employment issue with regard to Officer
3  Ford's shooting?
4  A. When I was asked to testify in this case.
5  Q. When that was?
6  A. I don't know exactly, maybe six, eight
7  weeks ago.
8  Q. When you were asked to, strike.
9     Besides --- I don't want to know any
10 conversation with Mr. Jackson, besides Mr. Jackson,
11 have you spoken to anybody about this case and this
12 shooting, strike.
13    With regard to the scope of employment
14 issue, in the last six to eight weeks, besides Mr.
15 Jackson have you spoken to anybody about Officer
16 Ford and the scope of employment?
17 A. When I spoke to Mr. Jackson, I think there
18 was one other attorney present, other than that,
19 no.
20 Q. How much time did you spend on review of
21 the FIT report and police manual to make your

14

1  determination?
2  A. I probably met with Mr. Jackson, spoke to
3  him on the phone a couple of times about once, one
4  maybe two times, I had to review the record, so a
5  couple of hours.
6  Q. What is the District's position with
7  regard to whether Officer Ford was within scope of
8  employment at the time of shooting February 22,
9  2006?
10 A. We said he was not in the scope of
11 employment.
12 Q. Can you tell me the basis of the
13 District's opinion that Officer Ford was not within
14 the scope of his employment?
15 A. He was given a directive specifically not
16 to participate in that case involving that person,
17 he did disobey that directive.
18 Q. Do you know who gave him that directive?
19 A. One of his supervisors or one of the
20 sergeants who interacted with him prior to that
21 event had given him that directive.

15

1  Q. Is it the District's position because he
2  received an order, anything he would have done in
3  violation of the order would put him outside the
4  scope of employment?
5  A. Anything he would have done in violation
6  of this order, I would say yes would be outside the
7  scope of his employment.
8  Q. Assume for purposes of my question that
9  the order was never given, that Officer Ford was
10 never told not to be involved in the investigation.
11    If that order was never given, is there
12 anything else that would place Officer Ford outside
13 the scope of his employment when he approached and
14 subsequently shot Mr. Brown?
15 A. I think that is getting a little bit more
16 complicated if you get into very specific actions
17 that were taken and I think you evaluate all
18 witnesses that were involved.
19    I would say to accidentally shoot someone
20 would not be within the scope of one's employment.
21    I would say that to intentionally shoot

16

1  someone who was not posing an immediate threat to
2  you would be outside the scope of employment.
3     That is not what we train our police
4  officers to do --- to intentionally shoot someone
5  under the circumstances which he shot someone.
6  Q. Is there anything else that Officer Ford
7  did that would put him outside the scope of
8  employment?
9     I understand you said he violated a direct
10 order.
11    And you talked about the action, shooting,
12 when someone is unintentionally shooting someone,
13 that would be outside the scope.
14    Is there anything else he did that placed
15 him outside the scope?
16 A. Than those three --- I can't think of any
17 other right now.
18    When --- do you want me to clarify?
19 Q. Please.
20 A. When talking about disobeying an order
21 that, I guess, there are some things that would

17

1  fall into that — we talked about other
2  regulations, interference with someone else's case
3  I guess could potentially, that would still fall
4  under disobeying an order. That is the main,
5  general violation.
6      Q. Chief, how about the fact Officer Ford —
7  forget about the order, you told me that was a
8  violation under normal circumstances, that order
9  had not been given.
10     If the officer had seen Mr. Brown, stopped
11 his car, got out, approached him, identified
12 himself to the lady on the porch, said call 911,
13 identified himself as an officer, would any of that
14 put him outside the scope of employment?
15     A. I think the personal involvement he had
16 with decedent I think would bring him outside the
17 scope of his employment, too.
18     One of the things we try to teach our
19 people is we are supposed to do our job without
20 personal involvement.
21     To the extent someone would get involved

18

1  in the investigation of a crime that is related to
2  them personally, I think that would be outside the
3  scope of what we teach them to do.
4      Q. Understanding you teach your people not to
5  do that, are there any codes, General Orders or
6  regulations that were in place that officers were
7  not to be involved in a personal issue?
8      A. I think if you go into the General Orders,
9  I think you could find something we are not
10 supposed to get involved in things that are
11 personal in nature.
12     Q. Would you be able, upon leaving here, to
13 look for that and provide it to Mr. Jackson and
14 have Mr. Jackson provide to me?
15     A. Sure.
16     Q. I would ask, then, for any order you based
17 those opinions on.
18     A. Right, outside of the scope of written
19 orders, it's something we generally train our
20 people on in daily interaction and when you go to
21 the training division, that is one of the things

19

1  they speak about, not supposed to get involved —
2  in personal relationships, you shouldn't be
3  involved in crimes that are personal to your
4  investigation of those things.
5      Intuitively it doesn't make sense, it is
6  common sense, it gives the appearance of
7  impropriety.
8      Q. When it goes into training, what — the
9  training academy?
10     A. Yes, and potentially, we have 40-hour
11 trainings given to officers on a yearly basis. It
12 is potentially mentioned during that. I am sure I
13 discussed when I was at roll call for people in
14 similar incidents and in daily mentoring with our
15 officers.
16     MR. JACKSON: For the record, the General
17 Orders I believe the chief is referring are the
18 same ones I questioned Officer Ford about at his
19 deposition.
20     THE WITNESS: 2101.24, 201.35, DCMRA
21 Chapter 6 A Section 200.1 and DCMRA Six A Section

20

1  200.5.
2      MR. LEIGHTON: Were those the ones you
3  provided me already?
4      MR. JACKSON: Yes.
5      BY MR. LEIGHTON:
6      Q. Chief, if I showed you these that were
7  provided to me by Mr. Jackson, can you take a look
8  and let me know if you are familiar and if they
9  would be something you would be relying on in your
10 opinions in the case?
11     A. Sure.
12     MR. LEIGHTON: Take your time.
13     (Pause in the proceedings.)
14     THE WITNESS: You want me to point to a
15 specific one I think encompasses what I was talking
16 about?
17     BY MR. LEIGHTON:
18     Q. I want to know if you are familiar with,
19 if you are familiar them and they are applicable in
20 this case.
21     I need for you to let me know the major

DEPOSITION OF CHIEF PETER NEWSHAM
Conducted on February 5, 2008

21

1  ones?
2     A.  201.1, it shall be the duty of each member
3  of the force to be thoroughly familiar with
4  Metropolitan Police Department manual by the time
5  he or she completes the review training school.
6        Carries the function of the department,
7  namely preservation of peace, protection of life
8  and property — all members of the force and
9  employees of the department and all branches of the
10 districts and bureaus thereof shall direct or
11 coordinate their efforts as managers that tends to
12 establish and maintain the highest standard for
13 efficiency.
14       Do you want the next one — 1200.5.
15    Q.  Whatever.
16    A.  Member of the force should promptly obey
17 any order emanating from a superior officer, an
18 order that conflicts with a previous order from any
19 other superior with any general or specific memo or
20 orders provision of the manual, the member of the
21 force to whom such order is given shall call

22

1  attention to the conflict to the officer giving the
2  order so to obviate that conflict, if his or her
3  order shall stand the person obeying order should
4  not be held any way responsible for disobeying any
5  order theretofore issued.
6        201 point 26, may take a while.
7        Under one, it is the duty and
8  responsibility of each member of the police force
9  to preserve, protect life and property, prevent
10 crime, apprehend criminals, recover lost and stolen
11 property, enforce all laws ordinances of the
12 District of Columbia in adequate, fair and
13 impartial manner.
14       I don't think if you are investigating a
15 crime associated with yourself that you can be fair
16 and impartial, that is Part A 1 Number 1 D and R, I
17 would call one of the ones we thought was very
18 important.
19    Q.  What that order in place at the time of
20 the shooting?
21    A.  November 10, 1976 is the date of this

23

1  order.
2        Part one A three — members shall
3  recognize power of police to fulfill function and
4  duty as dependent on public approval of existence
5  — and ability to cure and maintain public aren't.
6        I indicated earlier I think that would be
7  showing the appearance of impropriety if we do
8  personal investigates of minor crime that is
9  occurred to us individually members of the police
10 department.
11    Q.  Let me stop you, you said minor crimes.
12       Was the crime Mr. Brown was wanted for,
13 was it a felony or misdemeanor?
14    A.  Sounded like it was a felony.
15    Q.  How do you categorize minor crime?
16    A.  Unfortunately in the District of Columbia,
17 theft would be considered minor, but as part of the
18 Police Department — we have a lot of theft in the
19 District of Columbia and I don't remember it being
20 a strong arm theft or anything, there wasn't any
21 physical violence.

24

1  Q.  Even classified as a felony, it was minor?
2  A.  I think if you look at the District of
3  Columbia, the distinction between misdemeanor and
4  felony is about $250 because the laws were written
5  so long ago.
6        If they had updated the law, I don't think
7  the threshold would be so low.
8        It would be interesting to see what kind
9  of warrant they got in that case — felony or
10 misdemeanor, I don't know if they got warrants, the
11 U.S. Attorney's office may have decided to charge
12 felony, I think when they indicated it, put it down
13 on the papers, they made it a misdemeanor.
14    Q.  Chief, would your opinion be different
15 Mr. Brown had murdered Mr. Ford's brother, Ford saw
16 him, approached him — everything that happened
17 had happened, would it be different then because it
18 was a major crime?
19    A.  What?
20       MR. JACKSON:  Objection.
21       You can answer.

**Page 25**

BY MR. LEIGHTON:
Q. Would the scope of issue of employment issue be different?
A. If all other factors were the same?
Q. Same.
A. Different crime?
Q. Different crime.
A. I think the scope of employment would be the same. He would be acting outside the scope of employment, disobeying an order, he shot an unarmed person in an accidental discharge.
The fact he was investigating a crime, but it was personal, I think he violated pretty much the substance of this order.
Q. What, if anything, could Officer Ford have done when he saw Mr. Brown that day?
A. Called the police from a safe distance and have uniform police respond and handle the situation.
Q. Does the fact Officer Ford was not in uniform when he approached Mr. Brown have any

**Page 26**

bearing on your opinions in this case?
A. I can tell you that is not a good idea in a theft case, particularly it is not a good idea --- talking about scope of employment, that would be, provided he wasn't given an order --- we are not talking abuse of force?
Q. Right, lack of uniform.
A. Pursuing a criminal in a theft case, we are really --- your hypothetical is far away from this.
Q. I understand. I am not trying to muddy the water. I am trying to look at each thing and see how that effects your opinion. I know you looked at totality. I need to know just that.
A. I think I understand.
I would say the fact he was in plain clothes would that have impact, that alone, I don't think so, no.
Q. These officers, if they see a crime being committed, even if not on their tour of duty, if they are in plain clothes, they can still respond

**Page 27**

and be considered on duty. Correct?
A. Yeah, yeah, it is not a good idea, especially a minor crime.
The best course of action would be to call for a uniformed officer. That would be something in our on-going coaching of our officers, I am sure they cover it in the academy, and that is something we would discuss.
Q. Not a good idea because of danger of what could happen?
A. For a whole number of reasons, danger been probably the most important, you don't want to approach anybody by yourself.
Secondly, you don't want to approach someone when they don't know you are a police officer and they will more likely know that if you are driving a marked vehicle and wearing a uniform.
Q. It would be considered within the scope if you were in uniform and you were in a marked vehicle?
A. Probably could.

**Page 28**

Q. You were still going through there.
A. It will take a while, it is a long order.
Q. You don't have to read every part.
A. I would have to read the whole Order.
Q. Do you feel the whole Order is applicable?
A. I think a number of parts of the Order, which would go back to the main theme, which says we are supposed to enforce the law in a fair and impartial manner.
For us to get personally involved in the case where we are victims of a crime, the essence of the Order is violated. I really think you are acting outside the scope of your employment in that case.
Q. I will not make you read whole General Order.
What other General Order would you rely on for your opinion?
A. What?
Q. Which other General Order --- you have two in front of you, are they ---

DEPOSITION OF CHIEF PETER NEWSHAM
Conducted on February 5, 2008

---

Page 29

1  A. Yes, our ethics order, when you are
2  trying, being ethical, there is an appearance of
3  impropriety when you become involved in a matter
4  that is personal in nature, it gives the public the
5  opinion we are acting personally as opposed to on
6  behalf of the government.
7      I think ethical orders would probably
8  apply, I am not sure the outside employment order
9  would apply because an outside employment order is
10 orders that covers work for private establishments.
11 I didn't think that applied.
12     Q. Besides the order we just discussed, are
13 there any other orders you can think that would be
14 applicable here?
15     A. I don't think I could say that, whether
16 there are or aren't.
17     Q. If you find another that would be
18 applicable, would you supply that to Mr. Jackson so
19 he could give it to me?
20     A. Right.
21     Q. Understanding it may not be a good idea,

Page 30

1  does a Metropolitan Police Department officer who
2  is not within a tour of duty, but who sees someone
3  who they know there is an arrest warrant out for
4  them, do they have an obligation to try to arrest
5  that person and/or contain them?
6      A. No, definitely, I would say there was an
7  obligation to take police action and police action
8  could be anything as small as making a phone call
9  to the police.
10     I didn't think there is a requirement from
11 someone off duty to intercede in an arrest.
12     By law they would be required in D.C. to
13 take some form of police action.
14     Q. General Order 200.4, you referred to that
15 term off duty, that Orders state members of the
16 force are always considered to be on duty.
17 Can you tell me what is meant by that?
18     MR. JACKSON: For the record, Municipal
19 Regulations and General Orders.
20     BY MR. LEIGHTON:
21     Q. Thank you, I appreciate that.

Page 31

1  A. I think pretty similar to what we just
2  discussed, if you see a crime occurring, a citizen
3  comes up to you, when you are off duty, I think you
4  are required to take some kind of action.
5      Q. Back in February of 2006, was there a
6  requirement in the District of Columbia that
7  officers carry a service weapon at all times?
8      A. I don't know when we changed the Order.
9  Show me the new Order.
10     Q. I know it has been changed. I didn't know
11 if that was in place. I just got that from
12 Sergeant Wax.
13     A. It has been a while, I believe under Chief
14 Ramsey, that gets you back at least a year.
15     Q. Do you know why it was changed?
16     A. I think specifically to try and allow
17 officers to, for example, go out and eat in D.C.
18 and have a glass of wine and beer with dinner and
19 not be required to carry a service weapon, under
20 those circumstances, I think that had a lot to do
21 with it.

Page 32

1  MR. JACKSON: Before we go on, I found the
2  Use of Force Review Board report. I didn't really
3  think I had it. I will give it to you and let you
4  make copies.
5      MR. LEIGHTON: I will have someone make
6  copies.
7      MR. JACKSON: Signed by Chief Newsham.
8      (Discussion off the record.)
9      BY MR. LEIGHTON:
10     Q. Even though it may not be a good idea,
11 would you agree police officers who are not on
12 their tour of duty may still arrest and/or contain
13 an individual for a crime?
14     A. Not on their tour of duty?
15     Q. Not.
16     A. Not working?
17     Q. Correct.
18     A. Would it be okay, I can tell you every
19 time that officer would get involved in something
20 like that, I would think that a supervisor would
21 counsel about that being inappropriate, an

8 (Pages 29 to 32)

Page 33

1  inappropriate tactical maneuver.
2  Q. Would it put that outside the scope of
3  employment?
4  A. I'd say it's a fine line, no, probably
5  not.
6  Q. Did you read Officer Ford's deposition?
7  A. No.
8  Q. Chief, on page --- I took Officer Ford's
9  deposition, on page 52, I will read you a question
10  I asked him and the answer he gave.
11      Question, when you pulled out your weapon,
12  did you do so in your mind as a member of
13  Metropolitan Police Department.
14      Answer, yes, the moment I stopped him and
15  showed him my badge, arrived on the scene, I was
16  acting in the capacity of a police officer.
17      My question would be would Officer Ford's
18  state of mind at the time he was approaching and
19  subsequently shot Mr. Brown, would his state of
20  mind go into your determination, at all, with
21  regard to his scope of employment?

Page 34

1  A. No.
2  Q. Why not?
3  A. Because he was directed not to get
4  involved in the first place.
5      His state of mind, I think it would be,
6  come into play that you could get a determination
7  what his motives were, you know what I mean, at the
8  time, you know, so let me --- it will take
9  clarification.
10      If his motives were getting this guy who
11  stole his tools, we are more outside, we are even
12  more outside the scope of employment.
13      If his motives were to arrest this guy
14  wanted on this warrant, I think which is highly
15  questionable for that to be a motive considering
16  all of the circumstances, the fact he was still
17  given an order not to participate, that still
18  places him outside the scope.
19      I don't know if that helps you.
20      You are saying his state of mind, you
21  would get him further out of the scope of

Page 35

1  employment if he said I will go over there and get
2  revenge against this person who stole my tools. I
3  think that puts him, to that extent, that could
4  impact he is outside the scope of employment. I
5  think that puts him more outside the scope of
6  employment.
7      On the other hand, if he was to say I was
8  acting as Metropolitan Police Department, that's
9  pretty self-serving, to say the least.
10      I don't think that would impact the scope
11  of employment because he was all ready outside
12  scope of employment.
13  Q. Did the Attorney General's, the District's
14  attorney recommendation that charges not be filed
15  against Officer Ford come down before or after you
16  final report?
17  A. Before.
18  Q. Did you speak to the District's attorney,
19  at all, regarding that decision?
20  A. No.
21      MR. LEIGHTON: Mark this please.

Page 36

1      (Newsham Deposition Exhibit No. 1 was
2  marked for identification.)
3      BY MR. LEIGHTON:
4  Q. Chief, we have marked as Exhibit 1 the
5  Metropolitan Police Department Use of, Review Board
6  final FIT report?
7  A. It is Use of Force Review Board Report.
8  Q. You authored this report?
9  A. I have an administrator who writes the
10  report. I reviewed and signed.
11  Q. Upon signing it, you agreed with the
12  contents of it?
13  A. Yes.
14  Q. Under General Order 201.26, there is a
15  section dealing with conduct in arrests,
16  processing, well, I will read it --- member shall
17  make diligent efforts ---
18  A. May I see a copy?
19  Q. Of course, just read it and I can ask you
20  questions.
21  A. Okay.

Page 37

1    (Witness complies.)
2    THE WITNESS: D two or three?
3    MR. LEIGHTON: Two.
4    THE WITNESS: Okay.
5    BY MR. LEIGHTON:
6    Q. Member shall make diligent effort to
7    arrest or locate the wanted person and recover
8    stolen and lost property --- was this order in
9    place at the time of the shooting?
10   A. This order, yes.
11   Q. Could it be said that Officer Ford was, in
12   fact, locating a wanted person for stolen or lost
13   property and investigating at the time of the
14   shooting?
15   A. Repeat the question.
16   Q. Could this order be applicable to Officer
17   Ford if he was attempting to arrest or locate the
18   person who was wanted for stolen and lost property?
19   A. I don't think it would apply to Officer
20   Ford in his circumstance because he was given an
21   order not to do it. That would not be an illegal

Page 38

1    order, that would be a legal order.
2    Q. If it was an illegal order, he could have?
3    A. That is the only order you can disobey.
4    MR. LEIGHTON: I don't think I have any
5    further questions.
6    MR. WILHITE: Let me take a moment to
7    check my notes.
8    (Discussion off the record.)
9    EXAMINATION BY COUNSEL FOR DEFENDANT
10   OFFICER EDWARD FORD
11   BY MR. WILHITE:
12   Q. Chief, I am Marc Wilhite, counsel for
13   Officer Ford.
14   I have a couple of questions to follow up
15   on what has been covered, specifically concerning
16   the plain clothes issue.
17   The testimony you gave, it is my
18   understanding that in response to that line of
19   questions concerning approaching a suspect while in
20   plain clothes and when a crime is being committed
21   was your response while saying that could be in the

Page 39

1    scope, it is your impression that wouldn't be a
2    good idea?
3    A. Right.
4    Q. My question is are you aware, is it your
5    understanding that for an officer in the District
6    of Columbia who observed a crime being committed
7    that could be subject to, in an administrative
8    context, some sort of discipline for failing to act
9    if they chose not to do anything?
10   A. It would be a big difference between not
11   doing anything and taking some kind of action.
12   Police action could be as small as making
13   a phone call.
14   To be in plain clothes and to not make an
15   arrest because you determined it was a bad tactical
16   decision would not be something we could discipline
17   someone for.
18   Q. Specifically in this situation if, for
19   instance, the situation is you have someone in
20   plain clothes and they do observe something they
21   know to be a violation of the law in D.C. and they

Page 40

1    didn't do anything, kept walking, is that your
2    understanding?
3    A. Potentially could be discipline.
4    Q. The only other subject other I wanted to
5    touch on was your discussion briefly on the matter
6    being personal in nature.
7    I guess really from what you testified to,
8    you obviously indicated, I believe, is it true
9    things are that, where an officer is considered
10   specifically to have been given an order not to be
11   involved, they should cease, not take action or to
12   investigate?
13   A. If you were directed to stay out of the
14   investigation, that would be a lawful order.
15   Q. Are there any situations, based on your
16   experience and your understanding of the rules and
17   regulations where, strike.
18   If there is any personal involvement that
19   officer has, does that in and of itself not permit
20   that officer to be involved in the investigation?
21   A. I think they would, according to this

DEPOSITION OF CHIEF PETER NEWSHAM
Conducted on February 5, 2008

---

Page 41

1  Order, be required to withdraw themselves from that
2  to police in a fair and impartial way.
3      MR. WILHITE: Thank you.
4      MR. LEIGHTON: Two minutes.
5      (Discussion off the record.)
6      EXAMINATION BY COUNSEL FOR PLAINTIFFS
7      BY MR. LEIGHTON:
8      Q. Chief, in looking at Officer Ford's
9  deposition, he states he was not ordered to not
10 interfere in this investigation, that being said,
11 if he was never ordered, I know there is testimony
12 from people saying he was given an order.
13     If he wasn't given an order, he still
14 would have, wasn't within the scope because he
15 discharged his weapon when it wasn't appropriate.
16 Correct?
17     A. That is one of the reasons I would say,
18 yes.
19     Q. There is the personal involvement which we
20 talked about?
21     A. Right, I mean you don't want me to comment

Page 42

1  or personal involvement.
2      Q. Go ahead.
3      A. I guess one of the things that is kind of
4  telling with regard to his motivation in this
5  particular case is that in particular area of the
6  city there is a lot of wanted people.
7      And I guess we would have to review the
8  officer's history to see how frequently he became
9  involved in an arrest of other wanted people in
10 that particular neighborhood and see if that is
11 something he did on a frequent basis.
12     Q. He would have to know they were wanted?
13     A. Right.
14     Q. Here it was known he was wanted?
15     A. Right, officers that live in their
16 neighborhoods in our city became very much familiar
17 with the people who are wanted.
18     In that neighborhood, there are a lot of
19 wanted people.
20     MR. LEIGHTON: That is all I have.
21     MR. JACKSON: Two questions.

Page 43

1      EXAMINATION BY COUNSEL FOR
2      DEFENDANT DISTRICT OF COLUMBIA
3      BY MR. JACKSON:
4      Q. Chief, when there is an order from a
5  superior officer to a subordinate, does the order
6  have to be in writing or can it be verbal?
7      A. Could be verbal.
8      MR. JACKSON: That is all I have.
9      (Signing having not been waived, the
10 deposition was concluded at 1:42 p.m.)

Page 44

1      CERTIFICATE OF NOTARY PUBLIC
2      I, JONELL EASTON, the officer before whom the
3  foregoing deposition was taken, do hereby testify
4  that the witness whose testimony appears in the
5  foregoing deposition was duly sworn by me; that the
6  testimony of said witness was taken by me
7  stenographically and thereafter reduced to
8  typewriting under my direction; that said
9  deposition is a true and accurate record of the
10 testimony given by said witness; that I am neither
11 counsel for, related to, nor employed by any of the
12 parties to the action in which this deposition was
13 taken; and further, that I am not a relative or
14 employee of any attorney or counsel employed by the
15 parties hereto nor financially or otherwise
16 interested in the outcome of the action.
17     JONELL EASTON
18
19     Notary Public in and for the
20     District of Columbia
21 My Commission Expires: March 31, 2009

```
                                                    45
 1        CERTIFICATE FOR READING AND SIGNING
 2
 3        I hereby certify that I have read and examined
 4    the within transcript and the same is a true and
 5    accurate record of the testimony given by me.
 6        Any corrections that I feel are necessary, I
 7    have listed on the separate ERRATA SHEET enclosed,
 8    indicating the page and line number of each
 9    correction.
10
11
12
13    _____
14    Signature of Witness,    Date
15
16
17
18
19
20
```