UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                              )
TAKAISHA HENDERSON,  *et al*.,                )
                                              )
          Plaintiffs,                         )
                                              )
     v.                                       )   Civil Action No. 06-00947 (HHK)
                                              )
DISTRICT OF COLUMBIA, *et al*.,               )
                                              )
          Defendants.                         )
_____       )

**DEFENDANT DISTRICT OF COLUMBIA'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendant District of Columbia, by and through counsel, respectfully moves this Court,

pursuant to Fed. R. Civ. Pro. 56 (c), to enter judgment in its favor.  In support of this motion the

Defendant states as follows:

1.  Defendant Off-duty Police Officer Edward Ford was not acting within the scope of his

employment when he shot and killed Ignatius Brown and, therefore, the District of Columbia

cannot be held liable under the theory of vicarious liability.  As such, the District of

Columbia moves for summary judgment on Counts I, II, and V.


A memorandum of points and authorities in support of this motion is attached.

                              Respectfully submitted,

                              PETER J. NICKLES
                              Acting Attorney General

                              GEORGE VALENTINE
                              Deputy Attorney General
                              Civil Litigation Division

NICOLE L. LYNCH [471953]
Assistant Attorney General
Civ. Lit. Div., Chief Section II

/s/David A. Jackson/s/_____
DAVID A. JACKSON [471535]
Assistant Attorney General
Office of the Attorney General
441 Fourth Street, NW, 6 South
Washington, D.C.  20001
Direct Line: (202) 724-6618
Facsimile: (202) 727-3625
E-mail:  davida.jackson@dc.gov

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                      )
TAKAISHA HENDERSON,  *et al*.,            )
                                                      )
                    Plaintiffs,                    )
                                                      )
            v.                                        )   Civil Action No. 06-00947 (HHK)
                                                      )
DISTRICT OF COLUMBIA, *et al*.,           )
                                                      )
                    Defendants.                 )
_____        )


**DEFENDANT DISTRICT OF COLUMBIA'S MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY
JUDGMENT**

**PRELIMINARY STATEMENT**

This case arises out of the February 22, 2006 shooting death of Ignatius Brown (hereinafter "Mr. Brown") by Defendant off-duty Metropolitan Police Department Officer Edward Ford (hereinafter "Officer Ford").   on May 19, 2006, Mr. Brown's children, Plaintiffs Takaisha Henderson, Shakia Brown and Terrell Brown,  filed suit against the District of Columbia (hereinafter "the District") and Officer Ford.  Ms. Henderson is the named personal representative of the estate of Mr. Brown.  (Complaint ¶ 6).  Plaintiffs' brought suit for negligence-survival (Count I), wrongful death (Count II), violation of the Fifth Amendment pursuant to 42 U.S.C. § 1983 (Count III), deliberate indifference to police  training, supervision and discipline pursuant to § 1983 (Count IV), excessive force (Count V), negligent hiring (Count VI), and, negligent retention (Count VII).   Counts I through V are brought against both the District and Officer Ford while Counts VI and VII are only against the District.

On August 8, 2006, this Court stayed this matter pending an investigation of Officer Ford by the United States Attorney's Office for the District of Columbia. The stay was lifted on or about May 5, 2007, after this Court was informed that United States Attorneys Office had issued a letter of declination and would not bring criminal charges against Officer Ford. (See Status Report filed the District at Docket No. 13).

On June 14, 2007, the District filed its answer to the complaint and asserted the defense that Officer Ford acted outside the scope of his employment and, thus, the District could not he held liable for Officer Ford's conduct. (See, District's Answer to the Complaint, Seventh Defense). Officer Ford, who is not represented by the DC Office of the Attorney General filed his answer on July 2, 2007.

On June 8, 2007, this Court granted a joint oral motion by counsel for all parties to allow limited discovery on the District's scope of employment defense and, thereafter, the District would file a dispositive motion on this limited issue. All discovery bearing on the issue of scope of employment has been completed. The District now files this motion for summary judgment on scope of employment, as it can not be vicariously liable for the acts of Officer Ford. The District of Columbia moves for summary judgment on Counts I, II, and V.

## STATEMENT OF FACTS

On February 22, 2006, Defendant off-duty Police Officer Edward Ford shot and killed Ignatius Brown during a confrontation on West Virginia Avenue, NE, Washington. The events leading up to the shooting began several weeks earlier when Officer Ford's girl friend Ms. Jessica Smith-Haynie (hereinafter "Ms. Smith-Haynie"), decided to purchase a house located at

1247 Oates Street, Northeast, from Mr. Brown's mother. (Ford Depo. at 16). The Smith-Haynie and Brown families have known each other for many years.[1] According to Ms. Smith-Haynie, she is the mother of five children and was looking for a place to live when she found out that Mrs. Brown was moving out of the house at 1247 Oates Street. (Exhibit 3). According to Ms. Smith-Haynie, when she went to look at the house she was appalled by its condition. *Id.* Ms. Smith-Haynie stated that H-pack, the finance company, would not finance the purchase of the house on an "as-is" basis. *Id.* According to Ms. Smith-Haynie, she then signed an addendum to the original purchase agreement to allow her and Officer Ford to complete the repairs to the house. *Id.* At this time, Mrs. Brown was not living in the house but her son Mr. Brown was. (Ford Depo. at 17-19).

In order to get the house in a suitable condition to pass an inspection, with the finance company, Officer Ford and Ms. Smith-Haynie began to renovate the property. (Ford Depo. at 90). Officer Ford testified that during the first walk through of the house, he met Mr. Brown during the walk through. (Ford Depo at 15-16). Officer Ford brought to and left at the house a number of tools his which included a ladder, table saw, nailing guns, finishing gun, hammers, nails, compressor, levelers, etc. (Ford Depo. at 23-24). Officer Ford estimated that the tools were valued at three-thousand dollars ($3000.00). Since Mr. Brown was still occupying the premises, Officer Ford entered into a contractual relationship with Mr. Brown, wherein Officer Ford paid Mr. Brown two-hundred dollars ($200) to paint and clean up the house. (Ford Depo. at 20-21). According to Officer Ford, Mr. Brown completed only about twenty percent (20%) of the work. *Id.* At one point, Mr. Brown approached Ms. Smith-Haynie and asked for more

---

[1] According to Ms. Smith-Haynie, her mother has known the Brown family since before Ms. Smith Haynie's birth and her mother, working as a nurse, actually delivered Mr. Brown. (Exhibit 3).

money.  (Ford Depo. at 23-24).  Officer Ford testified that he told Mr. Brown that he, Mr.

Brown, had to deal with him, Officer Ford, about money.  (Ford Depo. at 21-22).

     Officer Ford testified that he had been at the house on twenty to thirty occasions.  Officer

Ford testified that he had observed in the front bedroom drug paraphernalia, including "crack

pipe and other things."  (Ford Depo at 87-89).   Officer Ford also testified that

he found hypodermic needles in the basement.  (Ford Depo at 93-94).  Officer Ford testified that

he never confronted Mr. Brown about the drug paraphernalia because Officer Ford's focus was

on getting the house ready for inspection. (Ford Depo at 87-89).  Officer Ford further testified

that he did not investigatie how the needles ended up in the basement.  (Ford Depo at 94).

Officer Ford testified that "it wasn't my responsibility to probe and see if [Mr. Brown] was on

drugs or if [Mr. Brown] had anything illegal." (Ford Depo at 88).  Officer Ford further testified

that in the District of Columbia possession of drug paraphernalia is illegal.  (Ford Depo at 89).

     On February 16, 2006, a week prior to the shooting, Officer Ford went to 1247 Oak

Street to do work and noticed that his tools were missing. (Ford Depo. at 24).   A neighbor told

Officer Ford that Mr. Brown had taken Officer Ford's tools and offered to sell them to him.

(Ford Depo. at 26).    According to Officer Ford, the neighbor recognized the tools as belonging

to Officer Ford because Officer Ford's initials appeared on the tools.  (Ford Depo. at 26-27).

Officer Ford testified that his initials, the last four digits of his social security number and tag

number are engraved on all his tools.  *Id*.

     Later that same evening, at approximately 8:30 PM, Mr. Brown appeared at the house

and Officer Ford confronted him about the tools. (Ford Depo. at 27-28).  Officer Ford testified

that Mr. Brown asked Officer Ford to give him a few days to get the tools back.  *Id*.   Officer

Ford testified that he responded by telling Mr. Brown that he, Officer Ford, was going to call the

police and Mr. Brown could tell his story to them.  *Id.*  Officer Ford testified that Mr. Brown

then ran from the house and Officer Ford chased after him.  (Ford Depo. at 29).  Officer Ford lost

sight of Mr. Brown who had ran into an alley.  (Ford Depo. at 30)

       At the time that Officer Ford chased Mr. Brown, Officer Ford was off-duty and not in

uniform.  Officer Ford did have his police issued radio, service weapon and police identification

on him.  (Ford Depo. at 32-35).   Officer Ford radioed for assistance and when uniformed

officers arrived, Officer Ford spoke with a Detective Tecobaum who told Officer Ford that he

would seek a warrant for Mr. Brown due to the value of the tools.  (Ford Depo. at 37).  Officer

Ford also testified that an "official" who had also arrived on the scene told him to "leave it

alone."  (Ford Depo. at 36).   A police report was completed based upon Officer Ford's

complaint.  Officer Ford testified that once he filed his police report about the missing tools, it

would be normal police procedure for the report to be investigated by someone else.  (Ford

Depo. at 116-117).  Officer Ford testified that neither Detective Tecobaun nor the "official" on

the scene asked Officer Ford to assist in the arrest of Mr. Brown.  (Ford Depo. at 119-120).

       Sergeant Colin Hall, of the Fifth District, was one of the officials who arrived on the

scene.  (Affidavit of Sergeant Hall).  Sergeant Hall told Officer Ford to let the investigators

handle the investigation into the theft of his tools. *Id.*  Sergeant Hall advised Officer Ford that

based on the information they had at that time the case needed to be investigated further and the

police may not have probable cause to make an arrest. *Id*.  Sergeant Hall further told Officer

Ford that at "this point Fifth District officers would identify Mr. Brown if he was stopped as part

of the investigation." *Id.*

       Subsequent to these events but prior to the day of the shooting, Officer Ford spoke to Mr.

Brown's brother, Eugene Brown, about the theft of the tools.  (Ford Depo. at 104).  According to

Officer Ford, Eugene Brown told Officer Ford that he would reimburse Officer Ford for the tools once the house was sold. (Ford Depo. at 104). Officer Ford testified that he accepted Eugene Brown's offer. (Ford Depo. at 105).

The events of the day of the shooting unfolded as follows: Officer Ford and Ms. Smith-Haynie were driving on West Virginia Avenue, Northeast towards Neal Street. When Officer Ford reached the intersection of West Virginia Avenue and Neal Street he saw Mr. Brown walking on West Virginia Avenue. Officer Ford proceeded through the intersection and parked on West Virginia Avenue. Officer Ford got out of his car, approached Mr. Brown and said to Mr. Brown "why did you steal from me?" (Ford Depo. at 141-143). According to Ms. Smith-Haynie, she heard Officer Ford say something to the effect of "Gary, I want to talk to you about the tools, it's okay, I talked to your brother." (Exhibit 3). According to Officer Ford, his purpose of approaching Mr. Brown was to have a uniformed police officer on the scene to run a warrant check. (Ford Depo. at 44-45).

Officer Ford testified that Mr. Brown became agitated, took off his book-bag and began pacing back and forth. Officer Ford testified that Mr. Brown said "look, I can't go back to jail. It's not about you, it's about me. You don't understand, you don't understand." (Ford Depo. at 47-49). According to Officer Ford, Mr. Brown then began swinging and making karate moves. (Ford Depo at 49). Officer Ford testified that he extended his left hand to push Mr. Brown away. *Id*. Officer Ford further testified that Mr. Brown struck him in the shoulder area but because Officer Ford was wearing padded clothing the blows had no effect. (Ford Depo at 49-50, 70).

According to Officer Ford, Mr. Brown became more aggressive and continued to approach Officer Ford. *Id*. Officer Ford testified that Mr. Brown repeatedly stated "I am not going back to jail. I am not going back to jail." *Id*. Officer Ford stated that he had to push Mr.

Brown away a second time. *Id.* (Ford Depo at 49). Officer Ford testified that while these events are going on he was continuously backing up. (Ford Depo at 50). Officer Ford testified that when he reached the corner of Neal Street and West Virginia Avenue, Mr. Brown jumped at him a third time. *Id.* According to Officer Ford, he then reached into the small of his back and retrieved his service revolver. *Id.* According to Officer Ford, he initially held the gun down towards the ground. (Ford Depo at 51). Officer Ford testified that Mr. Brown then stated "fuck it. I am not going back to jail" and then ran towards and leaped at him. (Ford Depo at 51-53). According to Officer Ford, Mr. Brown was approximately three to four feet away when Officer Ford shot Mr. Brown. (Ford Depo at 53, 78-79). Officer Ford testified that he did not see Mr. Brown with a weapon nor did Mr. Brown state that he had a weapon. (Ford Depo at 51, 56).

District of Columbia Municipal Regulation, Title 6 A, Chapter 2, § 200.5 provides: "Member of the force shall promptly obey any order emanating from a superior officer." Assistant Chief of Police Peter Newsham (hereinafter "Chief Newsham") testified that Officer Ford was not acting within the scope of his employment because Officer Ford was given a direct order by a Sergeant not to participate in the investigation of the case involving Mr. Brown. (Chief Newsham's Depo. at 14-15). Chief Newsham testified that anything that Officer Brown did in violation of an order from Officer Ford's superior would have been outside the scope of his employment. *Id.* Chief Newsham also testified that Officer Ford's actions violated the MPD Code of Ethics as setforth in General Order (GO) RAR-201.36 which provides in pertain part: "I will never act officiously or permit personal feeling, prejudices, political beliefs, aspirations, animosities, or friendships to influence my decisions." Additionally, Chief Newsham testified that Officer Ford's actions also violated GO 201.26 § Part I, B (28) which prohibits a police officer from interfering in the investigation of another police officer.

On these facts the District asserts that Officer Ford was not acting with the scope of his employment when he shot and killed Mr. Brown and, therefore, the District is entitled to judgment on this issue.

## STANDARD FOR SUMMARY JUDGMENT

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

Summary judgment is not a disfavored procedural shortcut, but rather is an integral part of the overall design of the rules of civil procedure, which is to secure the just, speedy, and inexpensive determination of every action. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). The party moving for summary judgment bears the initial responsibility of informing the trial court of the basis for its motion and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *Alexis v. District of Columbia*, 44 F. Supp. 331, 337 (D.D.C. 1999); *Celotex*, 477 U.S. at 323. Material facts relate to the substantive law governing the case and are those facts which would affect the outcome of the case. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986).

When the moving party has carried its burden, the responsibility shifts to the nonmoving party to show that there is, in fact, a genuine issue of material fact for trial. *Alexis,* 44 F. Supp. at 337. The opposing party must provide "specific facts showing that there is a genuine issue for trial," and "may not rely on mere allegations or denials to prevail." *Id.* The trial court must enter summary judgment against a nonmoving party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will

bear the burden of proof at trial. *Celotex*, 477 U.S. at 322; *see also Alexis,* 44 F. Supp. at 337

("Rule 56(c) *mandates* summary judgment" in this circumstance) (emphasis added).

A party may defeat a properly-supported summary judgment motion only by providing a

"response, by affidavits or as otherwise provided in this Rule, [setting] forth specific facts

showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).  Rule 56(e) directs that

summary judgment "shall be entered against the adverse party" if that party fails to raise a

genuine issue for trial. *See Anderson,* 477 U.S. at 249 ("[T]here is no issue for trial unless there

is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party");

*see also Celotex,* 477 U.S. at 324 ("a party who fails to make a showing sufficient to establish

the existence of an element essential to establish that party's case, and on which that party will

bear the burden at trial" cannot withstand a motion for summary judgment).

## ARGUMENT

**I.      The District is entitled to summary judgment because Officer Ford's conduct was outside the scope of his employment and, therefore, the District cannot be held liable.**

An employer can be liable under a theory of *respondeat superior* for the tort of one of its

employees when the employee is acting within the scope of his or her employment. *Weinberg v.

Johnson*, 518 A. 2d 985, 988 (D.C. App. 1986) (*Johnson II*).  Scope of employment questions

are governed by the law of the place where the employment relationship exists. *Williams v.

United States,* 350 U.S. 857, (1955); *Majano v. United States*, 469 F.3d 138, 141 (D.C. Cir.

2006); *Hoston v. Silbert,* 681 F.2d 876 (D.C. Cir. 1982).   Thus, in order to resolve the scope of

employment question presented in this case, this court must look to the law of the District of

Columbia.

The District of Columbia has adopted the definition of scope of employment in § 228 of the Restatement (Second) of Agency (1957). *Moseley v. Second New St. Paul Baptist Church,* 534 A.2d 346, 348 n.4 (D.C. 1987); *accord, District of Columbia v. Coron,* 515 A.2d 435, 437 (D.C. 1986); *Weinberg v. Johnson*, 434 A. 2d 404, 408 (D.C. App. 1981) (*Johnson I*).   That section of the Restatement provides:

> (1) Conduct of a servant is within the scope of employment if, but only if:
>
> > (a) it is of the kind he is employed to perform;
> >
> > (b) it occurs substantially within the authorized time and space limits;
> >
> > (c) it is actuated, at least in part, by a purpose to serve the master, and,
> >
> > (d)  if force is intentionally used by the servant against another, the use of
> >  force is not unexpected by the master.
>
> (2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.

Restatement (Second) of Agency § 228.

Thus, under District of Columbia law, an employer can be held liable under a theory of *respondeat superior* for the intentional torts of its employee.  However, an employer will not be held liable for the intentional tort of its employees when the conduct is solely in furtherance of the employee's personal interest and not that of the employer. *Johnson I*, at 408.  "An act is not within the scope of employment if done for the employee's purpose only; unless the tort occurred at least in part as a result of a desire to serve the employer, the employer is not liable." *District of Columbia, et al. v. Davis, et al*., 386 A.2d 1195, 1203, (D.C. App. 1978).  In addition, the tortuous act "must be of the same general nature as that authorized, or incidental to the conduct authorized." *Id.*   In *Johnson I*, the court further explained that the tort must be "the

outgrowth of a job-related controversy." *Johnson I, supra* at 408*; Penn Central Transportation Co., v. Reddick*, 398 A.2d 27, 32 (D.C. App. 1979).

When the intentional tort is an assault, the factors to be considered when determining scope of employment are "(1) the nature of the employee's job, (2) whether the assault occurred while the employee was furthering his employer's business, (3) whether the act was personal in nature and wholly unrelated to the employment relationship, and (3) whether the act was unprovoked and unexpected." *Id.* In *Haddon*, the Court held that an intentional assault falls within the scope of employment if it was connected to a "job-related controversy." *Haddon v. United States*, 68 F.3d 1420, 1424 (D.C. Cir. 1995) (applying D.C. Court of Appeals case law). In *Haddon*, the Court of Appeals for the District of Columbia Circuit held that a White House electrician was not acting within the scope of his employment when he threatened the White House chef with physical harm. *Id.* at 1424. The Court noted that the electrician's "alleged tort did not arise directly out of his instructions or job assignment as a White House electrician" because "[u]nlike the … shooting in *Johnson*, the electrician's threat did not stem from a dispute over the performance of his work." *Id.*

In *Penn Central Transportation Co. v. Reddick*, 398 A.2d 27 (D.C. App. 1979), the court held that a railroad employee was not acting within the scope of his employment when he kicked a taxicab driver while traveling between work sites. It concluded that the employee's action "was neither a direct outgrowth of [his] instructions or job assignment, nor an integral part of the employer's business activity," noting that "nothing in the business of running a railroad . . . makes it likely that an assault will occur between a railroad brakeman and a taxicab driver over the celerity with which the latter will provide a taxicab ride to the former." *Id.* at 32; *see also*

*Boykin*, 484 A.2d at 564 (teacher was not acting within scope of employment when he sexually assaulted student because teacher was not then performing teaching responsibilities).

In *Johnson I*, plaintiff brought suit against a laundromat owner after being shot in the face by a laundromat employee. 518 A.2d 985, 986 (D.C. 1986). The employee had been hired to take dry clothes out of the machines, and he and the plaintiff were initially involved in a verbal dispute over the location of the plaintiff's shirts. The plaintiff had given up on the argument and turned to leave. When he turned back, the employee shot him in the face. Despite this unprovoked behavior, the D.C. Court of Appeals held that the employee's intentional shooting of the plaintiff was within the scope of his employment, because his dispute with the plaintiff had arisen out of his job duties, writing:

> As the law has evolved, the intent or purpose criterion has become broad enough to embrace an intentional tort arising out of any dispute that "was originally taken on the employer's behalf." Instead, "the present trend is to extend liability for intentional torts to situations where the employer provides a 'peculiar opportunity and … incentive for such loss of temper, … as where an argument is likely by virtue of the servant's duties, and the conduct is wholly or partially in furtherance of the master's business.

*Id.* at 991.

In *District of Columbia v. Coron*, an off-duty police officer beat plaintiff after plaintiff kicked the wheel of the officer's vehicle. 515 A.2d 435 (D.C. App. 1986) Plaintiff sued the District of Columbia and the police officer for intentional torts. The jury returned a verdict in favor of plaintiff based solely upon the principles of *respondeat superior* liability. On appeal, plaintiff argued that since the Metropolitan Police Regulation required that officers are always on duty the District is liable for the intentional torts committed by one of its employees. The Court rejected this argument and explained:

> We do not, however, interpret such regulation as imposing liability on an employer for the intentional torts of its employee where the employee's conduct was motivated solely by personnel reasons.

14

> To apply such regulations to a dryly logical extreme, as appellee
> argues, would impose liability on the District regardless of the nature
> of an officer's conduct.  This we are unprepared to do.

*Id*. 438.

   In *Jordan, et al.  v. Medley, et al*., the Court of Appeals for the District of Columbia Circuit reversed a jury verdict finding that the employee was acting within the scope of his employment when the employee pointed a shot gun at plaintiff during a dispute.  711 F.2d 211, (D.C. Cir. 1983).  In that case, plaintiff was a tenant of defendant.  Defendant's employee went to plaintiff's house to give plaintiff a notice of a rent increase.  A heated argument ensued and plaintiff torn up the notice in front of the employee.  The employee left the premises and returned an hour later.  Plaintiff and the employee again began to argue but this time the employee banished a rifle.  Plaintiff sued the employer, under a theory of vicarious liability, for assault and intentional infliction of emotional distress.  The trial court instructed the jury that "[the employee] was engaged upon the business of the employer … at the time of the incident."   The Court of Appeals held that the instruction was not proper because it amounted to directing a verdict for the plaintiff on whether the employee was acting within the scope of his employment. The Court stated "an intentional tort, which by it nature is willful and thus more readily suggests personal motivation."  *Id.* at 215-216.  The Court further explained "The outrageous quality of an employee's act may well be persuasive in considering whether his motivation was purely personal. *Id*.

   In *Manjano v. United States*, plaintiff sued a fellow employee of the Smithsonian Institute for an alleged assault.  469 F.3d 138 (D.C. Cir. 2006).  The employee pushed plaintiff as the employee entered the office building through an unsecured door.  Plaintiff had been instructed not to allow people to enter the building without identification.  The assault on

plaintiff occurred because plaintiff had asked the employee for identification. The employee continued to pursue plaintiff, muttering obscenities and calling plaintiff stupid.  The employee grabbed a strap that was around plaintiff's neck and repeatedly pulled on it.  As a result, plaintiff alleged that she has suffered a herniated disk in her neck.  The case was originally filed in the DC Superior Court but removed to federal court when the Attorney General of the United States certified that the employee had been acting within the scope of her employment.  The United States then moved for summary judgment which was granted by the trial court.  On appeal, the Court of Appeals reversed.  In so doing, the Court reasoned that there was evidence from which a jury could conclude that the employee conduct was not "actuated, at least in part, by a purpose to serve the [Smithsonian]."   The Court went on to say that "the key inquiry is the employer's intent at the time moment of the tort."  *Id*. at 141-142.

Applying the principles set forth in Restatement (Second) of Agency, as adopted by the DC Court of Appeals, and the legal principles developed through case law, no jury could reasonable find that Officer Ford was acting within the scope of his employment on February 22, 2006 when he shot and killed Mr. Brown.  Officer Ford's confrontation with Mr. Brown was not the "outgrowth of a job related controversy" but was "personal in nature" and in furtherance  of the employee's personal interest and not that of the employer.  The controversy between Officer Ford and Mr. Brown arose from the fact that Officer Ford believed that Mr. Brown had stolen Officer Ford's tools and Officer Ford's desire to retrieve his tools back from Mr. Brown..

The relationship between Officer Ford and Mr. Brown did not originate as a result of Officer Ford performing his police duties but rather the relationship originated from the contractual relationship between Officer Ford and Mr. Brown.  This contractual relationship arose because of Officer Ford's personal relationship with Ms. Smith-Haynie, whose family

knew Mr. Brown's family for many years.  Officer Ford entered into a contractual relationship

with Mr. Brown, wherein Officer Ford paid Mr. Brown two-hundred dollars ($200) to paint and

clean up.  (Ford Depo. at 20-21).   Mr. Brown had completed about twenty percent of the work.

At one point, Mr. Brown approached Officer Ford's girlfriend, Ms. Smith-Haynie, and asked for

more money.  (Ford Depo. at 23-24).  Officer Ford told Mr. Brown that he, Mr. Brown, had to

deal with him, Officer Ford, about money.  (Ford Depo. at 21-22).   Accordingly, the controversy

arose out of the business relationship between Officer Ford and Mr. Brown.

      Officer Ford's actions were not actuated by a purpose to serve his employer – the District

of Columbia Metropolitan Police Department.  On the day of the shooting, when Officer Ford

approached Mr. Brown, he did not do so in his capacity as a police officer.   Officer Ford states

he said to Mr. Brown "why did you steal from me?"  (Ford Depo. at 141-143).  Ms. Smith-

Haynie, heard Officer Ford say something to the effect of "Gary, I want to talk to you about the

tools, it's okay, I talked to your brother." (Exhibit 3).

      The personal nature of Officer Ford's confrontation with Mr. Brown is also shown by the

fact that Officer Ford took no action when he found drug paraphernalia in the bedroom and

basement of the house at 1247 West Virginia Avenue.  Although Officer Ford knew that in the

District of Columbia possession of drug paraphernalia is illegal, he did not confront Mr. Brown

who was occupying the premises or investigate how the needles ended up in the basement

because as Officer Ford testified his focus was on getting the house ready for inspection.  (Ford

Depo at 87-89).  Moreover, Ford testified that "it wasn't my responsibility to probe and see if

[Mr. Brown] was on drugs or if [Mr. Brown] had anything illegal." (Ford Depo at 87-89).   Thus,

it was only when Mr. Brown's conduct - theft of his tools - affected Officer Ford personally, did

Officer Ford confront Mr. Brown.

Additionally, Officer Ford's actions were not actuated by a purpose to serve the District because his actions were in direct violation of the District's Municipal Regulations and MPD General Orders. Officer Ford testified that during the events that transpired a week prior to the shooting an "official" told him to "leave it alone." (Ford Depo. at 36). Sergeant Colin Hall was one of the officials who arrived on the scene. (Affidavit of Sergeant Hall). Sergeant Hall told Officer Ford to let the investigators handle the investigation into the theft of his tools. *Id.* Sergeant Hall advised Officer Ford that based on the information they had at this time, that the case needed to be investigated further and the police may not have probable cause to make an arrest. *Id*. Sergeant Hall further told Officer Ford that at "this point Fifth District officers would identify Mr. Brown if he was stopped as part of the investigation." *Id.*

Officer Ford's actions on February 22, 2006 were contrary to Title 6A, DCMR, Chapter 2, § 200.5 which provides: "Member of the force shall promptly obey any order emanating from a superior officer." Officer Ford testified that once he filed his police report about the missing tools, it would be normal police procedure for the report to be investigated by someone else. (Ford Depo. at 116-117). Officer Ford testified that neither Detective Tecobaun nor the "official" on the scene asked Officer Ford to assist in the arrest of Mr. Brown. (Ford Depo. at 119-120). GO 201.26 § Part I, B (28) prohibited Officer Ford from interfering in the investigation of another police officer. Lastly, Officer Ford's personal pursuit of Mr. Brown also violated the Code of Ethics as set forth in General Order (GO) RAR-201.36 which provides in pertain part: "I will never act officiously or permit personal feeling, prejudices, political beliefs, aspirations, animosities, or friendships to influence my decisions." Thus, Officer Ford's consciously chose to ignore District regulations and MPD GO's, his action were personal in nature and not actuated by a purpose to serve his employer.

## CONCLUSION

For the forgoing reasons, the District's motion for summary judgment as to its affirmative defense that Officer Ford was not acting within the scope of employment on February 22, 2006 when he shot and killed Mr. Brown should be granted. As such, judgment should be entered for the District of Columbia as to Counts I, II, and V as the District can not be held liable under *respondeat superior*.

Respectfully submitted,

PETER J. NICKLES
Acting Attorney General

GEORGE VALENTINE
Deputy Attorney General
Civil Litigation Division

NICOLE L. LYNCH [471953]
Assistant Attorney General
Civ. Lit. Div., Chief Section II

/s/David A. Jackson/s/_____
DAVID A. JACKSON [471535]
Assistant Attorney General
Office of the Attorney General
441 Fourth Street, NW, 6 South
Washington, D.C. 20001
Direct Line: (202) 724-6618
Facsimile: (202) 727-3625
E-mail: davida.jackson@dc.gov

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                    )
TAKAISHA HENDERSON,  *et al.*,                      )
                                                    )
                  Plaintiffs,                       )
                                                    )
      v.                                            )  Civil Action No. 06-00947 (HHK)
                                                    )
DISTRICT OF COLUMBIA, *et al.*,                     )
                                                    )
                  Defendants.                       )
_____ )

**DEFENDANTS' STATEMENT OF MATERIAL FACTS
AS TO WHICH THERE IS NO GENUINE ISSUE**

Defendant District of Columbia, by and through the Office of the Attorney General,

hereby, submits the following statement of material facts as to which there is no genuine issue.

1.     Exhibit 1 is a true and accurate copy of portions of Officer Edward Ford's deposition transcript.

2.     Exhibit 2 is a true and accurate copy of portions of Assistant Chief Peter Newsham's deposition transcript.

3.     Exhibit 3 is true and accurate copy of a Report of Investigation concerning the interview of Ms. Jessica Smith-Haynie.

4.     Exhibit 4 is a true and accurate copy of relevant sections of Title 6 A DCMR, Chapter 2, § 200.5.

5.     Exhibit 5 is a true and accurate copy of relevant sections MPD General Order 201.26, Part I, B, (28).

6.     Exhibit 6 is a true and accurate copy of relevant sections MPD General Order 201.36, § III.

7.     Exhibit 7 is a true and accurate copy of an Affidavit of Sergeant Colin Hall.

8.     On February 22, 2006 Defendant off-duty Police Officer Edward Ford shot and killed Ignatius Brown during a confrontation on West Virginia Avenue, NE, Washington.

9.      The events leading up to the shooting began several weeks earlier when Officer Ford's girl-friend Ms. Jessica Smith-Haynie decided to purchase a house, located at 1247 Oates Street, Northeast, from Mr. Brown's mother.

10.     Mr. Brown's mother was not living in the house but Mr. Brown was.

11.     When Ms. Smith-Haynie, when she went to look at the house she was appalled by its condition and would not be approved by the finance company unless renovations were done.

12.     Ms. Smith-Haynie, she then signed an addendum to the original purchase agreement to allow her and Officer Ford to complete the repairs to the house.

13.     In order to get the house in a suitable condition to pass an inspection Officer Ford and Ms. Smith-Haynie began to renovation the property.  (Ford Depo. at 90).

14.     During the first walk through of the house, Officer Ford met Mr. Brown.  (Ford Depo at 15-16 ).

15.     Officer Ford brought to and left at the house a number of tools which included a ladder, table saw, nailing guns, finishing gun, hammers, nails, compressor, levelers, etc.  (Ford Depo. at 23-24).

16.     Officer Ford entered into a contractual relationship with Mr. Brown, wherein Officer Ford paid Mr. Brown two-hundred dollars ($200) to paint and clean up. (Ford Depo. at 20-21).

17.     According to Officer Ford, Mr. Brown completed only about twenty percent (20%) of the work. *Id.*

18.     At one point, Mr. Brown approached Ms. Smith-Haynie and asked for more money.  (Ford Depo. at 23-24).  Officer Ford told Mr. Brown that he, Mr. Brown, had to deal with him, Officer Ford, about money.  (Ford Depo. at 21-22).

19.     Officer Ford observed in the front bedroom drug paraphernalia, including "crack pipe and other things."  (Ford Depo at 87-89).   Officer Ford found hypodermic needles in the basement.  (Ford Depo at 93-94).

20.     Officer Ford never confronted Mr. Brown about the drug paraphernalia because Officer Ford's focus was on getting the house ready for inspection. (Ford Depo. at 87-89).

21.     Officer Ford believed that "it wasn't [his] responsibility to probe and see if [Mr. Brown] was on drugs or if [Mr. Brown] had anything illegal."  (Ford Depo. at 88).

22. Officer Ford further knew that in the District of Columbia possession of drug paraphernalia is illegal. (Ford Depo at 89).

23. A week prior to the shooting, Officer Ford went to 1247 Oak Street to do work and noticed that his tools were missing. (Ford Depo. at 24).

24. A neighbor told Officer Ford that Mr. Brown had taken Officer Ford's tools and offered to sell them to him. (Ford Depo. at 26).

25. The neighbor recognized the tools as belonging to Officer Ford because Officer Ford's initials appeared on the tools. (Ford Depo. at 26-27). Officer Ford testified that his initials, the last four digits of his social security number and tag number are engraved on all his tools. *Id*.

26. Later that same evening, at approximately 8:30 PM, Mr. Brown appeared at the house and Officer Ford confronted him about the tools. (Ford Depo. at 27-28).

27. Mr. Brown asked Officer Ford to give him a few days to get the tools back. *Id*.

28. Officer Ford told Mr. Brown that he, Officer Ford, was going to call the police and Mr. Brown could tell his story to them. *Id*.

29. Mr. Brown then ran from the house and Officer Ford chased after him. (Ford Depo. at 29). Officer Ford lost sight of Mr. Brown who had ran into an alley. (Ford Depo. at 30).

30. Officer Ford was off-duty and not in uniform but he did have his police issued radio, serve weapon and police identification on him. (Ford Depo. at 32-35).

31. When uniformed officers arrived, Officer Ford spoke with a Detective Tecobaum who told Officer Ford that he would seek a warrant for Mr. Brown due to the value of the tools. (Ford Depo. at 37).

32. Officer Ford was told by an "official" who had also arrived on the scene told him to "leave it alone." (Ford Depo. at 36).

33. Officer Ford knew that once he filed his police report about the missing tools, it would be normal police procedure for the report to be investigated by someone else. (Ford Depo. at 116-117).

34. Neither Detective Tecobaun nor the "official" asked Officer Ford to assist in the arrest of Mr. Brown. (Ford Depo. at 119-120).

35. Sergeant Colin Hall was one of the official who arrived on the scene. (Affidavit of Sergeant Hall). Sergeant Hall told Officer Ford to let the investigators handle the investigation into the theft of his tools. *Id*. Sergeant Hall advised Officer Ford

that based on the information they had at this time, that the case needed to be investigated further and the police may not have probable cause to make an arrest at that. *Id*.  Sergeant hall further told Officer Ford that at "this point Fifth District officers would identify Mr. Brown if he was stopped as part of the investigation." *Id.*

36.     Mr. Brown's brother, Eugene Brown, about the left of the tools.  (Ford Depo. at 104).  According to Officer Ford, Eugene Brown told Officer Ford that he would reimburse Officer Ford for the tools once the house was sold.  (Ford Depo. at 104).

37.     Officer Ford accepted Eugene Brown's offer.  (Ford Depo. at 105).

38.     The events of the day of the shooting Officer Ford was driving on West Virginia Avenue, Neal Street when he saw Mr. Brown walking on West Virginia Avenue.

39.     Officer Ford proceeded through the intersection and parked on West Virginia Avenue.  Officer Ford got out of his car, approached Mr. Brown and said to Mr. Brown "why did you steal from me?"  (Ford Depo. at 141-143).

40.     Ms. Smith-Haynie, she heard Officer Ford say something to the effect of "Gary, I want to talk to you about the tools, it's okay, I talked to your brother." (Exhibit 3).

41.     A confrontation between Officer Ford and Mr. Brown followed resulting in Officer Ford shooting Mr. Brown.

42.     Officer Ford testified that he did not see Mr. Brown with a weapon nor did Mr. Brown stated that he had a weapon. (Ford Depo at 51, 56).

43.     Officer Ford was off-duty at the time of the shooting.

44.     District of Columbia Municipal Regulation, Title 6 A, Chapter 2, § 200.5 provides:  "Member of the force shall promptly obey any order emanating from a superior officer."

45.     MPD Code of Ethics as setforth in General Order (GO) RAR-201.36 which provides in pertain part: "I will never act officiously or permit personal feeling, prejudices, political beliefs, aspirations, animosities, or friendships to influence my decisions."

46.     MPD GO 201.26 § Part I, B (28) prohibits a police officer from interfering in the investigation of another police officer.

47.     Officer Ford was not acting within the scope of his employment when he shot and killed Mr. Brown on February 22, 2006.

Respectfully submitted,

PETER J. NICKLES
Acting Attorney General

GEORGE VALENTINE
Deputy Attorney General
Civil Litigation Division

NICOLE L. LYNCH [471953]
Assistant Attorney General
Civ. Lit. Div., Chief Section II

/s/David A. Jackson/s/_____
DAVID A. JACKSON [471535]
Assistant Attorney General
Office of the Attorney General
441 Fourth Street, NW, 6 South
Washington, D.C.  20001
Direct Line: (202) 724-6618
Facsimile: (202) 727-3625
E-mail:  davida.jackson@dc.gov