UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**TAKAISHA HENDERSON,** *et al.*            :
                                            :
    **Plaintiffs,**                         :
                                            :
                                            :
    **v.**                                  :        **1:06CV00947**
                                            :        **Judge Kennedy**
**DISTRICT OF COLUMBIA,** *et al.*          :
                                            :
    **Defendants.**                         :

### DEFENDANT EDWARD FORD'S OPPOSITION TO
### DEFENDANT DISTRICT OF COLUMBIA'S MOTION
### FOR PARTIAL SUMMARY JUDGMENT

Defendant Edward Ford, by and through counsel, hereby opposes Defendant District of Columbia's motion for summary judgment. The basis for this opposition is two fold: (1) as a matter of law, in the District of Columbia, Officer Edward M. Ford's shooting of Ignatius Brown on February 22, 2006 was clearly within the scope of his employment as a police officer with the District of Columbia Metropolitan Police Department; and (2) at a bare minimum, there exists a jury question as to whether Officer Ford took police action on February 22, 2006, when he approached Ignatius Brown, a suspect Officer Ford believed had an outstanding felony warrant at the time of the shooting.

This opposition is supported by the attached memorandum of points and authorities. A proposed order is also attached.

Respectfully Submitted,


/s/ James W. Pressler, Jr. /s/
James W. Pressler, Jr. [221051]
Marc L. Wilhite [468535]

PRESSLER & SENFTLE, P.C.
Three McPherson Square
927 15th Street, N.W.
12th Floor
Washington, D.C. 20005
(202) 822-8384

ATTORNEYS FOR DEFENDANT
EDWARD FORD


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of *Defendant Edward Ford's Opposition to Defendant District of Columbia's Motion for Partial Summary Judgment,* the accompanying Memorandum of Points and Authorities in Support thereof, and a proposed Order was e-served, and mailed first-class, postage prepaid this 28th day of May, 2008, to:


David Jackson, Esq.
Office of the Attorney General
441 Fourth Street, N.W., 6 South
Washington, D.C. 20001

Adam R. Leighton, Esq.
Cohen & Cohen, P.C.
1821 Jefferson Place, N.W.
4th Floor
Washington, D.C. 20036


/s/ James W. Pressler, Jr. /s/
James W. Pressler, Jr. [221051]

## TABLE OF AUTHORITIES

**Cases:**

*Anderson v. Liberty Lobby*, 477 U.S. 242 (1986) ............................................................... 5

*District of Columbia v. Coron*, 515 A.2d 435 (D.C. 1986) .................................... 15, 16, 17

*District of Columbia v. Davis*, 386 A.2d 1195 (1978) .......................................................... 12

*Harrison v. May Department Stores Co., Inc.*, D.C. App., 381 A.2d 610 (1977) ................ 5

*Hoston v. Silbert*, 681 F.2d 876 (D.C. Cir. 1982) .............................................................. 5

*Johnson v. Weinberg*, 434 A.2d 404 (D.C. 1981) (*Johnson I*) ................................ 6, 7, 8

*Jordan v. Medley*, 711 F.2d 211 (D.C. Cir. 1983) ...................................... 9, 15, 17

*Kimbro v. Velten,* 30 F.3d 1501 (D.C. Cir. 1994) ............................................................. 5

*Maddox v. Bano,* 422 A.2d 763 (D.C. 1980) ...................................................................... 5

*Majano v. U.S.*, 469 F.3d 138 (D.C. Cir. 2006) ................................................................ 5

*Penn Central Transportation Co., v. Reddick*, 398 A.2d 27 (D.C. 1979) ......................... 9

*Presley v. Commercial Credit Corp.*, 177 A.2d 916 (D.C. Mun. App. 1962) ................... 17

*Turner v. American Motors General Corp.*, D.C. App., 392 A.2d 1005, 1006 (1978) ........ 5

*Washington Metropolitan Area Transit Authority v. Jones*, 443 A. 2d 45 (D.C. 1982) ...... 5

*Weinberg v. Johnson*, 518 A.2d 985 (D.C. 1986) (*Johnson II*) ............................ 5, 9, 13

**Treatises**

Restatement (Second) of Agency § 228 (1957) ................................................................ 6, 7

Restatement (Second) of Agency § 245 (1957) ................................................................ 6, 9

**D.C. Municipal Regulations**

Title 6A DCMR, Chapter 2, § 200.4 .................................................................................7, 9

Title 6A DCMR, Chapter 2, § 200.5 ..................................................................................14

**Metropolitan Police Department General Orders**

General Order 201.26 ...................................................................................................13, 14

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **TAKAISHA HENDERSON, et al.** | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | **1:06CV00947** |
| | : | **Judge Kennedy** |
| **DISTRICT OF COLUMBIA, et al.** | : | |
| | : | |
| **Defendants.** | : | |

**MEMORANDUM OF POINTS OF AUTHORITIES IN SUPPORT OF**
**DEFENDANT EDWARD FORD'S OPPOSITION TO DEFENDANT**
**DISTRICT OF COLUMBIA'S MOTION FOR SUMMARY JUDGMENT**

## I.    PRELIMINARY STATEMENT

This case arises out of the February 22, 2006 conflict between Ignatius Brown ("Mr.

Brown") and Defendant Edward Ford ("Officer Ford"), a Metropolitan Police Department

("MPD" or "Department") officer.  Mr. Brown died from a gunshot as a result of that interaction.

Thereafter, Mr. Brown's children, Takaisha Henderson, Shakia Brown and Terrell Brown, filed

suit against Officer Ford and his employer, the District of Columbia, alleging seven separate

counts against the Defendants.

In its Answer, Defendant District of Columbia asserts that Officer Ford acted outside the

scope of his employment during his role in the shooting death of Mr. Brown, and thus the

District should not be held liable for his actions.  On April 8, 2008, after limited discovery was

conducted on the issue of Officer Ford's scope of employment with the District of Columbia, the

District filed a Motion for Partial Summary Judgment as to Counts I, II, and V of the Complaint,

claiming that Officer Ford acted outside the scope of his employment when he shot Mr. Brown

in self-defense. Officer Ford now files his opposition to that motion, asserting that he was acting within the scope of his employment with the Metropolitan Police Department.

## II.    STATEMENT OF FACTS

Several weeks prior to the February 22, 2006 death of Mr. Brown, Officer Ford's girlfriend, Jessica Smith-Haynie, began contemplating the purchase of a single-family residence located at 1247 Oates Street, Northeast, in Washington, D.C., which was then owned by Mr. Brown's mother (Ford Dep. 16). Ms. Smith-Haynie became aware that the house was for sale as a result of her long time friendship with the Brown family. When Ms. Smith-Haynie initially decided to look at the Oates Street house, Officer Ford accompanied her on a walk-through of the home. During the walk-through, Officer Brown and Ms. Smith-Haynie examined the deteriorating condition of the house, and Officer Ford was introduced to Mr. Brown, who was then residing at the house. *Id.* at 15-17.

In the weeks following, Ms. Smith-Hainey agreed to purchase the Oates Street property from Mr. Brown's mother. Because of the poor condition of the house, the parties further agreed to permit Ms. Smith-Hainey on the property so that she could begin to conduct repairs prior to the closing date. Mr. Brown continued to reside at the Oates Street residence after Ms. Smith-Hainey agreed to purchase the house. *Id* at 17-19. Because Mr. Brown was unemployed, and in need of a job, Officer Ford offered him $200 to complete various repairs to the house while he resided there. *Id.* at 20-22. Officer Ford, however, completed many of the repairs himself. He estimates that he saw Mr. Brown approximately 20-30 times prior to the February 22, 2006 incident. *Id.* at 20. On many of those occasions, Officer Ford drove to the house immediately after he had finished his shift with the Metropolitan Police Department, still wearing his police uniform. *Id.* at 23.

During the course of the renovations, Officer Ford brought to the Oates Street house a variety of tools, including table saws, nailing guns, finishing guns, compressors, compressor hoists, levelers, hammers, and nails. He left the tools at the house overnight. *Id* at. 23-24. On or about February 16, 2006, Officer Ford noticed that his tools were missing from the house. He immediately reported the missing tools to the police department, which responded within an hour to the Oates Street house. *Id*. at 24-25. He apprised them of the situation, including Mr. Brown's access to the house and the tools. Later that evening, Mr. Brown returned to the Oates Street house, at which time Officer Ford confronted him about the missing tools. *Id*. at 27-28. Officer Ford testified that he informed Mr. Brown that he was going to call the police based on his belief that Brown had the tools in his possession. According to Officer Ford, Mr. Brown then fled from the house down an alley. Officer Ford gave chase but was unable to find Mr. Brown. *Id*. at 30. Officer Ford made a call over his radio for the assistance of other officers. *Id*. at 32-35. One of the responding officials, Detective Tecobaum informed Officer Ford that he would seek a felony arrest warrant due to the value of the tools. *Id*. at 37. The officers were unable to apprehend Mr. Brown on February 16, 2006.

Several days thereafter, but prior to the February 22, 2006 shooting, Officer Ford met with Mr. Brown's brother, Eugene Brown, who agreed to reimburse Officer Ford for the value of the missing tools. *Id*. at 104-105.

On February 22, 2006, Officer Ford and Ms. Smith-Haynie were driving on West Virginia Avenue, Northeast, towards Ms. Smith-Haynie's residence on Neal Street, Northeast. Officer Ford was off-duty at the time. When Officer Ford reached the intersection of West Virginia and Neal Street, he observed Mr. Brown walking on West Virginia Avenue. Officer Ford pulled over to the side of the road and parked his vehicle. He then approached Mr. Brown,

3

operating under the assumption that the Department had issued a felony arrest warrant based on

Mr. Brown's alleged theft of Officer Ford's tools. *Id*. at 45, 139. Since he was off-duty, Officer

Ford's intent was to detain Mr. Brown until the arrival of backup officers who would be able to

conduct a warrants check, and then assist him with the arrest. *Id*. at 45.

     After he confronted Mr. Brown, Officer Ford identified himself as a Metropolitan Police

Department Officer, and asked for a woman sitting on a nearby porch to call the police for

assistance. *Id*. at 47. Thereafter, Mr. Brown became increasingly agitated about the prospect of

incarceration. He then took off his book bag and started pacing back and forth. *Id*. at 48. Mr.

Brown then began swinging his arms wildly and making karate-type moves in the direction of

Officer Ford, making physical contact with him on several occasions. *Id*. at 49. Mr. Brown

became more aggressive in his maneuvers. *Id*. at 49-50. As a result of Mr. Brown's erratic

behavior, Officer Ford retreated and attempted to reason with Mr. Brown, who refused to

cooperate, stating that he refused to go back to jail. *Id*. at 50.

     Officer Ford continued to retreat toward the corner of West Virginia Avenue and Neal

Street. However, when Mr. Brown lunged towards him for the third time, Officer Ford reached

for his service weapon, located near the small of his back on the right side. *Id*. at 50. Mr. Brown

continued to make karate-type moves in the direction of Officer Ford, even as Officer Ford

revealed his weapon being held in the long arm position. *Id*. at 51. After Mr. Brown reiterated

his refusal to cooperate, he charged aggressively toward Officer Ford and then leaped at him.

Officer Ford then raised his weapon and discharged it once at the center of Mr. Brown's chest.

*Id*. at 53.

III.    **STANDARD FOR SUMMARY JUDGMENT**

Summary judgment is an extreme remedy which should only be granted when there exists no material facts in dispute. *Maddox v. Bano,* 422 A.2d 763 (D.C. 1980). Also, the proponent of such a motion must shoulder the burden of proof while the opposing party is entitled to all favorable inferences that can be drawn from the evidence. *Turner v. American Motors General Corp.*, D.C. App., 392 A.2d 1005, 1006 (1978); *Harrison v. May Department Stores Co., Inc.*, D.C. App., 381 A.2d 610 (1977). Material facts relate to the substantive law governing the case and are those facts which would affect the outcome of the case. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). It is "only in a case where the facts are undisputed and, considering every legitimate inference, only one conclusion may be drawn, that the trial court may rule as a matter of law." *Washington Metropolitan Area Transit Authority v. Jones*, 443 A. 2d 45, 50 (D.C. 1982).

IV.    **ARGUMENT**

A.    **AS A MATTER OF LAW, THE DISTRICT'S MOTION FOR SUMMARY JUDGMENT MUST BE DENIED BECAUSE OFFICER FORD'S CONDUCT WAS WELL WITHIN HIS SCOPE OF EMPLOYMENT AS A POLICE OFFICER.**

It is well settled that the District of Columbia recognizes the doctrine of *respondeat superior*. Specifically, *respondeat superior* is a doctrine of vicarious liability which imposes liability on employers for any and all tortious conduct proven to be committed by their employees within the scope of their employment. *See Weinberg v. Johnson*, 518 A.2d 985, 988 (D.C. 1986) (*Johnson II*). As articulated by Defendant District of Columbia, scope of employment questions are governed by the law of the jurisdiction where the employment relationship exists. *See Kimbro v. Velten,* 30 F.3d 1501, 1506 (D.C. Cir. 1994); *Majano v. U.S.*, 469 F.3d 138, 141 (D.C. Cir. 2006); *Hoston v. Silbert*, 681 F.2d 876 (D.C. Cir. 1982). As such,

in order for the Court to properly make its scope of employment determination concerning

Officer Ford's actions within the Metropolitan Police Department, the Court shall be guided by

the law of the District of Columbia.

> **1.    The Legal Principles Cited by Defendant District of Columbia Support a Finding that Officer Ford Acted Within the Scope of His Employment.**

The seminal case of *Johnson v. Weinberg*, 434 A.2d 404, 408 (D.C. 1981) (*Johnson I*),

relied on by Defendant District of Columbia, involved a shooting between a customer and a

laundromat employee over a dispute about missing shirts.  There, the court looked to the

Restatement (Second) of Agency (1957) for guidance to determine whether the evidence

disclosed "any basis upon which a juror could find that the shooting did occur within the scope

of [the employee's] employment."  *Id.*  Specifically, § 228 of the Restatement provides, in

relevant part, that the conduct of a servant (employee) is within the scope of employment if:

    (a)  it is of the kind he is employed to perform;

    (b)  it occurs substantially within the authorized time and space limits;

    (c)  it is actuated, at least in part, by a purpose to serve the master; and

    (d)  if force is intentionally used by the servant against another, the use of force is not

unexpectable by the master.

Restatement (Second) of Agency § 228.

Furthermore, the Court in *Johnson I* cited § 245 of the same Restatement which sets forth

specific instances where force is used, and states:

> A master is subject to liability for the intended tortious harm by a servant to the person or things of another by an act done in connection with the servant's employment, ***although the act was unauthorized,*** if the act was not unexpected in view of the duties of the servant.

Restatement (Second) of Agency § 245 (emphasis added).

Assessing the vicarious liability of the employer, the Court in *Johnson I* also stated that "in determining whether an assault occurred within the scope of employment, we look at the nature of the employee's job, whether the assault occurred while the employee was furthering his employer's business, whether the act was personal in nature and wholly unrelated to the employment relationship, and whether the act was totally unprovoked and unexpected." *Id.* at 408.

Here, as in *Johnson I,* each of the elements set forth in the Restatement demonstrates that Officer Ford's actions were well within the scope of his employment as a police officer with the Metropolitan Police Department. First, it is undisputed that Edward M. Ford is an Officer within the Department. As set forth in the Restatement (Second) of Agency, § 228, Officer Ford's actions shall be deemed in the scope of his employment if they are the "kind he is employed to perform." As a police officer, Officer Ford is expected to investigate crimes and apprehend suspects. Unfortunately, part of a police officer's responsibility may also include discharging their service weapon, as in this case; however, that is part and parcel with what Officer Ford was hired to do – serve and protect the citizens of the District of Columbia.

Second, it is equally undisputed that Officer Ford's police action was within the "authorized time and space limits," as required. Title 6A, DCMR, Chapter 2, § 200.4 provides, in part, that "[m]embers of the force shall be held to be always on duty. . ." Even though Officer Ford acknowledged that when he saw Mr. Brown on February 22, 2006, he was not working a scheduled tour of duty, under the law of the District of Columbia, police officers are always on duty and, within the District of Columbia, have police powers to effectuate an arrest. Title 6A DCMR, Chapter 2, § 200.4. Here, it is acknowledged by Defendant District of Columbia that this incident took place on West Virginia Avenue, N.E., in Washington, DC. *See Defendant*

*District of Columbia's Memorandum of Points and Authorities in Support of its Motion for Partial Summary Judgment* at 4.

Third, the evidence, as set forth below, clearly demonstrates that Officer Ford's actions were taken "at least in part, …to serve the [Metropolitan Police Department]." During Officer Ford's deposition, he testified that when he approached Mr. Brown, he believed there was an outstanding felony warrant for his arrest (Ford Dep. 45: 14-17). Moreover, in an effort to try and detain Mr. Brown on the scene, he identified himself to a female bystander (Ms. Nancy Jackson) as a police officer and physically showed her his badge and ID (Ford Dep. 46:7 – 47: 4). Such actions were clearly taken to serve the Metropolitan Police Department and its interest in apprehending suspected criminals.

Fourth, given that Edward Ford is a police officer, the intentional use of force would never be "unexpectable" by the Metropolitan Police Department because all police officers are issued service weapons, asp batons, OC sprays and handcuffs (Ford Dep. 60: 18 – 61: 20). The Department trains its officers how to control agitated suspects and when it is appropriate to use deadly force in certain circumstances. Consequently, the discharge of a weapon by a police officer is necessarily, by practice, a foreseeable circumstance.

Therefore, contrary to the assertions of Defendant District of Columbia, *Johnson I* requires that this Court find that Officer Ford's police action was in the scope of his employment as a sworn police officer. Moreover, the Court in *Johnson I* held that although the laundromat employee shot a customer as a result of a ***personal dispute***, the assault itself arose out of a transaction that brought the victim to the laundromat; therefore, it was a question of fact for the jury to decide. *Johnson I*, 434 A.2d at 404. In this case, similarly, it is undisputed that the genesis of the conflict between Mr. Brown and Officer Ford stems from Mr. Brown stealing

Officer Ford's tools; however, given that Officer Ford is a police officer, and he believed there was an outstanding warrant for Mr. Brown's arrest in connection with the theft of his tools, as a sworn police officer, it was Officer Ford's duty to take police action on behalf of the Department and apprehend Mr. Brown. *See Johnson II*, 518 A.2d at 988 (stating that the "employer does not avoid liability for the employee's intentional torts, however, if the tort is committed partially because of a personal motive, such as revenge, as long as 'the employee [is] actuated, ***at least in part***, by a desire to serve his principal's interest'" (emphasis added); *quoting Jordan v. Medley*, 711 F.2d 211 (D.C. Cir. 1983); Restatement (Second) of Agency § 245, comment f (1958).

As such, the evidence demonstrates that Officer Ford's actions were, at least in part, an "outgrowth of a job-related controversy"; therefore, the Metropolitan Police Department cannot now divorce itself of any potential liability stemming from the police actions taken by Officer Ford. *See Johnson I*, 434 A.2d at 408; *Penn Central Transportation Co., v. Reddick*, 398 A.2d 27, 32 (D.C. 1979).

> **2.    The Undisputed Evidence in the Record Shows that Officer Ford's Actions on February 22, 2006 Were Within the Scope of His Employment.**

A brief review of the evidence in the record demonstrates that when Officer Ford approached Mr. Brown on February 22, 2006, he did so in his capacity as a police officer. It is undisputed that Officer Ford believed that Mr. Brown had committed a crime and that there was a warrant out for his arrest (Ford Dep. 45: 10-13; 141: 5-9). Under D.C. law, if a police officer witnesses a crime or knows there is an outstanding arrest warrant for an individual, that officer must take police action. Title 6A DCMR, Chapter 2, § 200.4.

In fact, Assistant Chief of Police, Peter Newsham, who was previously deposed and designated by the Department as a 30(b)(6) corporate representative concerning the issue "scope

9

of employment," testified that when an officer observes an individual whom they to have an outstanding arrest warrant, "by law they would be required in D.C. to take some form of police action." (Newsham Dep. 30:12-13). In his deposition, Officer Ford testified that through his discussions with Detective Tecobaum, he believed that the Metropolitan Police Department either had issued or was in the process of issuing a felony warrant for the arrest of Mr. Brown (Ford Dep. 37: 4-8). As such, when Officer Ford saw Mr. Brown walking down West Virginia Avenue, N.E., Washington, DC, knowing that he was required to take police action while in the confines of the District of Columbia, Officer Ford stopped his vehicle and approached Mr. Brown in an attempt to detain him until a uniformed officer arrived to conduct a warrant check. Specifically, when questioned about his intention in approaching Mr. Brown on February 22, 2006, Officer Ford, during his deposition, testified that:

> A.:    My intention was to detain him there until a uniform officer showed up on the scene to have that uniform officer run a 1029.
>
> Q.:    When you say a 1029, what is that?
>
> A.:    That is a warrants check, criminal check or however you want to put it.

(Ford Dep. 45: 14-17.) Consequently, the record demonstrates that Officer Ford's actions were in accordance with Defendant District of Columbia's own expectation that Officer Ford would take police action under these circumstances.

Furthermore, during his deposition, Chief Newsham was also questioned about the impact of Officer Ford approaching Mr. Brown off-duty and in plain clothes. While Chief Newsham's testimony makes it clear that the Department does not recommend such behavior, he unequivocally states that such action does not take an officer outside the scope of his employment with the Department (Newsham Dep. 26: 15-18). In fact, Chief Newsham

implicitly acknowledges that an opinion to the contrary would be ludicrous as officers are expected to respond to crime whether they are on or off their tour of duty, and that police officers who are not on their tour of duty may still arrest suspects (Newsham Dep. 26: 19-21, 27: 1-3). When specifically questioned whether off duty arrests placed police officers outside the scope of their employment, Chief Newsham testified as follows:

Q.:    Would it put that outside the scope of employment?

A.:    I'd say it's a fine line, no, probably not.

(Newsham Dep. 33: 2-5).

Furthermore, Chief Newsham testified that if a police officer sees a violation of D.C. law outside of their tour of duty, while in plain clothes, the police officer "could be discipline[d]" if he or she failed to take police action (Newsham Dep. 39-40: 18-21; 1-3).

The Department cannot have it both ways. Officer Ford took police action as required by law, and needed in order to avoid administrative discipline. The Department cannot now be permitted to claim that because it disputes the level of force utilized in effectuating that police action, Officer Ford's conduct is now outside the scope of employment. The evidence clearly shows that when Officer Ford approached Mr. Brown, he did so in furtherance of his duties as a police officer.

As further evidence that Officer Ford approached Mr. Brown in the capacity of a police officer is the fact that Officer Ford promptly identified himself as a police officer to a bystander. In his deposition, Officer Ford testified as follows:

A.:    I asked the young lady that was up on the porch to call the police after I showed her my badge and I verbally told her I was a police officer.

Q.:    Is this before or after you approached Mr. Brown?

11

A.:    This is after.

Q.:    So while you were talking to Mr. Brown you saw a woman on the porch?

A.:    Yes.

Q.:    And this is while you were on West Virginia Avenue?

A.:    Yes.

Q.:    And at that time you pulled out your badge and showed her your badge?

A.:    Yes, I verbally told her, I said, "Excuse me, ma'am, is it possible you can call the

       police?  I'm a police officer."  I reached into my pocket, I pulled out my badge

       and I visually showed her my badge and my ID."

(Ford Dep. 46: 7- 47: 4).  As such, upon examination of all the relevant factors at issue

concerning Officer Ford's interaction with Mr. Brown–a perceived outstanding felony warrant

against Mr. Brown; a law mandating MPD Officers remain on duty at all times; and Officer

Ford's formal pronouncement identifying himself as an Officer of the Metropolitan Police

Department– it is evident that Officer Ford was not only acting within the scope of his

employment, he was engaged in good police work.[1]

---

[1] During his deposition, Chief Newsham opined that Officer Ford's actions were outside the scope of employment, in part, because MPD interpreted Officer Ford's comments after the shooting to mean he accidentally shot Mr. Brown.  Specifically Chief Newsham testified "I would say to accidentally shoot someone would not be within the scope of one's employment." (Newsham Dep. 15: 19-20).  During Officer Ford's deposition, however, he clarified his statement to the Department by stating that the weapon was drawn initially as a deterrent, but after repeated attacks Officer Ford did intentionally shoot Mr. Brown (Ford Dep. 69-70).  Moreover, irrespective of Officer Ford's testimony, Chief Newsham's opinion is a misstatement of the law.  In *District of Columbia v. Davis*, 386 A.2d 1195 (1978), the District of Columbia Court of Appeals addressed the issue of a Metropolitan Police Officer accidentally discharging his service weapon while in the process of unholstering it.  In that case, despite an apparent accidental shooting, the Court of Appeals ruled that the officer's actions were within the scope of employment.  As such, Chief Newsham's testimony to the contrary is without merit.

B.    **DEFENDANT DISTRICT OF COLUMBIA HAS FAILED TO DEMONSTRATE THAT OFFICER FORD APPRAOCHED MR. BROWN ENTIRELY FOR PERSONAL REASONS**.

Defendant District of Columbia asserts that Officer Ford's conduct on February 22, 2006, is outside of the scope of his employment because his actions "were not actuated by a purpose to serve his employer – the District of Columbia Metropolitan Police Department." (Def.'s Mot. Summ. J. 17.) According to Defendant District of Columbia, Officer Ford and Mr. Brown merely had a confrontation in order to resolve a discrepancy that occurred during a personal contractual relationship. *Id.* As its sole evidence, Defendant District of Columbia cites the deposition testimony of Officer Ford where he asked Mr. Brown "why did you steal from me?" *Id.* As a matter of law, however, unless an employee's motivation is completely for his own personal purposes, the employee's actions will be deemed to be within the scope of their employment. *See Johnson II*, 518 A.2d at 988. The key is for the employee's actions to be "actuated, *at least in part*, by a desire to serve his principal's interest." *Jordan,* 228 U.S. App. D.C. at 428 (emphasis added).

Here, the analysis set forth above makes it clear that, at a minimum, Officer Ford's decision to approach Mr. Brown on February 22, 2006, was for reasons that serve the Department. Furthermore, during his deposition, Chief Newsham identified General Order 201.26 as a basis for concluding that Officer Ford's actions were outside of the scope of his employment. However, that very General Order states, in part, that it is "the duty and responsibility of each member of the police force to preserve, protect life and property, prevent crime, *apprehend criminals*, [and] recover lost and stolen property . . .." (Newsham Dep. 22: 7-11) (emphasis added). Moreover, General Order 201.26, Part I, D. 2 states, "[m]embers shall make diligent efforts to arrest or locate wanted persons and to recover stolen and lost property."

13

Here, this is precisely the action that Officer Ford took. General Order 201.26 does not have a limitation or qualifier that prohibits officer involvement in arresting wanted persons if they happen to have personal involvement. In fact, nowhere in any of the Metropolitan Police Department general orders does it affirmatively say that if an officer has some personal involvement with a suspect that the involved officer must stay away from a suspect or remove himself from an investigation. Consequently, the mere fact that Officer Ford knew Mr. Brown and reported to the Department his suspicion that Mr. Brown had stolen his tools, is insufficient to establish that Officer Ford could not participate in the arrest or investigation related to this crime.

In an effort to rectify this glaring deficiency, Defendant District of Columbia also contends that Officer Ford was not acting within the scope of his employment as an MPD Officer on February 22, 2006 because "his actions were in direct violation of the District's Municipal Regulations…" (Def.'s Mot. Summ. J. 18). Particularly, Defendant District of Columbia alleges that Officer Ford violated Title 6A, DCMR, Chapter 2, § 200.5 by failing to obey an order from a superior officer when Sergeant Colin Hall, on February 16, 2006, told Officer Ford to allow the investigators to handle the investigation of the theft of Defendant Ford's tools. (Hall Aff. 1). As evidenced by the language used in Sgt. Hall's affidavit, however, his discussion with Officer Ford did not constitute "an order." Specifically, Officer Ford testified that, to constitute an official order, the police official must express to a subordinate: "this is an order." Officer Ford made it very clear during his deposition that "[t]hose words were never spoken," concerning his involvement with the investigation (Ford Dep. 121: 4-17). Consequently, Officer Ford was not precluded from approaching or apprehending Mr. Brown. When questioned during his deposition about the discussion Officer Ford had with MPD officials, Officer Ford testified that

14

an official simply told him to "leave it alone *at that time*." (Ford Dep. 36: 6-8) (emphasis added). This is further evidence that, according to Officer Ford, he was not being definitively instructed to stay away from Mr. Brown or to avoid participation in his apprehension.

It should also be noted that Officer Ford's ability to participate in the investigation notwithstanding, he chose not to do so. In fact, it was mere chance that led him to Mr. Brown on February 22, 2006, when Officer Ford happened to see him walking down the street while he was driving home for lunch (Ford Dep. 42: 17-19). As such, Officer Ford's actions can neither be construed to be personal nor investigatory in nature, but merely an effort to capture a believed fugitive. Such actions were certainly required under the law and within the scope of his employment as a police officer.

C.     **THE FACTS IN THE CASES RELIED ON BY DEFENDANT DISTRICT OF COLUMBIA ARE MATERIALLY DISTINGUISHABLE FROM OFFICER FORD'S ACTIONS.**

In support of its scope of employment argument, Defendant District of Columbia relies heavily on two cases – *District of Columbia v. Coron*, 515 A.2d 435 (D.C. 1986) and *Jordan, supra.*. Each case is materially distinguishable from this matter. Specifically, *Coron* is a case that also addressed the actions of an off-duty MPD officer. In that case, a police officer was driving his personal vehicle down Wisconsin Avenue in Georgetown with a fellow officer. Both officers were en route to a bar when a pedestrian, believing that the officer's car was driving too close to him in the intersection of Wisconsin and Dumbarton Street, kicked the officer's car. In response, the officers immediately stopped the car, exited the vehicle, and assaulted the pedestrian. In light of the purely personal nature of their actions, the Court found that the officer's actions were outside the scope of employment.

Here, the evidence shows that Officer Ford's actions were not purely personal in nature, but that of a seasoned and professional police officer. As previously indicated, after Officer Ford approached Mr. Brown he identified himself to an onlooker as a police officer, showed the citizen his badge and ID and requested that she call 911 for assistance. All of these actions took place *before* Officer Ford used any force against Mr. Brown. Conversely, in *Coron*, the officers displayed their police badges *after* the use of force. *Coron,* 515 A.2d at 437. Clearly, Officer Ford's actions were not purely personal in nature, as he conducted himself during the contact with Mr. Brown in a courteous and professional manner in his attempt to detain and apprehend Mr. Brown. As such, the Court's determination in *Coron* that the officer "did not handle the situation in a manner expected of a police officer [and that the] incident reflected that of an individual bent on personal vengeance for a perceived personal affront" is inapplicable to the facts of the present case. *Id.* at 438.

Moreover, another important distinction between *Coron* and the matter before this Court is the officer's perception of an arrest warrant. A week prior to the shooting, Officer Ford spoke with Detective Tecobaum who assured him that MPD was going to secure a warrant for Mr. Brown's arrest (Ford Dep. 37: 4-8). Consequently, at the time Officer Ford saw Mr. Brown walking down West Virginia Avenue, on February 22, 2006, he had reason to believe that there was a warrant out for Mr. Brown's arrest (Wax Dep. 33: 5-13). As a police officer under these circumstances, Officer Ford was required to take police action. General Order 201.26, Part I, D, 2; Newsham Dep. 30:12-13). Conversely, the officer in *Coron* was not pursuing an individual who he believed had an outstanding arrest warrant. Moreover, the officer in *Coron* was equally not interested in properly investigating a potential violation committed by the pedestrian,[2] but

---

[2] In response to nearly being hit by a vehicle, the pedestrian kicked the car.

rather saw fit to immediately retaliate in a personal and unprofessional manner.  As such, the facts in *Coron* are easily distinguishable from the actions taken by Officer Ford.

With respect to *Jordan*, Defendant District of Columbia's reliance on this case is curious. In that case, the D.C. Circuit Court concluded that a jury instruction was erroneous and that, if permitted to stand, would amount to a directed verdict on the issue of scope of employment; therefore, the issue was properly left for the jury to decide.  *Id*. at 215-216.  As such, the Court did not conclude as a matter of law that Larry Medley was not acting within the scope of his employment.  Therefore, Defendant District of Columbia's reliance on this case to bolster their scope of employment argument is misguided.

In fact, if anything, the facts of *Jordan* are materially distinguishable from this case.  In *Medley*, Plaintiffs Mrs. Jordan and Mr. Graham were the tenants of an apartment owned by the Medleys.  The Medleys' son, Larry Medley, assisted his parents with the management of the apartment building where the Plaintiffs lived.  *Jordan, supra* at 211.  After Larry Medley and his father delivered a letter indicating an increase in rent, an argument occurred between Mrs. Jordan and the son, Larry Medley.  Ultimately, during a subsequent argument concerning the rent increase, Larry Medley retrieved his semi-automatic rifle from his truck, loaded it with ammunition and went back to continue the argument with Mrs. Jordan.  Thereafter, the Plaintiffs sued the Medleys for assault and intentional infliction of emotional distress.  *Id*. at 213. As the Court noted in *Jordan*, "[t]o be within the scope of employment, the conduct of the servant must be of the same general nature as that authorized or incidental to the conduct authorized." *Id*; *citing Presley v. Commercial Credit Corp*., 177 A.2d 916, 918 (D.C. Mun. App. 1962).  While carrying a rifle is not conduct that is within the general nature or incidental to being a residential manager of an apartment building, carrying a service weapon, as an MPD officer, is not only

17

authorized conduct, but required conduct. Specifically, at the time of this incident in February 2006, MPD General Orders required that police officers carry their service weapons at all times. Ford Dep. 62:3-5; Wax Dep. 37:14-38:15. Consequently, Defendant District of Columbia's Motion for Summary Judgment is without merit.

WHEREFORE, for the foregoing reasons, Defendant Edward M. Ford requests that the Court deny Defendant District of Columbia's Motion for Partial Summary Judgment.

Respectfully Submitted,

/s/ James W. Pressler, Jr. /s/
James W. Pressler, Jr. [221051]
Marc L. Wilhite [468535]

PRESSLER & SENFTLE, P.C.
Three McPherson Square
927 15th Street, N.W.
12th Floor
Washington, D.C. 20005
mwilhite@presslerpc.com
(202) 822-8384

ATTORNEYS FOR DEFENDANT
EDWARD M. FORD

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

TAKAISHA HENDERSON, *et al.*              :
                                          :
    Plaintiffs,                       :
                                          :
                                          :
    v.                                :        **1:06CV00947**
                                          :        **Judge Kennedy**
DISTRICT OF COLUMBIA, *et al.*            :
                                          :
    Defendants.                       :

### ORDER

Upon consideration of Defendant District of Columbia's Motion for Summary Judgment,

and all Opposition thereto, it is this _____ day of _____, 2008,

**ORDERED** that the motion is hereby **DENIED**; and it is further

**ORDERED**, that, as a matter of law, Defendant Ford was acting within the scope of his

employment as a Metropolitan Police Department officer on February 22, 2006.


                                      _____
                                        Judge, United States District Court
                                        District of Columbia

cc:    David Jackson, Esq.
       Office of the Attorney General
       441 Fourth Street, N.W., 6 South
       Washington, D.C. 20001

       Adam R. Leighton, Esq.
       Cohen & Cohen, P.C.
       1821 Jefferson Place, N.W.
       4th Floor
       Washington, D.C. 20036

       James W. Pressler, Jr., Esq.
       Marc L. Wilhite, Esq.
       PRESSLER & SENFTLE, P.C.
       927 15th Street, N.W., 12th Floor
       Washington D.C. 20005

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **TAKAISHA HENDERSON,** *et al.* | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | **1:06V00947** |
| v. | : | **Judge Kennedy** |
| | : | |
| **DISTRICT OF COLUMBIA,** *et al.* | : | |
| | : | |
| **Defendants.** | : | |

**DEFENDANT EDWARD FORD'S STATEMENT OF**
**MATERIAL FACTS TO WHICH THERE IS NO GENUINE ISSUE**

Defendant Edward Ford, by and through counsel, hereby submits the following statement of material facts to which there is no genuine issue.

1. On February 22, 2006, Defendant Edward Ford ("Officer Ford") was employed by the District of Columbia as a Metropolitan Police Department Officer. (Ford Dep. 8-15)

2. Title 6A DCMR, Chapter 2, § 200.4 states that District of Columbia police officers are held to be always on duty, and Officer Ford knew this in February 2006. (Ford Dep. 31-32, 37)

3. MPD General Order 201.26, Part I, D. 2, requires police officers to make diligent efforts to arrest or locate wanted persons, and Assistant Chief Peter Newsham acknowledges that this General Order was in place in February 2006. (Newsham Dep. 37)

4. On February 22, 2006, Officer Ford was carrying his Metropolitan Police Officer badge and service weapon. (Ford Dep. 46, 50, 51, 62)

5. In February 2006, the Metropolitan Police Department required off-duty officers to carry their service weapon, ID and badge at all time. (Ford Dep. 62)

6. Several weeks prior to the February 22, 2006 occurrence, Officer Ford's girlfriend, Jessica Smith-Haynie, contracted to purchase a residence located at 1247 Oates Street, Northeast, in Washington, D.C., which was owned by Ignatius Brown's mother at the time of the agreement. (Ford Dep. 16)

7. Ignatius Brown resided at 1247 Oates Street when Ms. Smith-Haynie contracted to purchase the house. (Ford Dep. 17-19)

20

8.     Officer Ford left various tools at the 1247 Oates Street house while Ignatius Brown was residing there. (Ford Dep. 23-24)

9.     On or about February 16, 2006, Officer Ford went to 1247 Oates Street to work on renovations when he noticed that his tools were missing. (Ford Dep. 23-24)

10.    On the evening of February 16, 2006, Officer Ford confronted Ignatius Brown at 1247 Oates Street about the missing tools. (Ford Dep. 27-28.)

11.    On the evening of February 16, 2006, Ignatius Brown fled the Oates Street residence after Officer Ford indicated that he needed to call the police regarding the missing tools. (Ford Dep. 28-29)

12.    On the evening of February 16, 2006, Officer Ford called the police as Ignatius Brown fled from the scene. (Ford Dep. 33-34)

13.    On the evening of February 16, 2006, several members of the Metropolitan Police Department responded to Officer Ford's call.  Officer Ford was told by Detective Tecobaum of the Metropolitan Police Department that he would seek a felony arrest warrant for Mr. Brown based on the value of the stolen tools. (Ford Dep. 36)

14.    On February 16, 2006, in reference to the pursuit of Ignatius Brown, Detective Tecobaum told Officer Ford to "leave it alone at that time." (Ford Dep. 36)

15.    Officer Ford never received an order to avoid all contact with Ignatius Brown following the February 16, 2006 incident. (Hall Aff. 1)

16.    On February 22, 2006, Officer Ford was traveling on West Virginia Avenue, Northeast, near Neal Street, Northeast, with his girlfriend, Jessica Smith-Haynie, when he saw Ignatius Brown walking along West Virginia Avenue. (Ford Dep. 43)

17.    On February 22, 2006, Officer Ford confronted Ignatius Brown under the belief that the Metropolitan Police Department had issued a warrant for Mr. Brown's arrest based on the alleged theft of Officer Ford's tools. (Ford Dep. 45)

18.    On February 22, 2006, during his confrontation with Ignatius Brown on West Virginia Avenue, Northeast, Officer Ford identified himself as a Metropolitan Police Department Officer to onlooker Nancy Jackson, and showed her his badge, before asking her to call the police for assistance with the arrest of Ignatius Brown. (Ford Dep. 46-47)

19.  After Officer Ford confronted Ignatius Brown, Mr. Brown became agitated and increasingly aggressive, making karate-type motions in Officer Ford's direction. (Ford Dep. 48-50)

20.  As Ignatius Brown continued to assault and make physical contact with Officer Ford, Officer Ford retreated backwards from Brown's attacks. (Ford Dep. 49-50)

21.  Officer Ford did not draw his service weapon until Ignatius Brown lunged at him for a third time. (Ford Dep. 50)

22.  Ignatius Brown continued to express his reluctance to return to jail, stating, "I'm going to meet my maker, whatever you have got to do because I'm not going back to jail." (Ford Dep. 51)

23.  Officer Ford was acting within the scope of his employment when he shot Ignatius Brown in self-defense on February 22, 2006.

Respectfully Submitted,

/s/ James W. Pressler, Jr. /s/
James W. Pressler, Jr. [221051]
Marc L. Wilhite [468535]

PRESSLER & SENFTLE, P.C.
Three McPherson Square
927 15th Street, N.W.
12th Floor
Washington, D.C. 20005
mwilhite@presslerpc.com
(202) 822-8384

ATTORNEYS FOR DEFENDANT
EDWARD M. FORD